**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**COLUMBUS DIVISION**

| | | |
|---|---|---|
| **MARK CHANGIZI,** | ) | |
| **MICHAEL P. SENGER,** | ) | |
| **DANIEL KOTZIN,** | ) | |
|    *Plaintiffs*, | ) | **COMPLAINT** |
| | ) | **FOR DECLARATORY AND** |
|  v. | ) | **INJUNCTIVE RELIEF** |
| | ) | |
| **DEPARTMENT OF HEALTH AND** | ) | |
| **HUMAN SERVICES;** | ) | |
| **VIVEK MURTHY, United States** | ) | |
| **Surgeon General, in his** | ) | |
| **official capacity, and** | ) | |
| **XAVIER BECERRA,** | ) | |
| **Secretary of the Department** | ) | JURY TRIAL DEMANDED |
| **of Health and Human Services,** | ) | |
| **in his official capacity,** | ) | |
| | ) | |
|    *Defendants*. | ) | |

## INTRODUCTORY STATEMENT

The Plaintiffs in this case—Michael P. Senger, Mark Changizi, and Daniel Kotzin—became active on Twitter, one of the world's largest social media platforms, starting around March 2020. All three Plaintiffs focused their accounts on criticizing restrictions imposed by governments and public health authorities in response to COVID-19. Over the course of the pandemic, the three accrued at least tens of thousands of followers and are influential on Twitter as well as other social media platforms. Their activities on Twitter provided them with a social network and the ability to express their views, to hear the views of others, and to engage with detractors and fans alike.

The White House began a coordinated and escalating public campaign to stop the flow of alleged "health misinformation" related to COVID-19 in May of 2021. On May 5, White House

1

Press Secretary Jen Psaki stated that the President believed social media platforms have a responsibility to censor health "misinformation" related to COVID-19 vaccinations, they needed to do more to effectuate this end, and that the President believed "anti-trust" efforts were in order. This assertion clearly conveyed a thinly veiled threat that, if tech companies refused to censor, there would be unwelcome consequences. Logically, plans to launch this intimidation campaign must have begun prior to this initial public statement on the subject.

In July of 2021, Surgeon General Vivek Murthy and the Department of Health and Human Services (HHS) ratcheted up the pressure by, *inter alia*, issuing an advisory on the subject ("July Advisory"). They again directed much of their ire towards social media platforms, which they largely blamed for the problem of ostensible "misinformation," ordering social media companies, like Twitter, to remove certain posts and ban certain users. Statements made by Murthy, Psaki, and President Joe Biden made clear that these were not requests, but demands, and that the administration was contemplating penalties against social media platforms for allowing "misinformation" to be disseminated on them. As reporters pointed out during press conferences held on July 15 and 16, 2021, what the public health establishment deems misinformation today may next week turn out to be the consensus position of experts on the matter. For example, individuals were censored for posting on social media that COVID-19 may have originated in a lab, which the Biden Administration later acknowledged was a definite possibility.

Twitter began to suspend more and more accounts, some permanently, following this initiative. Between May and December 2021, after the May and July announcements by Murthy and the White House, all three Plaintiffs were suspended from Twitter at least once for, *inter alia*, tweeting that the vaccines do not stop transmission of COVID-19 (*i.e.*, are not sterilizing vaccines) and that masks do not work and are harmful. The suspensions ranged from 12 hours to 7 days.

In December of 2021, Mr. Changizi was permanently suspended for stating that the seasonal flu is more deadly to children than COVID-19, the vaccines had not been studied long-term for that age group, asymptomatic individuals rarely spread the virus, and vaccines do not slow the spread. All of these views are shared by some scientists, including CDC Director Rochelle Walensky, who remarked in August of 2021 that the vaccines do not stop transmission. Mr. Changizi was reinstated following an appeal.

On March 3, 2022, the Surgeon General demanded that technology platforms, *inter alia*, turn over "information about sources of COVID-19 misinformation" by May 2, 2022 (the RFI). *See* Dep't of Health & Hum. Servs., Docket HHS-OASH-2022-0006, Impact of Health Misinformation in the Digital Information Environment in the United States Throughout the COVID-19 Pandemic Request for Information (Mar. 10, 2022) *available at* https://www.regulations.gov/document/HHS-OASH-2022-0006-0001 (COVID-19 RFI).[1]

Just days after the COVID-19 RFI was issued, Mr. Kotzin was suspended for 7 days, allegedly for a Tweet stating that the pandemic would end not because of vaccination, but when most people have been infected (a view held by many epidemiologists). Around the same time, on March 8, 2022, Mr. Senger was permanently suspended—meaning he is never permitted to create another Twitter account—for voicing his opinion that COVID-19 mitigation measures do not work (which numerous studies, including a recent one from Johns Hopkins University, have found to be the case).

No statute endows the Surgeon General with the authority to direct social media companies to censor individuals or viewpoints that the Biden Administration considers problematic. Indeed,

---

[1] Collectively, Psaki's May statements, the July Advisory and the March RFI, along with presumptive efforts by the Biden Administration that occurred in the interim, will be referred to as "the Surgeon General's initiative" or "the initiative."

Congress could not adopt such a statute because of the constitutional violations such a law would entail (*see infra*). Accordingly, this initiative constitutes *ultra vires* action. In sum, to the extent the Surgeon General is interpreting the statute that empowers him to stem the spread of communicable diseases, 42 U.S.C. § 264, to encompass this initiative, then he is either misconstruing the statute or else the statute violates Article I, § 1 of the U.S. Constitution, which vests all legislative power in Congress.

Furthermore, the facts laid out above demonstrate that—at least since May of 2021 and almost certainly before that—the Surgeon General, HHS, and the Biden Administration, are not simply colluding with, but instrumentalizing Twitter and other technology companies to effectuate their goal of silencing opinions that diverge from the White House's messaging on COVID-19. That commandeering transforms the Surgeon General's initiative into government action.

This sort of publicly directed censorship, which strikes at the heart of what the First Amendment to the United States Constitution was designed to protect—free speech, *especially* political speech—constitutes unlawful government action. Likewise, the Surgeon General's demand that social media platforms, including Twitter, turn over information about users *to the Government* that *the Government* has deemed problematic, constitutes a warrantless search in violation of the Fourth Amendment to the United States Constitution (nor does any statute give the Surgeon General such authority).

Finally, this action exceeds the Surgeon General's and HHS's powers under the Administrative Procedure Act (APA). Because this initiative constitutes final agency action *and* violates Plaintiffs' constitutional rights, this Court should find it unlawful and invalid and set aside the RFI.

**JURISDICTION AND VENUE**

1.      This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 133 and 28 U.S.C. § 1367 because the federal law claims arise under the Constitution and statutes of the United States and pursuant to 28 U.S.C. § 1402 because the United States is a defendant in this action.

2.      Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because Plaintiff Mark Changizi resides in this District.

3.      This Court may issue a declaratory judgment and grant permanent injunctive relief pursuant to 28 U.S.C. §§ 2201-2202.

**PARTIES**

4.      Plaintiff Michael P. Senger is an attorney and author of *Snake Oil: How Xi Jinping Shut Down the World*.  He resides in San Francisco, California.

5.      Plaintiff Mark Changizi is a theoretical cognitive scientist.  He resides in Columbus, Ohio.

6.      Plaintiff Daniel P. Kotzin is a stay-at-home father.  He resides in Denver, Colorado.

7.      Defendant HHS is an agency of the United States.

8.      Defendant Dr. Vivek Murthy is Surgeon General of the United States.  He is sued in his official capacity.

9.      Defendant Xavier Becerra is Secretary of the Department of Health and Human Services (HHS).  He is sued in his official capacity.

## STATEMENT OF FACTS

I.    **TWITTER AND THE GOVERNMENT'S STATEMENTS OF INTENT TO USE SOCIAL MEDIA COMPANIES TO ACCOMPLISH GOVERNMENTAL OBJECTIVES**

10.    Twitter, one of the largest social media platforms in the world, "allows its users to electronically send messages of limited length to the public." *Knight First Amend. Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 230 (2d Cir. 2019), *cert. granted*, *judgment vacated sub nom. Biden v. Knight First Amend Inst.*, 141 S. Ct. 1220 (2021).

11.    A Twitter user can "post their own messages (referred to as tweeting)" and "may also respond to the messages of others (replying), republish the messages of others (retweeting), or convey approval or acknowledgment of another's message by 'liking'" it. *Id.*

12.    Users can accrue followers. Follower size is one indication of an account's impact and reach, but engagements (likes and retweets) and impressions (views) are likewise measures of influence.

13.    Twitter is among the world's leading social media websites, with a user base of hundreds of millions. According to a 2019 survey, "[a]round one-in-five U.S. adults say they use Twitter."[2]

14.    The ubiquity of the company's platform gives it significant influence over public discourse: among U.S. adult Twitter users, more than half receive news from the site on a regular basis.[3]

---

[2] Adam Hughes and Stefan Wojcick, *10 Facts about Americans and Twitter*, Pew Res. Ctr. (Aug. 2, 2019), *available at* https://www.pewresearch.org/fact-tank/2019/08/02/10-facts-about-americans-and-twitter/.

[3] *See* Mason Walker & Katerina Eva Matsa. *News Consumption Across Social Media in 2021*, Pew Res. Ctr. (Sept. 20, 2021), *available at* https://www.pewresearch.org/journalism/2021/09/20/news-consumption-across-social-media-in-2021/.

15.     On information and belief, Twitter collects information from individuals who create accounts, including information that is otherwise not public, including a user's "name and phone number or email address."[4]

16.     On information and belief, Twitter can access direct messages and group messages (or group chats) that users exchange on the platform.

17.     In March of 2020, formerly having eschewed censorship, Twitter announced that it was "[b]roadening its definition of harm to address content that goes directly against guidance from authoritative sources of global and local public health information" and that it would censor information that fell into this category.[5]

18.     Twitter continued to ramp up efforts to quell the spread of "misleading" COVID-19 information on several subsequent dates, broadening the definition and explaining that it could be labeled or even removed.[6]

19.     Nevertheless, on information and belief, Twitter only rarely suspended users for spreading "misleading information" about COVID-19, per its policy, before March 1, 2021.

---

[4] Twitter, *How to sign up for a Twitter account*, Help Center, https://bit.ly/3KS0MtH (last visited Mar. 17, 2022).

[5] Vijaya Gadde (@Vijaya) & Matt Derella (@Derella), *An update on our continuity strategy during COVID-19*, Twitter Blog (last updated Apr. 1, 2020), https://blog.twitter.com/en_us/topics/company/2020/An-update-on-our-continuity-strategy-during-COVID-19.

[6] *See* Yoel Roth (@yoyoel) & Nick Prickles (@nickpickles), *Updating our approach to misleading information*, Twitter Blog (May 11, 2020), https://blog.twitter.com/en_us/topics/product/2020/updating-our-approach-to-misleading-information; Twitter Safety (@TwitterSafety), *Twitter Safety, COVID-19: Our approach to misleading vaccine information*, Twitter Blog (Dec. 16, 2020), https://blog.twitter.com/en_us/topics/company/2020/covid19-vaccine; Twitter, COVID-19 misleading information policy, Help Center General guidelines and policies (Dec. 16, 2020), https://help.twitter.com/en/rules-and-policies/medical-misinformation-policy [https://web.archive.org/web/20201216200114/https://help.twitter.com/en/rules-and-policies/medical-misinformation-policy].

20.     On that date, Twitter announced that it was instituting a new policy:  after five or more infractions, permanent suspension would result.[7]

21.     Permanent suspension means not only that a user's account is permanently disabled, but that he or she may never create another Twitter account.

22.     On May 5, 2021, White House Press Secretary Jen Psaki gave a press conference where she stated that:

> The President's view is that the major platforms have a responsibility related to the health and safety of all Americans to stop amplifying untrustworthy content, disinformation, and misinformation, especially related to Covid19 vaccinations …. He also supports better privacy protections and *a robust anti-trust program*. So, his view is that there's *more that needs to be done* to ensure that this type of misinformation, disinformation, damaging, sometimes life-threatening information, is not going out to the American public (emphasis added).[8]

23.     On July 15, 2021, the Surgeon General released an advisory (the July Advisory) aimed at censoring purported "misinformation" (according to the Government) about COVID-19. *See* U.S. Surgeon General's Advisory, Confronting Health Misinformation (July 15, 2021), https://www.hhs.gov/sites/default/files/surgeon-general-misinformation-advisory.pdf   (COVID-19 Advisory).

24.     According to the Surgeon General's advisory, "[m]isinformation" has "caused confusion and led people to decline COVID-19 vaccines, reject public health measures such as masking and physical distancing. And use unproven treatments." *Id.* at 4.

---

[7] Twitter, COVID-19 misleading information policy, Help Center General guidelines and policies (Mar. 1, 2021), https://help.twitter.com/en/rules-and-policies/medical-misinformation-policy [https://web.archive.org/web/20210827062904/https://help.twitter.com/en/rules-and-policies/medical-misinformation-policy].

[8] Big Tech Censorship is Actually Government Censorship | Revue (getrevue.co)

25.     The advisory identifies social media platforms as major sources of "misinformation." *Id.* at 3-4.

26.     Among other things, the Surgeon General's advisory commands technology platforms to:

    a.  Collect data on the "spread and impact of misinformation."

    b.  "Strengthen the monitoring of misinformation."

    c.  "Prioritize early detection of misinformation 'super-spreaders' and repeat offenders" by "impos[ing] clear consequences for accounts that repeatedly violate platform policies."

    d.  "Proactively address information deficits" by "[p]rovid[ing] information from trusted and credible sources[.]"

    e.  "Amplify communications from trusted messengers and subject matter experts." *Id.* at 12.

27.     The COVID-19 Advisory also appeared on the HHS website and stated, *inter alia*, that "American lives are at risk.  From the *tech and social media companies who must do more* to address the spread on their platforms…" (emphasis added).[9]

28.     That day, Press Secretary Jen Psaki gave a joint press briefing with the Surgeon General to discuss the advisory.[10]

29.     Murthy acknowledged that:

---

[9] Press Release, Office of the Surgeon General, US Surgeon General Issues Advisory During COVID-19 Vaccination Push Warning American Public About Threat of Health Misinformation (July 15, 2021), https://www.hhs.gov/about/news/2021/07/15/us-surgeon-general-issues-advisory-during-covid-19-vaccination-push-warning-american.html.

[10] Press Briefing by Press Secretary Jen Psaki and Surgeon General Dr. Vivek H. Murthy (July 15, 2021, 1:05 PM EDT), https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/15/press-briefing-by-press-secretary-jen-psaki-and-surgeon-general-dr-vivek-h-murthy-july-15-2021/.

health misinformation didn't start with COVID-19. What's different now though is the speed and scale at which health misinformation is spreading. *Modern technology companies have enabled misinformation to poison our information environment* with little accountability to their users. *They've allowed people who intentionally spread misinformation—what we call "disinformation"—to have extraordinary reach.*

*Id.* (emphasis added).

30.    Murthy continued:

we expect more from our technology companies.  We're asking them to operate with greater transparency and accountability.  *We're asking them to monitor misinformation more closely.  We're asking them to consistently take action against misinformation super spreaders* on their platforms.

*Id.* (emphasis added).

31.    In response to a reporter's question about whether the federal government had taken

action to ensure cooperation of tech companies, Ms. Psaki stated:

In terms of actions, Alex, that we have taken—or we're working to take, I should say—from the federal government: *We've increased disinformation research and tracking within the Surgeon General's office. We're flagging problematic posts for Facebook that spread disinformation* (emphasis added).

* * *

There are also proposed changes that we have made to social media platforms, including Facebook, and those specifically are four key steps.

One, that they measure and publicly share the impact of misinformation on their platform. Facebook should provide, publicly and transparently, data on the reach of COVID-19— COVID vaccine misinformation. Not just engagement, but the reach of the misinformation and the audience that it's reaching.

That will help us ensure we're getting accurate information to people. This should be provided not just to researchers, but to the public so that the public knows and understands what is accurate and inaccurate.

10

Second, that we have *recommended—proposed that they create a robust enforcement strategy* that bridges their properties and provides transparency about the rules. So, about—I think this was a question asked before—there's about 12 people who are producing 65 percent of anti-vaccine misinformation on social media platforms. All of them remain active on Facebook, despite some even being banned on other platforms, including Facebook—ones that Facebook owns (emphasis added).

Third, it's important to *take faster action against harmful posts*. As you all know, information travels quite quickly on social media platforms; sometimes it's not accurate. And Facebook needs to move more quickly to remove harmful, violative posts—posts that will be within their policies for removal often remain up for days. That's too long. The information spreads too quickly (emphasis added).

Finally, we have *proposed they promote quality information sources* in their feed algorithm.

*Id.* (emphasis added).

32.     On July 16, 2021, a reporter asked Ms. Psaki to elaborate on the Government's role

in flagging Facebook "disinformation."[11]

33.     Ms. Psaki responded:

it shouldn't come as any surprise that we're in regular touch with social media platforms—just like we're in regular touch with all of you and your media outlets—about areas where we have concern, information that might be useful … so we are regularly making sure social media platforms are aware of the latest narratives dangerous to public health that we and many other Americans … are seeing across all of social and traditional media.  And we work to engage with them to better understand the enforcement of social media platforms.

*Id.*

---

[11] Press Briefing by Press Secretary Jen Psaki (July 16, 2021, 1:20 PM EDT), https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/16/press-briefing-by-press-secretary-jen-psaki-july-16-2021/.

34.     Ms. Psaki called on social media companies to ban users who had also been banned from other platforms for ostensible misinformation and to "tak[e] faster action against harmful posts" and "promot[e] quality information algorithms." *Id.*

35.     A reporter stated that "yesterday after the press briefing" Facebook said that they had removed 18 million pieces of COVID misinformation, and asked whether the White House found that sufficient. *Id.*

36.     Ms. Psaki responded, "[c]learly not, because we're talking about additional steps that *should* be taken." *Id.* (emphasis added).

37.     She also reiterated that "we are in regular touch with social media platforms." *Id.*

38.     Ms. Psaki told the reporter that "I, frankly, think it should be your biggest concern … the number of people who are dying around the country because they're getting misinformation[.]" *Id.*

39.     When the reporter stated that people were concerned about "Big Brother" watching them through Facebook, Ms. Psaki responded that it was "unlikely" that the surveillance issue concerned people more than "people dying across the country because of a pandemic where misinformation is traveling on social media platforms." *Id.*

40.     The reporter pointed out that there were videos of Dr. Fauci saying in 2020 that there was no reason to mask and asked whether the administration was going to ask Facebook to remove that material. *Id.*

41.     Ms. Psaki responded that science and information "evolves," to which the reporter responded "exactly," and went on to make the point that Facebook used to prevent people from posting that COVID-19 may have originated in a lab, something President Biden now admitted was a possibility. *Id.*

42. That day, in response to a reporter who asked, "On COVID misinformation, what's your message to platforms like Facebook," President Biden said, "They're killing people."[12]

43. President Biden's statement caused other media to conclude that the government "blamed" social media companies "for spreading misinformation about the coronavirus and vaccines" creating "stalling U.S. vaccine rates."[13]

44. Four days after President Biden's comments, USA Today reported that "[t]he White House is assessing whether social media platforms are legally liable for misinformation spread on their platforms."[14]

45. The report noted: "[r]elations are tense between the Biden administration and social media platforms," and that the government was "examining how misinformation fits into the liability protections granted by Section 230 of the Communications Decency Act, which shields online platforms from being responsible for what is posted by third parties on their sites." *Id.*

46. In a January 2022 interview on MSNBC, Murthy stated that social media "platforms still have not stepped up to do the right thing[,]" that the focus in stopping the spread of "misinformation" should be on these companies, and that "this is actually about what government can do.  This is about companies and individuals recognizing that the only way we

---

[12] C-Span, *President Biden: "They're killing people."*, YouTube (July 16, 2021), https://www.youtube.com/watch?v=gJoOtLn4goY.

[13] Lauren Egan, *'They're killing people': Biden blames Facebook, other social media for allowing Covid misinformation*, NBC News (July 16, 2021, 4:10 PM EDT), https://www.nbcnews.com/politics/white-house/they-re-killing-people-biden-blames-facebookother-social-media-n1274232.

[14] Matthew Brown, *'They should be held accountable': White House reviews platforms' misinformation liability*, USA Today (July 20, 2021, updated 8:06 PM ET), https://www.usatoday.com/story/news/politics/2021/07/20/whitehouse-reviews-section-230-protections-covid-misinformation/8024210002/.

get past misinformation is if we are careful about what we say and we use the power that we have to limit the spread of that misinformation."[15]

47. On March 3, 2022, the Surgeon General formally demanded that major tech platforms submit information regarding COVID-19 misinformation.[16]

48. According to the *New York Times*, Murthy "demanded" information about the major sources of COVID-19 misinformation by May 2, 2022. *Id.*

49. Technically, refusing to provide the information does not carry a penalty, but this is the first such formal request. *Id.*

50. The "Request for Information" webpage created to facilitate this reporting asks for information from technology platforms, *inter alia*, about "sources of COVID-19 misinformation" including "specific, public actors that are providing misinformation[.]" HHS Request for Information on Mar. 7, 2022, *available at* https://www.federalregister.gov/documents/2022/03/07/2022-04777/impact-of-health-misinformation-in-the-digital-information-environment-in-the-united-states.

51. This is defined as "both specific, public actors that are providing ['health information that is false inaccurate, or misleading according to the best available evidence at the time'], as well as components of specific platforms that are driving exposure to information" dating back to January 2020. COVID-19 RFI at 4, 5, 7-9.

---

[15] Tom Elliott (@tomselliott), Twitter (Jan. 25, 2022, 10:03 AM), bit.ly/3CGcncD.

[16] *See* Davey Alba, *The surgeon general calls on Big Tech to turn over Covid-19 misinformation data*, The New York Times (Mar. 3, 2022), https://www.nytimes.com/2022/03/03/technology/surgeon-general-covid-misinformation.html; *see also* COVID-19 RFI.

52.     The technology platforms covered by the RFI are broad and include "general search engines, content sharing platforms, social media platforms, e-commerce platforms, crowd sourced platforms, and instant messaging systems." *Id.* at 6.

53.     While this purports to be a mere information-gathering initiative, the language— along with previous and contemporaneous statements by Murthy, Psaki, and Biden—establishes that the RFI is a demand masquerading as an innocent "request."

54.     On information and belief, users and technology companies are on notice that the Government's involvement in social media censorship is likely to escalate, causing a chilling effect on speech and prompting technology companies to ramp up censorship for fear of adverse action against them by the Government, including, but not limited to, regulation.

## II. THE PLAINTIFFS' TWITTER ACCOUNTS

55.     All three Plaintiffs maintain(ed) active Twitter accounts since at least March of 2020.

56.     While the content of each is or was unique, all three Plaintiffs regularly used their accounts to: (1) question the wisdom, efficacy, and morality of government responses to the pandemic, specifically lockdowns and mask and vaccine mandates; (2) read other users' views on the same or similar subjects; and (3) engage with other users on the same or similar topics.

57.     Before his permanent suspension, Mr. Senger had 112,000 followers.  He had maintained an account since about 2014 but did not become an active, regular user until 2020.  *See* Declaration of Michael P. Senger, Exhibit A ¶ 3.

58.      Mr. Kotzin has 29,700 followers.  He created his account in April 2013. *See* Declaration of Daniel P. Kotzin, Exhibit B ¶ 3.

59.     Mr. Changizi has 37,000 followers, having created his account in June 2009.  *See* Declaration of Mark Changizi, Exhibit C ¶ 5.

60.     Upon information and belief, all three Plaintiffs' accounts are considered influential given the size of their followings, as well as the level of engagement with their accounts.

61.     Mr. Senger was suspended twice for 12 hours, on October 27 and 29, 2021.  *See* Exhibit A at ¶ 4.

62.     On March 8, 2022, Twitter permanently suspended Mr. Senger's account.  *Id.* at ¶ 7.

63.     The Tweet cited for this harsh penalty had linked to an *Atlantic* article by Ed Yong that bore the headline: "*How Did This Many Deaths Become Normal?*"

64.     Mr. Senger had remarked: "How did this many 'deaths' become normal?  Because, though they may not yet be willing to face it, the vast majority have realized that every COVID policy—from the lockdowns and masks to the tests, death coding, and vaccine passes—has been one, giant fraud."

65.     Twitter notified Mr. Senger that his account had been suspended for "violating the Twitter Rules" by "spreading misleading and potentially harmful information related to COVID-19."

66.     The notification further stated that "if you attempt to evade a permanent suspension by creating new accounts, we will suspend your new accounts.  If you wish to appeal this suspension, please contact our support team."  *See* Exhibit A at ¶ 7; Screenshot 1, Attached to Exhibit A.

67.     Upon information and belief, the abrupt nature of the permanent suspension which followed on the heels of the Surgeon General's RFI, combined with the fact that this post expressed

an opinion that is shared by many individuals around the world, indicates that Twitter suspended Mr. Senger because of the Surgeon General's initiative.

68.    Mr. Kotzin has been suspended twice, once for 24 hours and once for 7 days.

69.    The first Tweet, posted on September 24, 2021, stated: "There is not now, nor has there ever been, evidence that the Covid shots reduce infection or transmission.  Vaccine passports; vaccine mandates; vaccine requirements—they are all an abomination."

70.    Mr. Kotzin received an email notification stating that his account had been locked for "violating the policy on spreading misleading and potentially harmful information related to COVID-19."

71.    He was warned that "repeated violations may lead to permanent suspension of your account." *See* Exhibit B ¶ 4(a), (b); Screenshot 1, Attached to Exhibit B.

72.    The second tweet, posted on March 7, 2022, read: "It is important to never lose sight of the fact that the global pandemic is ending not because of the vaccines, but because almost everyone on the planet got infected with covid."

73.    After labeling the tweet "misleading," Mr. Kotzin was again notified by Twitter that he was being locked out of his account for 7 days in an email that was identical to the first one. *See* Exhibit B ¶ 4(c), (d); Screenshot 2, Attached to Exhibit B.

74.    On information and belief, for the same reasons discussed *supra* ¶ 67, Mr. Kotzin's suspension resulted from the Surgeon General's initiative.

75.    Mr. Changizi first was suspended by Twitter for 12 hours on April 20, 2021, for linking to an article finding that masks were "ineffective, harmful."  *See* Exhibit C ¶ 6.

76. By way of explanation for the suspension, Twitter stated that his account had been locked for "violating the Twitter rules" by "spreading misleading and potentially harmful information related to COVID-19." *See* Exhibit C ¶ 6; Screenshot 1, Attached to Exhibit C.

77. On June 25, 2021, Mr. Changizi was suspended again, but the message did not contain the ostensibly offending Tweet, so he does not know why. *See* Exhibit C ¶ 7.

78. Around December 1, 2021, Mr. Changizi learned, after being alerted by followers, that his account was heavily censored and "de-boosted" (this means that the user's tweets are de-platformed—they appear in Twitter feeds much less frequently and replies to other posts may be hidden). *See* Exhibit C ¶ 8.

79. Mr. Changizi aggregated his monthly impressions, establishing that the de-boosting actually began much earlier, around May of 2021. His engagements dropped precipitously at that time and continued to decline. The only explanation for this sudden change was the de-boosting to which Mr. Changizi was subsequently alerted. *See* Exhibit C ¶ 14.

80. Mr. Changizi was permanently suspended on December 18, 2021, again for "spreading misleading and potentially harmful information related to COVID-19." The following two Tweets were cited as the cause:

> Covid is 10 to 20 times less dangerous than flu for kids. Get. A. Grip. There is NO long[-] term data for the shot. And even the short[-] and medium[-]term data for that age group are ambiguous at best.

> Asymptomatics rarely spread it ~ Vaccinations don't slow spread ~ unvaxed pose no threat to vaxxed ~ Risks are broadly flu like (and safer than flu for &lt; 40) ~ Huge % of unvaxxed have superior natural immunity via recovery [*sic*].

*See* Exhibit C ¶ 9, Screenshot 2, Attached to Exhibit C.

81.    The email to Mr. Changizi notifying him of the suspension was identical to that received by Mr. Senger and warned him that any "attempt to evade a permanent suspension by creating new accounts" would result in suspension of those accounts. *See* Exhibit C ¶ 10.

82.    Mr. Changizi appealed the suspension Christmas Day of 2021.  He wrote that:

> You have permanently suspended me for speaking out as a scientist concerning the evidence-based dangers of Covid and the efficacy & ethics of the interventions.
>
> Ironically, I am one of the few scientists studying the importance of free expression, and how it is an absolutely crucial part of the mechanism society—and science—uses to stumble toward the truth.
>
> I am an academic with a number of well known discoveries, my sixth book appearing in a few months, and am also perhaps the only person arguing against the interventions that understands there was no "plandemic," and has tried to educate people against their bias toward conspiracy-theory thinking.
>
> You have made a huge mistake in suspending so many voices, including mine.
>
> And, that is true whether or not what we're saying is true! Of course, I believe my statements are true, and always provide argument & evidence. Remember: nearly every journal article in the academic literature is false. But that doesn't mean it gets cancelled. It is part of the truth-discovery process itself.
>
> Don't become part of the problem by encouraging censorship and groupthink.

*See* Exhibit C ¶ 11.

83.    On December 27, 2021, presumably as a result of his appeal, Twitter unsuspended Mr. Changizi without further explanation, although he had to delete the two Tweets that led to the suspension.  *See* Exhibit C ¶ 12.

84.    Nevertheless, his account is heavily censored:  his Tweets are typically labeled "age-restricted adult content" that require an explicit effort to read them (in contrast to the vast

majority of Twitter accounts). *See* Screenshot 3, Attached to Exhibit C. He does not occur in a search unless his name is fully typed, and the same is true of his Instagram account (Instagram and Facebook share an owner). *See* Exhibit C ¶ 13.

85.    Both his follower-ships on YouTube and Twitter accounts have plateaued, despite the fact that Mr. Changizi is very active, and prior to the censorship period had steadily gained followers. *See* Exhibit C ¶ 15.

86.    Notably, the Surgeon General's initiative included the demands that social media platforms make algorithms that promote favored accounts (those that endorse the Government's message).

87.    Thus, on information and belief, for similar reasons discussed *supra* ¶¶ 67 and 74 and given the points at which Mr. Changizi's account was de-boosted and suspended (May of 2021, when the Biden Administration became public about the initiative, and April, June, and December of 2021, respectively) Mr. Changizi's de-boosting and suspension resulted from the Surgeon General's initiative.[17]

88.    Mr. Senger, because of Government action, has been permanently stripped of his voice on Twitter, carrying negative implications for his personal and professional life: he promoted his ideas and his work on the platform, and engaged with others—both those with whom he agreed and detractors. *See* Exhibit A ¶ 8.

89.    In his own words:

> I discovered a gift I had for writing and developed a network of thousands of intelligent people from all over the world with whom I had a close relationship discussing these and other issues. Now I

---

[17] While the first public statement from someone in the Biden Administration blaming technology companies for "misinformation," instructing them to do more, and threatening action if they do not, occurred in May, commonsense dictates that discussions of this nature had occurred previously. In all likelihood, the technology companies were aware of the administration's position on the matter.

have been silenced and completely cut off from all of them, with no viable way of getting that network back or promoting my work, seemingly for the sole crime of being too articulate in vocalizing my beliefs.

Regardless of motivation, this power to create a false consensus in political discourse by systematically silencing the most articulate voices from one side of any given debate, unbeknownst to 99% of Twitter users, is unprecedented in American history: it is a power that has historically only been held by authoritarian regimes. We are expected to believe that Twitter and the Surgeon General will use this unprecedent[ed] power only for good, based on nothing but their promise that they will do so. Historically, such promises have proven empty—and destructive—every single time.

*See* Exhibit A ¶¶ 11-12.

90. Since his suspension, Mr. Changizi has become very careful about what he says on Twitter to avoid permanent loss of his account. For example:

a. He never discusses early treatments, as that leads to immediate suspensions.

b. He avoids linking to studies and makes very general statements when referring to the vaccines, which makes his Tweets vague and more difficult to comprehend.

c. He fears engaging with those who have opposing views, as they may report him to Twitter, increasing the chance of suspension. *See* Exhibit C ¶¶ 14-16.

91. Mr. Kotzin considers "permanent suspension" a prospect "so devastating that I self-censor."

a. He contrives creative ways to avoid suspension, for example using hypotheticals and phrasing statements in question form.

b. Although he believes he has valuable information and insight to share on the subjects of treatment options, vaccines, and risk factors for a severe COVID-19 outcome, he does not do so. *See* Exhibit B ¶ 5.

92.     Twitter's COVID-related suspensions have been one-sided, in favor of the government. Twitter suspends only those who question the wisdom and efficacy of government restrictions or the government's messaging on health matters related to COVID-19, especially but not limited to the vaccines.

93.     Upon information and belief, there are no examples of Twitter suspending individuals who have spread misinformation that is Government approved—by, for example, exaggerating the efficacy of masks or the threat the virus poses to children.

94.     For example, CDC Director Rochelle Walensky has tweeted that masks reduce the chance of COVID infection by over 80 percent, which is widely considered a falsehood.

95.     Eric Feigl-Ding, a nutritionist who is considered a COVID "expert" and has publicly embraced the idea of stirring panic as a motivating force, has made untrue claims, including that Omicron is more severe in children than adults, and that if 30 unmasked children are in a classroom, about 4 will suffer from long covid.

96.     Rather than having their accounts locked or suspended, Twitter has promoted their Tweets.

## II.     THE SURGEON GENERAL'S STATUTORY AUTHORITY

97.     42 U.S.C. § 264(a) endows the Surgeon General of the United States with authority to:

> make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States or possessions, or from one State or possession into any other State or possession. For purposes of carrying out and enforcing such regulations, the Surgeon General may provide for such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings, and other measures, as in his judgment may be necessary.

98.     In order to effectuate this goal, the statute provides for the Surgeon General to apprehend and detain individuals who are infected with a communicable disease in certain situations. 42 U.S.C. § 264(b).

99.     On March 14, 2021, the undersigned counsel (Jenin Younes) wrote to Max Lesko, the individual within HHS designated to answer questions about the Surgeon General's RFI, and pointed out that 42 U.S.C. § 264 "pertains to the quarantining of individuals reasonably suspected to be infected with communicable diseases," and inquired whether there are "other statutes relied upon for this action of which we are unaware[.]" *See* Exhibit D.

100.    Having received no response by the following day, Ms. Younes called and left a message to the same effect.

101.    To date, Ms. Younes has received no response to this inquiry.

## CLAIMS FOR RELIEF
### COUNT I:  THE SURGEON GENERAL'S INITIATIVE CONSTITUTES *ULTRA VIRES* ACTION

102.    Plaintiffs incorporate by reference all of the preceding material as though fully set forth herein.

103.    "An agency's power is no greater than that delegated to it by Congress." *Lyng v. Payne*, 476 U.S. 926, 937 (1986).

104.    "[A]gency actions beyond delegated authority are *ultra vires* and should be invalidated." *Detroit International Bridge Company v. Government of Canada*, 192 F.Supp.3d 54 (D.D.C. 2016).  *See National Federation of Independent Business v. OSHA*, 595 U.S.___, Nos. 21A244 and 21A247 (2022) (OSHA vaccine mandate "extends beyond the agency's legitimate reach" evidenced by the "lack of historical precedent coupled with the breadth of authority that the Secretary now claims"; internal citations and quotation marks omitted).

105.    Courts look to an agency's enabling statute and subsequent legislation to determine whether the agency has exceeded its authority.  *See Tiger Lily LLC v. U.S. Dep't of Housing and Urban Development*, 525 F.Supp.3d 850, 861 (W.D. Tennessee), *aff'd*, 5 F.4th 666 (6th Cir. 2021) (determining that CDC eviction moratorium was unlawful, as "to hold otherwise would be to construe the statute so broadly as to grant this administrative agency unfettered power to prohibit or mandate anything, which would ignore the separation of powers and violate the non-delegation doctrine.").

106.    "A reviewing court owes no deference to the agency's pronouncement on a constitutional question and must make an independent assessment of a citizen's claim of constitutional right when reviewing agency decision-making."  *Poett v. United States*, 657 F.Supp. 230, 241 (D.D.C. 2009) (internal citations and quotation marks omitted).

107.    The statute which endows the Surgeon General and HHS with authority authorizes these entities only to:

> make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States or possessions, or from one State or possession into any other State or possession.  For purposes of carrying out and enforcing such regulations, the Surgeon General may provide for such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings, and other measures, as in his judgment may be necessary.

U.S.C. § 264(a).

108.    This is the same statute that the CDC relied upon for authority to unlawfully halt evictions nationwide.  *See Alabama Association of Realtors v. Department of Health and Human Services*, 141 S.Ct. 2485 (2021).

109.     In *Alabama Association*, the Supreme Court held that CDC's claim that this statute granted it authority to halt evictions nationwide "strain[ed] credulity." 141 S.Ct. at 2486. *See also Tiger Lily, LLC v. U. S. Dep't of Housing and Urban Development*, 5 F.4th 666, 670 (6th Cir. 2021) ("We cannot read § 264(a) to grant the CDC the power to insert itself into the landlord-tenant relationship without clear textual evidence of Congress's intent to do so.").

110.     This case is very similar to *Alabama Association* and *Tiger Lily*. "If it 'strains credulity' that this statutory language authorizes a nationwide eviction moratorium, *a fortiori*, it strains credulity to say that this language authorizes the Surgeon General to urge Twitter and other speech platforms to take down speech with which the government disagrees in violation of those speakers' First Amendment rights."

111.     Nothing in this statute permits the Surgeon General to determine what constitutes health misinformation; to direct social media companies to censor ostensible "misinformation"; to work with social media companies to censor this material and silence or de-boost accounts with whom he disagrees; or to demand that these companies turn over private (or public) information collected from users. *See also Kentucky v. Biden*, __F.Supp.3d__, 2021 WL 5587446 (E.D. Kentucky 2021) (holding that Biden's vaccine mandate for federal contractors, which commandeered the Procurement Statute, exceeded authority delegated through the statute by Congress, as did the OSHA vaccine mandate, and was therefore invalid; "neither OSHA nor the executive branch is permitted to exercise authority it does not have.").

112.     This conclusion is reinforced by the fact, in the many decades since § 264 was enacted, the Surgeon General never before interpreted that statute to authorize the regulation of "misinformation." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324, 134 S. Ct. 2427, 2444, 189 L.

Ed. 2d 372 (2014) (When an agency claims to discover in a long-extant statute an unheralded power to regulate … we typically greet its announcement with a measure of skepticism.").

113.     The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const. Art. I § 1.

114.     "The nondelegation doctrine bars Congress from transferring its legislative power to another branch of Government." *Gundy v. United States*, __U.S.__, 139 S.Ct. 2116, 2121 (2019).

115.     Congress may seek assistance from another branch, provided it establishes through legislation "an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform." *J.W. Hampton, Jr. & Co v. United States*, 276 U.S. 394, 406 (1928).

116.     Not only is this action unauthorized by Congress, but it could not have been authorized by Congress, as it entails First and Fourth Amendment violations (*see* supra, Counts II and III). *See Poett*, 657 F.Supp. at 241.

117.     Even if § 264 could somehow be construed a granting the Surgeon General with power to order technology companies to turn over information about individuals accused of spreading "misinformation"—it cannot—the lack of intelligible principle regarding what constitutes misinformation means such an interpretation would violate the Constitution's nondelegation principle. *Gundy*, 139 S.Ct. at 2121.

118.     Indeed, the absence of guidance would transform the Surgeon General's office into the Ministry of Truth. "A construction of the statute that avoids this kind of open-ended grant should certainly be favored." *Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 646 (1980).

119. Relatedly, the Surgeon General's action is clearly *ultra vires* under the major questions doctrine, which recognizes that Congress is expected "to speak clearly when authorizing an agency to exercise powers of vast economic and political significance." *Alabama Association of Realtors*, 141 S.Ct. at 2486.

120. An initiative that commandeers technology platforms to provide the Government with users' data (*see* Count II), that entails censoring speech and viewpoints on important, current events and political issues, and that has a profound chilling effect (*see* Count I), is precisely such a major question.

121. As discussed above, Congress did not authorize the Surgeon General or HHS to employ such a program.

122. For these reasons, the Surgeon General and HHS have exceeded their delegated authority (which in fact Congress could not give them) and this action therefore is *ultra vires* and invalid.

### COUNT II: THE SURGEON GENERAL'S INITIATIVE INSTRUMENTALIZES TECHNOLOGY COMPANIES TO CENSOR USERS, IN VIOLATION OF THE FIRST AMENDMENT

123. Plaintiffs incorporate by reference all of the preceding material as though fully set forth herein.

124. The First Amendment to the United States Constitution prohibits Congress from making laws "abridging the freedom of speech." U.S. Const., amend. I.

125. "The First Amendment gives freedom of mind the same security as freedom of conscience …. And the rights of free speech and free press are not confined to any field of human interest." *Thomas v. Collins*, 323 U.S. 516, 531 (1945); *see also Knight First Amend. Inst.*, 928 F.3d at 237 ("As a general matter, social media is entitled to the same First Amendment protections as other forms of media.").

126.    There is no question that the prohibition against restrictions on speech applies to all branches of government.  *See Matal v. Tam*, 137 S.Ct. 1744, 1757 (2017) ("The First Amendment prohibits Congress and other government entities and actors from 'abridging the freedom of speech[.]'"); *New York Times Co. v. United States*, 403 U.S. 713, 714 (1971) (holding that Nixon Administration's attempt to prevent publication of classified information violated the First Amendment).

127.    "Debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co.*, 376 U.S. at 270.  *See Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 790 (2011) ("The Free Speech Clause exists principally to protect discourse on public matters[.]").

128.    The First Amendment also protects the right to receive information.  *See Martin v. U.S. E.P.A.*, 271 F.Supp.2d 38 (2002), *quoting Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 756 (1976) ("where a speaker exists …, the protection afforded is to the communication, to its source and to its recipients both.").

129.    The right to receive information is "an inherent corollary of the rights to free speech and press that are explicitly, guaranteed by the Constitution" because "the right to receive ideas follows ineluctably from the *sender's* First Amendment right to send them."  *Board of Educ., Island Trees Union Free Sch. Dist. Number 26 v. Pico*, 457 U.S. 853, 867 (1982).  *See also id.* (quoting *Lamont v. Postmaster General*, 381 U.S. 301, 308 (1965) (Brennan, J., concurring) ("The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them. It would be a barren marketplace of ideas that had only sellers and no buyers.")).

130.    As the Supreme Court has recognized, "[a] fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then,

after reflection, speak and listen once more." *Packingham v. North Carolina*, 127 S. Ct. 1730, 1735 (2017).

131.    "[A]s a general matter, … government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 573 (2002).

132.    It is "axiomatic" that the government may not "induce, encourage, or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 U.S. 455, 465 (1973).

133.    In a similar vein, private actors are considered governmental when jointly engaged with state actors to deprive an individual of his constitutional rights, *Dennis v. Sparks*, 449 U.S. 24 (1980) or where the state compels the act or controls the private actor.

134.    The Surgeon General and the Biden Administration have made clear that they blame social media companies for American deaths, and they have threatened the companies with criminal and regulatory consequences unless those companies censor the views of individuals determined to be spreading what the *Government* deems to be "misinformation" in various ways that the Administration has identified.

135.    It is evident that the technology companies fear those consequences, as they have ramped up censorship of users—including Plaintiffs—deemed to have spread COVID "misinformation" following various public statements of individuals within the Biden administration, including Psaki and Murthy.

136.    The censorship is entirely viewpoint based and one-sided, as only individuals who oppose government-imposed COVID-19 mitigation measures and question the efficacy and safety of the vaccines are suspended.

137.    By instrumentalizing tech companies including Twitter—through pressure, coercion, and threats—to censor viewpoints that the federal executive has deemed "misinformation," the Surgeon General has turned Twitter's censorship into State action.  *See Hammerhead Enterprises v. Brezenoff*, 707 F.2d 33, 39 (1983) ("Where comments of a government official can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request, a valid claim can be stated … Similarly, claimants who can demonstrate that the distribution of items containing protected speech has been deterred by official pronouncements might raise cognizable First Amendment issues."); *Bantam Books v. Sullivan*, 372 U.S. 58, 62 (1963) (finding First Amendment violation when a private bookseller stopped selling works that state officials deemed "objectionable" after they sent him a veiled threat of prosecution). *See also Knight First Amendment Institute*, No. 20-197, 593 U.S.___   (Thomas, J., concurring) ("[I]f the government coerces or induces [a private entity] to take action the government itself would not be permitted to do, such as censorship expression of a lawful viewpoint," the First Amendment is implicated.).

138.    Twitter has permanently silenced Mr. Senger, and temporarily silenced Mr. Kotzin and Mr. Changizi, at Defendants' behest.

139.    Mr. Changizi also has been de-boosted on Twitter and other social media platforms (YouTube, Instagram), at the Government's instruction (Ironic given the views of Defendants on "boosting.")

140.    Not only is the Government responsible for overt censorship, but the Surgeon General's initiative has a profound chilling effect.

141.    Government action that chills speech—especially political speech—for fear of adverse consequences violates the First Amendment. *Citizens United v.  Federal Election Com'n*,

558 U.S. 310, 329 (2010) (political speech "is central to the meaning and purpose of the First Amendment."). *See Virginia v. Black*, 538 U.S. 343, 365 (2003) (holding that provision prohibiting flag-burning "chills constitutionally protected political speech … [which is] at the core of what the First Amendment is designed to protect.").

142.    To the extent that Mr. Kotzin and Mr. Changizi are still able to use their Twitter accounts, they constantly fear losing them, and curtail their expression accordingly. *Penny Saver Publications, Inc. v. Vill of Hazel Crest*, 905 F.2d 150, 154 (7th Cir. 1990) ("Constitutional violations may arise from the chilling effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights.").

143.    All three Plaintiffs have been deprived of their First Amendment right to receive information, including from each other, due to the atmosphere of censorship.  That is especially so for Mr. Senger, who has been entirely excluded from participating in discourse on Twitter.

144.    Once again, that is because Twitter is suspending accounts not only at the instruction of the Government and based on the Government's rubric, but also because it fears reprisal from the Government.

145.    Accordingly, the Government's coercive actions directed at Twitter are continually violating Plaintiffs' First Amendment Rights.

146.    Defendants have violated and are continuing to violate Plaintiffs' First Amendment rights to free speech and free expression, and to receive information.

## COUNT III:  THE SURGEON GENERAL'S RFI CONSTITUTES A SEARCH IN VIOLATION OF THE FOURTH AMENDMENT

147.    Plaintiffs incorporate by reference all of the preceding material as though fully set forth herein.

31

148.    The Fourth Amendment to the United States Constitution prohibits "unreasonable searches and seizures," and provides that "no warrants shall issue, but upon probable cause."

149.    The Fourth Amendment "seeks to secure the privacies of life against arbitrary power."  *See Carpenter v. United States*, 138 S.Ct. 2206, 2214 (2018) (internal citations and quotation marks omitted).

150.    The central aim of the Fourth Amendment was "to place obstacles in the way of a too permeating police surveillance."  *United States v. Di Re*, 332 U.S. 581, 595 (1948).

151.    A search occurs when an individual has a subjective expectation of privacy, and that expectation of privacy is one that society views as reasonable.  *California v. Ciraolo*, 476 U.S. 207 (1986); *United States v. Jacobsen*, 466 U.S. 109 (1984).

152.    Courts, including the Supreme Court, widely recognize that individuals have a reasonable expectation of privacy in digital records, including those given to private companies. *See Carpenter*, 138 S.Ct. 2206.

153.    "A person does not surrender all Fourth Amendment protection by venturing into the public sphere."  *Carpenter*, 138 S.Ct. at 2217.

154.    On the contrary, "what [one] seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected."  *Katz v. United States*, 389 U.S. 347, 351-52 (1967).

155.    Nor does the fact that the information in question may have been voluntarily given to third parties mean that the Fourth Amendment is inapplicable when the Government seeks that data.  *See Carpenter*, 138 S.Ct. at 2219 (rejecting Government's contention that cell-site records are "fair game" because they are "business records" created and maintained by wireless carriers and finding that a warrant is needed for such a search).

156.    Here, Defendants have demanded that Twitter (and other social media companies) provide them with "sources of misinformation" by May 2, without a warrant or probable cause. *See Carpenter*, 138 S.Ct. at 2221.

157.    Defendants have provided no more specific indication of precisely what information about users it is seeking or planning to collect, nor do they have probable cause to believe Plaintiffs have committed any sort of crime, nor have they obtained a search warrant.

158.    Plaintiffs have a reasonable expectation of privacy in the information they provided to Twitter—and that they did not agree to make available to the United States Government. *See Riley v. California*, 573 U.S. 373, 403 (2014) (holding that warrants are required to search cell phones, as "[w]ith all they contain and all they may reveal, they hold for many Americans the privacies of life … The fact that technology now allows an individual to carry such information in his hand does not make the information any less worthy of the protection for which the Founders fought.") (internal citations and quotation marks omitted).

159.    As mentioned, Twitter has access to users' information—including that which is not made public—and which Plaintiffs did not agree to turn over to the Government.

160.    The Government's action thereby constitutes an unlawful search under the Fourth Amendment to the United States Constitution.

## COUNT IV: UNLAWFUL AGENCY ACTION IN VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT

161.    Plaintiffs incorporate by reference all of the preceding material as though fully set forth herein.

162.    Under the Administrative Procedure Act (APA), this Court is authorized to hold unlawful and set aside agency action, findings, and conclusions that it determines to be contrary

to constitutional rights or in excess of statutory jurisdiction, authority, or limitations, or short of statutory right. *See* 5 U.S.C. §§ 706(2)(B), (C).

163.    Also under the APA, agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. *See* 5 U.S.C. § 704.

164.    Agency action is final if first it "marks the 'consummation' of the agency's decisionmaking process." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quoting *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103. 113 (1948)).

165.    Second, the action must be one by which "'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett*, 520 U.S. at 178 (quoting *Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)).

166.    The Surgeon General's initiative (encompassed by the July Advisory, the March RFI, and the continuous pressure on social media companies at least throughout that time but likely before) constitutes final agency action under the APA.

167.    In no uncertain terms, social media platforms have been instructed that they are to censor those who propagate what the Government has deemed "misinformation"—that constitutes an "obligation." *See Bennett*, 520 U.S. at 178.

168.    Lest there be any doubt, consider the following statements pertaining to the Surgeon General's initiative:

> a.    "We're asking [tech companies] to consistently take action against misinformation superspreaders." (Murthy).

b. "We've increased disinformation research and tracking within the Surgeon General's office.  We're flagging problematic posts for Facebook that spread disinformation." (Psaki).

c. "There are proposed changes that we have made to social media platforms," including "a robust enforcement strategy" and taking "faster action against harmful posts." (Psaki).

d. "tech and social media companies must do more[.]" (Murthy).

e. "Clearly [they haven't done enough], because we're talking about additional steps that should be taken." (Psaki).

f. Social media companies are "killing people." (Biden).

169.    For similar reasons, this action clearly constitutes "consummation" of the agency's decisionmaking process and is not tentative or interlocutory.  *See Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992) ("The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties.").

170.    Furthermore, the Surgeon General's initiative is substantive, because it affects legal rights (*see* Counts I and III).

171.    Substantive policies must undergo notice and comment.  The Surgeon General has not subjected his initiative to notice and comment.

172.    The Surgeon General's initiative is also arbitrary and capricious because it is being deployed to favor the Government's viewpoints.

173.    The Plaintiffs in this case have obviously been affected by the agency's actions, as they have all been suspended from Twitter for spreading "misinformation" related to COVID-19 in the period when Twitter stepped up its enforcement in response to the Surgeon General's threats.

174.    Mr. Changizi and Mr. Kotzin, who still have access to their accounts, operate them while fearing permanent suspension, causing them to self-censor.  *See supra* Count I.  They are also no longer able to learn and benefit from Mr. Senger's Twitter feed (not to mention the perspectives of many other users who have been permanently suspended).

175.    Nothing in the governing statute gives or purports to give HHS or the Surgeon General the power or authority to coerce technology companies to censor users or to demand that they hand their private user information (as opposed to public Tweets) over to the Government.

176.    Furthermore, for the reasons discussed in Counts I, II and III, the Surgeon General's actions violate Plaintiffs' constitutional rights.

177.    In sum, the entire initiative is in excess of any statutory authority and therefore invalid under the APA.  *See* 5 U.S.C. §§ 706(2)(B), (C).

## PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court enter judgment in their favor and grant the following relief:

A.    A declaration that Defendants' policy of pressuring Twitter to censor Plaintiffs' accounts violates the First Amendment of the United States Constitution;

B.    A declaration that the Surgeon General's entire misinformation campaign constitutes *ultra vires* action lacking statutory authority, and that Defendants' statutory interpretation runs afoul of the nondelegation and major questions doctrines;

C.    A declaration that Defendants' RFI demand that Twitter and other companies turn over information about "sources of misinformation" by May 2 constitutes a search

in violation of the Fourth Amendment and would require a warrant approved by a court of law;

D.     A declaration that the Surgeon General's campaign violates the Administrative Procedure Act and therefore is unlawful and invalid; and setting aside the RFI as a violation of the APA;

E.     Injunctive relief restraining and enjoining Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them (*see* Fed. R. Civ. P. 65(d)(2)), and each of them, from enforcing coercive or otherwise pressuring policies or conditions similar to those described above that exert pressure upon Twitter and other technology companies to censor users;

F.     A declaration that Twitter and other social media companies are under no obligation to censor content (especially content deemed COVID-19 misinformation) and will not be penalized if they do not engage in viewpoint-based censorship;

G.     Nominal damages of $1 each;

H.     Attorney's fees pursuant to 42 U.S.C. § 1988; and

I.     Any other just and proper relief.

## **JURY DEMAND**

Plaintiffs herein demand a trial by jury of any triable issues in the present matter.

March 24, 2022

                Respectfully submitted,

                /s/ *Angela Lavin*
                Angela M. Lavin (0069604)

Jay R. Carson (0068526)
Local  Counsel
WEGMAN HESSLER LPA
6055 Rockside Woods Boulevard North
Suite 200
Cleveland, Ohio 44131
Telephone: (216) 642-3342
Facsimile: (216) 642-8826
AMlavin@wegmanlaw.com
JRCarson@wegmanlaw.com

And

/s/*Jenin Younes*
Jenin Younes*
Litigation Counsel
NEW CIVIL LIBERTIES ALLIANCE
1225 19th Street NW, Suite 450
Washington, DC 20036
Telephone: (202) 869-5210
Facsimile: (202) 869-5238
jenin.younes@ncla.legal

*Pro hac vice application pending*
* Admitted only in New York.  DC practice
limited to matters and proceedings before
United States courts and agencies.
Practicing under members of the District of
Columbia Bar.

*Attorneys for Plaintiff*