# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## COLUMBUS DIVISION

| | | |
|---|---|---|
| **MARK CHANGIZI,** | ) | |
| **MICHAEL P. SENGER,** | ) | |
| **DANIEL KOTZIN,** | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | **Civil Action No.: 2:22-cv-01776** |
| v. | ) | |
| | ) | |
| **DEPARTMENT OF HEALTH AND** | ) | |
| **HUMAN SERVICES;** | ) | **Motion for Preliminary Injunction** |
| **VIVEK MURTHY, United States** | ) | |
| **Surgeon General, in his** | ) | |
| **official capacity, and** | ) | |
| **XAVIER BECERRA,** | ) | |
| **Secretary of the Department** | ) | **Oral Argument Requested** |
| **of Health and Human Services** | ) | |
| **in his official capacity,** | ) | |
| | ) | |
| *Defendants.* | ) | |

## MEMORANDUM IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION
## ORAL ARGUMENT REQUESTED

ANGELA LAVIN
JAY CARSON
WEGMANHESSLER
6055 Rockside Woods Boulevard North
Cleveland, Ohio 44131
Telephone: (216) 642-3342
Facsimile: (216) 642-8826

JENIN YOUNES
NEW CIVIL LIBERTIES ALLIANCE
1225 19th St. NW, Ste. 450
Washington, DC 20036
Telephone: 202-869-5210
Jenin.Younes@ncla.legal

*Attorneys for Plaintiffs*

# Table of Contents

INTRODUCTION............................................................................................................... 1

FACTS ............................................................................................................................... 3

ARGUMENT ................................................................................................................... 10

   I.   LEGAL STANDARD ................................................................................................ 10

Plaintiffs are entitled to a preliminary injunction against Defendants' initiative, forcing technology companies to censor users who offer certain perspectives about COVID-19 that differ from the Government's, and the Surgeon General's RFI requiring those companies to turn over information about these users by May 2, because they have satisfied all four of the requisite factors. *Nken v. Holder*, 556 U.S. 418, 434 (2009).

   II.   PLAINTIFFS HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS ............ 11

     A.   The Government's Action Is Ultra Vires .................................................................. 11

The statute empowering the Surgeon General to make rules and regulations does not permit him to determine what constitutes health "misinformation"; to order tech companies to censor such "misinformation"; or to demand that these companies turn over private (or public) information gathered from users. Accordingly, the Surgeon General's initiative and the RFI are unlawful. *See Alabama Association of Realtors v. Department of Health and Human Services*, 141 S.Ct. 2485, 2489 (2021); *Tiger Lily LLC v. U.S. Dep't. of Housing and Urban Development*, 525 F.Supp.3d 850, 861 (W.D. Tennessee), *aff'd*, 5 F.4th 666 (6th Cir. 2021).

     B.   Defendants' Initiative Constitutes a Flagrant Violation of Plaintiffs' First Amendment Rights to Free Speech and Free Expression ................................................. 15

As made clear by countless statements of members of the Biden Administration, Defendants are utilizing tech companies to accomplish their goal of suppressing and eliminating from the public discourse viewpoints about COVID-19 that differ from the Government's. That transforms Twitter's censorship of Plaintiffs into state action and violates their First Amendment Rights. U.S. Const. amend. I; *Bantam Books v. Sullivan*, 372 U.S. 58, 62 (1963).

     C.   The RFI Constitutes a Warrantless Search, Violating the Fourth Amendment... 20

Defendants' demand that technology companies, including Twitter, turn over private information about users who are deemed to be spreaders of "misinformation," constitutes a warrantless search in violation of the Fourth Amendment. U.S. Const. amend. IV; *Carpenter v. United States*, 138 S.Ct. 2206, 2214 (2018); *Riley v. California*, 573 U.S. 373, 403 (2014).

**III.**      **PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION** ........................................................................................................ **22**

Plaintiffs will suffer irreparable harm in the absence of a preliminary injunction. The ongoing violation of their First and Fourth Amendment rights under the United States Constitution is in itself an irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The further infringement of their constitutional rights, posed by the Government's RFI with a May 2 deadline, makes the grant of a preliminary injunction all the more urgent. *See BST Holdings v. OSHA*, No. 21-60845 *18 (5th Cir. 2021).

**IV.**      **THE BALANCE OF EQUITIES (INCLUDING THE PUBLIC INTEREST) WEIGHS HEAVILY IN PLAINTIFFS' FAVOR** ......................................................................................... **23**

There is a strong public interest in vindication of Plaintiffs' constitutional rights, while the Government has no interest in enforcing and promoting an unconstitutional, unlawful initiative. *See Coal. to Defend Affirmative Action v. Granholm*, 473 F.3d 237, 252 (6th Cir. 2006).

**CONCLUSION** ........................................................................................................ **24**

# INTRODUCTION

Pursuant to Rule 65(a) of the Federal Rules of Civil Procedure, Plaintiffs Michael P. Senger, Mark Changizi, and Daniel P. Kotzin seek preliminary injunctive relief with respect to the Surgeon General's initiative, directing technology companies to censor viewpoints that conflict with federal executive Government messaging on COVID-19, and demanding information about individuals who voice those contrary opinions on social media by May 2, 2022. The relief sought is against the Defendants identified above (collectively, Defendants), the Department of Health and Human Services (HHS), Surgeon General of the United States Vivek Murthy, and Secretary of HHS Xavier Becerra. The latter two are sued in their official capacities for prospective injunctive and declaratory relief as well as nominal damages and any other relief that may be deemed just and proper as this case progresses and information surfaces.

On March 3, 2022, Defendants issued a Request for Information (RFI) demanding that technology companies, including Twitter, provide them with "sources of misinformation" on COVID-19 by May 2. This was the culmination of a nearly year-long public campaign wherein, *inter alia*, President Joseph Biden, White House Press Secretary Jen Psaki, and Surgeon General Vivek Murthy made countless threatening statements indicating that they blame technology companies not only for the dissemination of "misinformation" (which translates into anything that diverges from Government-approved messaging on COVID-19), but also American deaths, and threatening them with adverse consequences, including regulation, unless they effectuate the Government's bidding.

Censorship of Twitter (and other social media) accounts such as those belonging to Plaintiffs, that center upon questioning Government and public health responses to the pandemic, ramped up around the time the Biden Administration made public these beliefs and intentions,

beginning in the spring of 2021. Mere days after the March 3, 2022 RFI, Mr. Kotzin was suspended from Twitter for 7 days, allegedly for a Tweet stating that the pandemic would end not because of vaccination, but when most people have been infected (a view held by many epidemiologists). Around the same time, on March 8, 2022, Mr. Senger was permanently suspended—meaning that he is never permitted to create another Twitter account—for voicing his opinion that COVID-19 mitigation measures do not work (which numerous studies, including a recent one from Johns Hopkins University, have found to be the case). Mr. Changizi was suspended several times temporarily, beginning around the time Defendants began their public campaign, and once permanently, although he was reinstated following an appeal.

The timing of these events, along with the one-sided nature of the censorship, establishes that Twitter suspended Plaintiffs because it feared reprisal from the Government. Moreover, the RFI (not to mention the Government's earlier actions), has created a profound chilling effect. Aware that Twitter and other technology companies are operating under threats from the Government, Mr. Changizi and Mr. Kotzin, who have not lost their accounts, self-censor for fear of permanent suspension.

No statute endows the Surgeon General with the authority to direct social media companies to censor individuals or viewpoints that he, or the Biden Administration, considers problematic. Indeed, Congress could not adopt such a statute. To the extent the Surgeon General interprets the statute that empowers him to issue rules and regulations designed to stem the spread of communicable disease, 42 U.S.C. § 264, to encompass this initiative, then he is either misconstruing the statute or else the statute violates Article I, § 1 of the U.S. Constitution, which vests all legislative power in Congress. Such a broad interpretation of the statute would also run afoul of the major questions doctrine, which instructs courts not to presume that statutory language

2

implicitly adopts—or authorizes the administrative agency to adopt—such a significant policy. Here the policy in question has dramatic First and Fourth Amendment implications. Accordingly, with no statute to support the Defendants' conduct, this initiative constitutes *ultra vires* action.

Furthermore, the totality of the circumstances indicates that—at least since May of 2021 and likely before that—Defendants are not merely colluding with, but also directing Twitter and other technology companies to silence opinions that diverge from the White House's messaging on COVID-19. That degree of influence transforms the Surgeon General's initiative, including the RFI, into government action.

Publicly directed censorship strikes at the heart of what the First Amendment to the United States Constitution was designed to protect—free speech, *especially* political speech. So, it constitutes unlawful government action. Likewise, the Surgeon General's demand that social media platforms, including Twitter, turn over information about users *to the Government* that *the Government* has deemed problematic, constitutes a warrantless search in violation of the Fourth Amendment to the United States Constitution.

Plaintiffs are likely to prevail on the merits, for reasons that will be discussed in more detail below. If the Court does not issue a preliminary injunction at the earliest possible date, then Plaintiffs will suffer irreparable harm: Twitter has been ordered to give their private information to the Government by May 2. That cannot be undone. Furthermore, the ongoing violation of their First and Fourth Amendment rights in and of itself constitutes irreparable harm. The balance of equities and the public interest both favor Plaintiffs. The Government has no valid interest in implementing unlawful, unconstitutional policies that violate Americans' constitutional rights. Moreover, the public has an interest in seeing Plaintiffs' constitutional rights vindicated. This Court should halt the unconstitutional search of Plaintiffs' digital records by issuing a preliminary

injection as soon as is practically possible.  Furthermore, it should cancel the RFI and forbid the Surgeon General (or anyone else at HHS) from continuing this unlawful initiative.

## FACTS[1]

Twitter is one of the world's largest social media platforms (Complaint ¶¶ 10, 13).  It allows users to electronically send messages of limited length to the public (Complaint ¶ 10).  A Twitter user can "post their own messages (referred to as tweeting)" and "may also respond to the messages of others (replying), republish the messages of others (retweeting), or convey approval or acknowledgment of another's message by 'liking'" it (Complaint ¶¶ 10-11).

Twitter has a private messaging system, wherein users can send direct messages to other users, as well as participate in group chats (Complaint ¶ 16).  Users can accrue followers; follower size is one indication of an account's impact and reach, but engagements (likes and retweets) and impressions (views) are likewise measures of influence (Complaint ¶ 12). When an individual creates an account, Twitter collects information from him or her that is not otherwise public, including an email address and telephone number (Complaint ¶ 15).

Although beginning in March of 2020, Twitter censored some users for content that conflicted with "authoritative sources of global and local public health information," suspensions of users for this reason were exceedingly rare (Complaint ¶¶ 17-19).

Between May of 2021 and March of 2022, several individuals within the Biden Administration—most notably President Biden himself, White House Press Secretary Jen Psaki, and Surgeon General Vivek Murthy—made numerous statements indicating that they consider tech companies responsible for American deaths from COVID-19 because they are allegedly not

---

[1] A more detailed statement of facts is laid out in the Complaint, ¶¶ 10-98.  A succinct version of those facts most pertinent to the request for a preliminary injunction is offered here.

doing enough to stop the flow of "misinformation" related to the virus and surrounding issues. These individuals have not only directed the companies to deboost or even ban users whose articulated viewpoints on COVID-related matters conflicted with Government messaging, and to promote favored accounts via algorithms, but they have also threatened adverse consequences for noncompliance (*see* Complaint ¶¶ 22-46).

On October 29, 2021, the Surgeon General tweeted from his official account (as opposed to his personal one, which remains active), as part of a thread: [2]

> We must demand Facebook and the rest of the social media ecosystem take responsibility for stopping health misinformation on their platforms. The time for excuses and half measures is long past. We need transparency and accountability now. The health of our country is at stake.[3]

On March 3, 2022, the Surgeon General demanded that major tech platforms submit "sources" of COVID-19 misinformation to the government by May 2, 2022 (Complaint ¶ 47).[4] Refusing to provide the information does not carry an explicit penalty, but given the threatening atmosphere created by a multitude of statements over the previous 10 months, tech companies undoubtedly assume that noncompliance will result in retaliatory action (Complaint ¶ 49).

The webpage created to facilitate this reporting asks for information from technology platforms about "sources of COVID-19 misinformation" including "specific, public actors that are providing misinformation" (Complaint ¶ 50). HHS Request for Information on Mar. 7, 2022, *available at* https://www.federalregister.gov/documents/2022/03/07/2022-04777/impact-of-

---

[2] A thread is a longer message, composed of more than one Tweet.

[3] Dr. Vivek Murthy, U.S. Surgeon General (@Surgeon_General), Twitter (October 29, 2021, 4:19PM), https://twitter.com/Surgeon_General/status/1454181191494606854.

[4] *See* Davey Alba, *The Surgeon General Calls on Big Tech to Turn Over Covid-19 Misinformation Data*, The New York Times (Mar. 3, 2022), https://www.nytimes.com/2022/03/03/technology/surgeon-general-covid-misinformation.html (last visited March 29, 2022); *see also* COVID-19 RFI.

health-misinformation-in-the-digital-information-environment-in-the-united-states. Sources of misinformation are defined as "specific, public actors that are providing ['health information that is false inaccurate, or misleading according to the best available evidence at the time'], as well as components of specific platforms that are driving exposure to information" dating back to January 2020. COVID-19 RFI at 4, 5, 7-9.

The technology platforms covered by the RFI are broad and include "general search engines, content sharing platforms, social media platforms, e-commerce platforms, crowd sourced platforms, and instant messaging systems" (Complaint ¶ 52). *Id.* at 6. While this RFI purports to be a mere information gathering initiative, the language—along with previous and contemporaneous statements by Murthy, Psaki, and Biden—establishes that the RFI is a demand masquerading as an innocent "request" (Complaint ¶ 53). Users and technology companies are on notice that the Government's involvement in social media censorship is likely to escalate, causing a chilling effect on speech and prompting technology companies to ramp up censorship for fear of adverse action against them by the Government, including, but not limited to, regulation and antitrust investigations (Complaint ¶ 54).

All three Plaintiffs maintain(ed) active Twitter accounts since at least March of 2020 (Complaint ¶ 55). While the content of each is or was unique, all three Plaintiffs regularly used their accounts to: (1) question the wisdom, efficacy, and morality of government responses to the pandemic, specifically lockdowns and mask and vaccine mandates; (2) read other users' views on the same or similar subjects; and (3) engage with other users on the same or similar topics (Complaint ¶ 56).

Before his permanent suspension, Mr. Senger had 112,000 followers. *See* Declaration of Michael P. Senger, Attached to Complaint as Exhibit A ¶ 3. Mr. Kotzin has 29,700 followers. *See*

Declaration of Daniel P. Kotzin, Attached to Complaint as Exhibit B ¶ 3. Mr. Changizi has 37,000 followers. *See* Declaration of Mark Changizi, Attached to Complaint as Exhibit C ¶ 5. All three Plaintiffs' accounts are considered influential given the size of their followings, as well as the level of engagement with their accounts (Complaint ¶ 60).

Mr. Senger was suspended twice for 12 hours, on October 27 and 29, 2021. *See* Exhibit A at ¶ 4. On March 8, 2022, Twitter permanently suspended Mr. Senger's account for a Tweet linking to an *Atlantic* article by Ed Yong that bore the headline: "*How Did This Many Deaths Become Normal?*" (Exhibit A at ¶ 7). Mr. Senger had remarked: "How did this many 'deaths' become normal? Because, though they may not yet be willing to face it, the vast majority have realized that every COVID policy—from the lockdowns and masks to the tests, death coding, and vaccine passes—has been one, giant fraud." Exhibit A at ¶ 7. That is, he was banned from Twitter for publicly criticizing the purported ineffectiveness of the Government's COVID-19 policies.

Twitter notified Mr. Senger that his account had been suspended for "violating the Twitter Rules" by "spreading misleading and potentially harmful information related to COVID-19." The notification further stated that "if you attempt to evade a permanent suspension by creating new accounts, we will suspend your new accounts. If you wish to appeal this suspension, please contact our support team." *See* Exhibit A at ¶ 7; Screenshot 1, Attached to Exhibit A.

Mr. Kotzin has been suspended twice, once for 24 hours and once for 7 days. The first Tweet that led to a suspension, posted on September 24, 2021, stated: "There is not now, nor has there ever been, evidence that the Covid shots reduce infection or transmission. Vaccine passports; vaccine mandates; vaccine requirements—they are all an abomination." Mr. Kotzin received an email notification stating that his account had been locked for "violating the policy on spreading misleading and potentially harmful information related to COVID-19." He was warned that

"repeated violations may lead to permanent suspension of your account." *See* Exhibit B ¶ 4(a), (b); Screenshot 1, Attached to Exhibit B.

The second suspension-producing tweet, posted on March 7, 2022, read: "It is important to never lose sight of the fact that the global pandemic is ending not because of the vaccines, but because almost everyone on the planet got infected with covid." After labeling the Tweet "misleading," Twitter notified Mr. Kotzin that he was being locked out of his account for 7 days in an email that was identical to the first one (apart from the duration of the suspension). *See* Exhibit B ¶ 4(c), (d); Screenshot 2, Attached to Exhibit B.

Twitter first suspended Mr. Changizi on April 20, 2021, for 12 hours, as a penalty for linking to and quoting an article finding that masks were "ineffective, harmful." *See* Exhibit C ¶ 6. By way of explanation for the suspension, Twitter stated that his account had been locked for "violating the Twitter rules" by "spreading misleading and potentially harmful information related to COVID-19." *See* Exhibit C ¶ 6; Screenshot 1, Attached to Exhibit C. On June 25, 2021, Twitter again suspended Mr. Changizi, but he does not know why. *See* Exhibit C ¶ 7.

Around December 1, 2021, Mr. Changizi learned, after followers alerted him, that his account was heavily censored and "de-boosted" (this means that the user's tweets appear in Twitter feeds much less frequently and replies to other posts may be hidden). *See* Exhibit C ¶ 8. Mr. Changizi aggregated his monthly impressions, establishing that the de-boosting actually began much earlier, around May of 2021. His engagements dropped precipitously at that time and continued to decline. The only explanation for this sudden change was the de-boosting to which Mr. Changizi was subsequently alerted. *See* Exhibit C ¶ 14.

Twitter permanently suspended Mr. Changizi on December 18, 2021, again for "spreading misleading and potentially harmful information related to COVID-19." Twitter informed him that it was for tweeting the following:

> Covid is 10 to 20 times less dangerous than flu for kids. Get. A. Grip. There is NO long[-] term data for the shot. And even the short[-] and medium[-]term data for that age group are ambiguous at best.

> Asymptomatics rarely spread it ~ Vaccinations don't slow spread ~ unvaxed pose no threat to vaxxed ~ Risks are broadly flu like (and safer than flu for &lt; 40) ~ Huge % of unvaxxed have superior natural immunity via recovery [*sic*].

*See* Exhibit C ¶ 9, Screenshot 2, Attached to Exhibit C.

The email to Mr. Changizi notifying him of the suspension was identical to that received by Mr. Senger. *See* Exhibit C ¶ 10. Mr. Changizi appealed the suspension Christmas Day of 2021. *See* Exhibit C ¶ 11. On December 27, 2021, presumably as a result of his appeal, Twitter unsuspended Mr. Changizi without further explanation, although he had to delete the two offending Tweets. *See* Exhibit C ¶ 12. Nevertheless, his account remains heavily censored. *See* Exhibit C ¶ 13; Screenshot 3, Attached to Exhibit C.

Notably, and as discussed, the Surgeon General's initiative included the demand that social media platforms make their algorithms promote favored accounts (those that endorse the Government's message).

Given the points at which Mr. Changizi's account was de-boosted and suspended (May of 2021, when the Biden Administration became public about the initiative, and April, June, and December of 2021, respectively) Mr. Changizi's de-boosting and suspension apparently resulted

from the Surgeon General's initiative.[5]  Likewise, the timing of Mr. Senger's and Mr. Kotzin's suspensions—after officials in the Biden Administration began making statements threatening technology companies that did not censor individuals who voiced opinions about COVID that differed from the Government's—establishes that the suspension of their accounts (and entire loss, in the case of Mr. Senger) stemmed from the Government's initiative (Complaint ¶¶ 67, 74, 87).

Mr. Senger has been permanently stripped of his voice on Twitter, which has negatively affected his personal and professional life: he promoted his ideas and his work on the platform, and engaged with others—both those with whom he agreed and detractors.  *See* Exhibit A ¶¶ 8-12.  Both Mr. Changizi and Mr. Kotzin self-censor constantly on Twitter (and other platforms) for fear of losing their accounts. *See* Exhibit B ¶ 5; Exhibit C ¶¶ 14-16.

Twitter's COVID-related suspensions have been one-sided, in favor of the Government. Twitter suspends only those who question the wisdom and efficacy of governmental restrictions or the government's messaging on health matters related to COVID-19, especially but not limited to the vaccines.  On information and belief, there are no examples of Twitter suspending individuals who have spread misinformation from the other side—by, for example, exaggerating the efficacy of masks or the threat the virus poses to children (Complaint ¶¶ 92-96).

## ARGUMENT

### I.  LEGAL STANDARD

Rule 65(a) of the Federal Rules of Civil Procedure allows a court to issue a preliminary injunction after notice has been provided to an adverse party. A preliminary injunction is

---

[5] While the first public statement from someone in the Biden Administration blaming technology companies for "misinformation," instructing them to do more, and threatening action if they do not, occurred in May of 2021, commonsense dictates that internal government discussions of this nature had occurred previously.  In all likelihood, the technology companies were aware of the administration's position on the matter.

appropriate if: (1) the moving party demonstrates a substantial likelihood of success on the merits; (2) it is necessary to prevent irreparable injury; (3) the threatened injury outweighs the harm the preliminary injunction would cause the other litigant; and (4) the preliminary injunction would not be averse to the public interest. *See Nken v. Holder*, 556 U.S. 418, 434 (2009); *Liberty Coins v. Goodman*, 748 F.3d 682, 689-90 (6th Cir. 2014).

## II.    PLAINTIFFS HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

### A.    The Government's Action Is *Ultra Vires*

"[A]gency actions beyond delegated authority are *ultra vires* and should be invalidated." *Detroit International Bridge Company v. Government of Canada*, 192 F.Supp.3d 54 (D.D.C. 2016). Courts look to an agency's enabling statute and subsequent legislation to determine whether the agency has exceeded its authority. *See Tiger Lily LLC v. U.S. Dep't of Housing and Urban Development*, 525 F.Supp.3d 850, 861 (W.D. Tennessee), *aff'd*, 5 F.4th 666 (6th Cir. 2021) (determining that CDC eviction moratorium was unlawful, as "to hold otherwise would be to construe the statute so broadly as to grant this administrative agency unfettered power to prohibit or mandate anything, which would ignore the separation of powers and violate the non-delegation doctrine."). "A reviewing court owes no deference to the agency's pronouncement on a constitutional question and must make an independent assessment of a citizen's claim of constitutional right when reviewing agency decision-making." *Poett v. United States*, 657 F.Supp. 230, 241 (D.D.C. 2009) (internal citations and quotation marks omitted).

The *only* statute which empowers the Surgeon General and HHS to make rules and regulations authorizes these entities only to make those that:

> in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States or possessions, or from one State or possession into any other State or possession. For purposes of

carrying out and enforcing such regulations, the Surgeon General may provide for such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings, and other measures, as in his judgment may be necessary.

42 U.S.C. § 264(A).[6]

Nothing in this statute permits the Surgeon General to determine what constitutes health "misinformation"; to direct social media companies to censor ostensible "misinformation"; to work with social media companies to censor this material and silence or de-boost accounts with whom he disagrees; or to demand that these companies turn over to the Government private (or public) information collected from users. *See Tiger Lily*, 5 F.4th at 670 ("We cannot read § 264(a) to grant the CDC the power to insert itself into the landlord-tenant relationship without clear textual evidence of Congress's intent to do so."); *Kentucky v. Biden*, __F.Supp.3d__, 2021 WL 5587446 (E.D. Kentucky 2021) ("[N]either OSHA nor the executive branch is permitted to exercise authority it does not have."), *aff'd* 23 F.4th 585 (6th Cir. 2022).

In fact, the CDC eviction moratorium cases, including *Tiger Lily* and *Alabama Association of Realtors v. Department of Health and Human Services*, 141 S.Ct. 2485, 2489 (2021), involved CDC attempting to use the same statute at issue here to halt evictions nationwide. In *Alabama Association*, the Supreme Court held that CDC's claim that this statute granted it authority to halt evictions nationwide "strain[ed] credulity." 141 S.Ct. at 2486. *See also Tiger Lily*, 5 F.4th at 670.

This case is very similar to *Alabama Association* and *Tiger Lily*. If it "strains credulity" that this statutory language authorizes a nationwide eviction moratorium, *a fortiori*, it strains

_____

[6] As discussed in the Complaint, the undersigned counsel, Ms. Younes, twice contacted the individual at HHS designated with responsibility for fielding inquiries about the March 3, 2022 RFI and asked whether there was another basis that the agency believed authorized this action and of which she was unaware. She received no response. *See* Complaint ¶¶ 100-101; 3/14/22 Email from Jenin Younes to Max Lesko, Attached to Complaint as Exhibit D.

credulity to say that this language authorizes the Surgeon General to urge Twitter and other platforms to take down speech with which the government disagrees in violation of those speakers' First Amendment rights. HHS and its subordinate agencies—like CDC and the Surgeon General's office—have established a troubling trend, wherein they adopt a tortured interpretation of their enabling statutes to justify action that far exceeds their statutory authority.

The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const. Art. I § 1. "The nondelegation doctrine bars Congress from transferring its legislative power to another branch of Government." *Gundy v. United States*, __U.S.__, 139 S.Ct. 2116, 2121 (2019). Congress may seek assistance from another branch, provided it establishes through legislation "an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform." *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 406 (1928), but "[a]n agency's power is no greater than that delegated to it by Congress." *Lyng v. Payne*, 476 U.S. 926, 937 (1986). "[A]gency actions beyond delegated authority are *ultra vires* and should be invalidated." *Detroit International*, 192 F.Supp.3d 54. *See National Federation of Independent Business v. OSHA*, 595 U.S.___, Nos. 21A244 and 21A247 (2022) (OSHA vaccine mandate "extends beyond the agency's legitimate reach" evidenced by the "lack of historical precedent coupled with the breadth of authority that the Secretary now claims"; internal citations and quotation marks omitted).

Even if § 264 could somehow be construed as granting the Surgeon General power to turn over information about individuals accused of spreading "misinformation"—it cannot—the lack of an intelligible principle regarding what constitutes misinformation means that such an interpretation would violate the Constitution's nondelegation principle. *Gundy*, 139 S.Ct. at 2121.

"A construction of the statute that avoids this kind of open-ended grant should certainly be favored." *Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 646 (1980).

The Surgeon General's statutory interpretation would also run afoul of the major questions doctrine, which recognizes that Congress is expected "to speak clearly when authorizing an agency to exercise powers of vast economic and political significance." *Alabama Association*, 141 S.Ct. at 2489. *See National Federation*, Nos. 21A244 and 21A247 (finding that vaccine mandate for private companies, implemented through OSHA, exceeded the agency's congressionally delegated authority).

An initiative that utilizes technology platforms to provide the Government with users' data, that censors speech and viewpoints on important, current events and political issues, and that has a profound chilling effect (*see* Parts II (B), (C)), is precisely such a major question. *See Tiger Lily, LLC*, 5 F.4th at 672 (rejecting CDC's contention that it had authority to halt evictions nationwide via the same statute at issue in this case, as such a reading "would grant the CDC director near-dictatorial power for the duration of the pandemic[.]"). The lack of clear language authorizing censorship and intrusion demonstrates Congress did not delegate such authority. *Alabama Association of Realtors*, 141 S.Ct. at 2489. This conclusion is reinforced by the fact that, in the many decades since § 264 was enacted, the Surgeon General never before interpreted that statute to authorize the regulation of "misinformation." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324, 134 S. Ct. 2427, 2444, 189 L. Ed. 2d 372 (2014) ("When an agency claims to discover in a long-extant statute an unheralded power to regulate … we typically greet its announcement with a measure of skepticism.").

Congress did not authorize the Surgeon General or HHS to employ such a program. For this reason, the Surgeon General and HHS have vastly exceeded their delegated authority (which in fact Congress could not give them), so this action is *ultra vires* and invalid.

## B. Defendants' Initiative Constitutes a Flagrant Violation of Plaintiffs' First Amendment Rights to Free Speech and Free Expression

The First Amendment to the United States Constitution prohibits Congress from making laws "abridging the freedom of speech." U.S. Const. amend. I. The "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 573 (2002).[7] "The First Amendment gives freedom of mind the same security as freedom of conscience …. And the rights of free speech and free press are not confined to any field of human interest." *Thomas v. Collins*, 323 U.S. 516, 531 (1945); *see also Knight First Amend. Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 237 (2d Cir. 2019) ("As a general matter, social media is entitled to the same First Amendment protections as other forms of media."). Courts have long recognized that "debate on public issues should be uninhibited, robust, and wide-open[.]" *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964); *see Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 790 (2011) ("The Free Speech Clause exists principally to protect discourse on public matters[.]"). This "profound" commitment to the principle of free speech is even more necessary when, as here, the debate may include critical or "unpleasantly sharp attacks" on the government or its policies. *See id.* As Justice Learned Hand has explained, the First Amendment "presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection. To many

---

[7] The prohibition against restrictions on speech applies to all branches of government. *See Matal v. Tam*, 137 S.Ct. 1744, 1757 (2017) ("The First Amendment prohibits Congress and other government entities and actors from 'abridging the freedom of speech[.]'"); *New York Times Co. v. United States*, 403 U.S. 713, 714 (1971) (holding Nixon Administration's attempt to prevent publication of classified information violated First Amendment).

this is, and always will be, folly; but we have staked upon it our all." *U.S. v. Assoc. Press*, 52 F. Supp. 362, 372 (S.D.N.Y. 1943).

The First Amendment also protects the right to receive information. *See Martin v. U.S. E.P.A.*, 271 F.Supp.2d 38 (2002) (quoting *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 756 (1976) ("where a speaker exists …, the protection afforded is to the communication, to its source and to its recipients both.")). This right is "an inherent corollary of the rights to free speech and press that are explicitly guaranteed by the Constitution" because "the right to receive ideas follows ineluctably from the *sender's* First Amendment right to send them." *Board of Educ., Island Trees Union Free Sch. Dist. Number 26 v. Pico*, 457 U.S. 853, 867 (1982) (emphasis in original). *See also id.* (quoting *Lamont v. Postmaster General*, 381 U.S. 301, 308 (1965) (Brennan, J., concurring) ("The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them. It would be a barren marketplace of ideas that had only sellers and no buyers.")). As the Supreme Court has recognized, "[a] fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more." *Packingham v. North Carolina*, 127 S. Ct. 1730, 1735 (2017).

It is "axiomatic" that the Government may not "induce, encourage, or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 U.S. 455, 465 (1973). In a similar vein, private actors are considered governmental when jointly engaged with state actors to deprive an individual of his constitutional rights. *Dennis v. Sparks*, 449 U.S. 24 (1980), or where the state compels the act or controls the private actor. *See Blum v. Yaretsky*, 457 U.S. 991, 1004-05 (1982) (state action can be found where the state exercises coercive power on the private actor, provides "significant encouragement," or transfers into private

16

hands traditionally state powers); *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922 937 (1982) ("[T]he conduct allegedly causing the deprivation of a federal right [is] fairly attributable to the State.").

The only real question here is whether Defendants' statements directed at technology companies suffice to establish that they are "induc[ing], encourage[ing], or promot[ing]," *Norwood*, 413 U.S. at 465, the censorship of Plaintiffs' Twitter accounts. Without question, they are. *Cf. Council for Periodical Distributors Ass'n v. Evans*, 642 F. Supp. 552 (July 14, 1986), *judgment aff'd in pertinent part* 827 F.2d 1483 (11th Cir. 1987) (finding an unlawful system of prior restraint where government "knew and intended" that its threats would cause removal of constitutionally protected but sexually explicit material).

Defendants have made clear that they blame social media companies for American deaths and have threatened the companies with consequences unless those companies censor the views of individuals determined to be spreading what the *Government* deems to be "misinformation," in various ways that the Administration has identified. It is evident that the technology companies fear those consequences, as they have ramped up censorship of users—including Plaintiffs— deemed to have spread COVID "misinformation" following various public statements of individuals within the Biden administration—including Defendants.

The censorship is entirely viewpoint based and one-sided, as only users who oppose government-imposed COVID-19 mitigation measures and question the efficacy and safety of the vaccines are suspended, de-boosted, or otherwise suppressed. By utilizing tech companies including Twitter—through pressure, coercion, and threats—to censor perspectives that conflict with government messaging, the Surgeon General has turned Twitter's censorship into state action. *See Bantam Books v. Sullivan*, 372 U.S. 58, 62 (1963) (finding First Amendment violation when

a private bookseller stopped selling works that state officials deemed "objectionable" after they sent him a veiled threat of prosecution.); *Hammerhead Enterprises v. Brezenoff*, 707 F.2d 33, 39 (1983) ("Where comments of a government official can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request, a valid claim can be stated …. Similarly, claimants who can demonstrate that the distribution of items containing protected speech has been deterred by official pronouncements might raise cognizable First Amendment issues."). *See also Biden v. Knight First Amend. Inst.*, 141 S. Ct. 1220, 1226 (2021) (granting writ of certiorari, vacating judgment, and remanding to Second Circuit to dismiss case as moot) (Thomas, J., concurring) ("if the government coerces or induces [a private entity] to take action the government itself would not be permitted to do, such as censor expression of a lawful viewpoint," the First Amendment is implicated.).

Indeed, and quite similar to the facts presented here, in *Bantam Books*, 372 U.S. at 68, the Court rejected the Rhode Island Government Commission's argument that because it merely "exhort[ed] booksellers and advise[d] them of their legal rights" with respect to sale of pornography, there was no government action:

> This contention, premised on the Commission's want of power to apply formal legal sanctions, is untenable. It is true that appellants' books have not been seized or banned by the State, and that no one has been prosecuted for their possession or sale. But though the Commission is limited to informal sanctions—the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation—the record amply demonstrates that the Commission deliberately set about to achieve the suppression of publications deemed 'objectionable' and succeeded in its aim. We are not the first court to look through forms *to the substance* and recognize that informal censorship may sufficiently inhibit the circulation of publications to warrant injunctive relief.

*Id.* (emphasis added). *See also Speech First v. Schlissel*, 939 F.3d 756, 765 (6th Cir. 2019) ("The Response Team's ability to make referrals—*i.e.*, to inform OSCR or the police about reported

conduct—is a real consequence that objectively chills speech. The referral itself does not punish a student …. But the referral subjects students to processes which could *lead* to those punishments.").

The statements of Defendants and others within the Biden Administration, as well as the RFI, are the twenty-first century version of the Commission's approach. They are coercing, persuading, and intimidating technology companies to suppress views the Government has deemed objectionable, inhibiting the circulation of the perspectives of Plaintiffs (and others). *See Schlissel*, 939 F.3d at 765 ("Even if an official lacks actual power to punish, the threat of punishment from a public official who *appears* to have punitive authority can be enough to produce an objective chill.").

But not only that. The Government's RFI (tantamount to a warrantless search, *see infra* Part B (3)) is unequivocally state action, as Defendants have ordered technology companies to turn over private information of users who articulate ideas that the Government has decided constitute "misinformation." This RFI has had a profound chilling effect, evidenced by the suspensions of Mr. Senger and Mr. Kotzin just *days* after its announcement, as well as the attestations of Mr. Kotzin and Mr. Changizi that they are now even more afraid to address subjects that the Government has deemed controversial. Government action that chills speech—especially political speech—for fear of adverse consequences violates the First Amendment. *See Citizens United v. Federal Election Com'n*, 558 U.S. 310, 329 (2010) (political speech "is central to the meaning and purpose of the First Amendment."); *Speech First*, 939 F.3d at 765 ("[Plaintiff] maintains that the Response Team acts by way of implicit threat of punishment and intimidation to quell speech. We agree."). *See also Virginia v. Black*, 538 U.S. 343, 365 (2003) (holding that provision prohibiting flag-burning "chills constitutionally protected political speech … [which is] at the core of what the

First Amendment is designed to protect."); *Penny Saver Publications, Inc. v. Village of Hazel Crest*, 905 F.2d 150, 154 (7th Cir. 1990) ("Constitutional violations may arise from the chilling effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights.").

All three Plaintiffs have been deprived of their First Amendment rights to receive information, due to the atmosphere of censorship, and to engage freely with each other (and others on Twitter). That is especially so for Mr. Senger, who has been entirely excluded from participating in discourse on Twitter. *See Packingham v. North Carolina*, 127 S. Ct. at 1735. In sum, Plaintiffs have been deprived of their First Amendment rights to free speech, free expression, and to receive information, as a result of the Government's actions. They have shown that they will succeed on the merits of this claim.

### C. The RFI Constitutes a Warrantless Search, Violating the Fourth Amendment

The Fourth Amendment to the United States Constitution prohibits "unreasonable searches and seizures," and provides that "no warrants shall issue, but upon probable cause" as it "seeks to secure the privacies of life against arbitrary power." *Carpenter v. United States*, 138 S.Ct. 2206, 2214 (2018) (internal citations and quotation marks omitted). By including the Fourth Amendment in the Bill of Rights, the Framers sought "to place obstacles in the way of a too permeating police surveillance." *United States v. Di Re*, 332 U.S. 581, 595 (1948).

A search occurs when an individual has a subjective expectation of privacy, and that expectation of privacy is one that society recognizes is reasonable. *California v. Ciraolo*, 476 U.S. 207 (1986); *United States v. Jacobsen*, 466 U.S. 109 (1984). The Supreme Court recognizes that individuals have a reasonable expectation of privacy in digital records, including those given to private companies. *See Carpenter*, 138 S.Ct. at 2217. "A person does not surrender all Fourth

Amendment protection by venturing into the public sphere." *Id.* On the contrary, "what [one] seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Katz v. United States*, 389 U.S. 347, 351-52 (1967). Nor does the fact that the information in question may have been voluntarily given to third parties mean that the Fourth Amendment is inapplicable when the Government seeks that data. *See Carpenter*, 138 S.Ct. at 2219 (rejecting Government's contention that cell-site records are "fair game" because they are "business records" created and maintained by wireless carriers and finding that a warrant is needed for such a search); *City of Los Angeles v. Patel*, 135 S.Ct. 2443 (2015) (invalidating Los Angeles ordinance permitting warrantless police inspections of hotel guest records). Furthermore, searches conducted by administrative agencies constitute significant intrusions upon interests protected by the Fourth Amendment, requiring the safeguard of a warrant. *Camara v. Municipal Court of the City and County of San Francisco*, 387 U.S 523, 534 (1967).

Here, Defendants have demanded that Twitter (and other social media companies) provide them with "sources of misinformation" by May 2, without a warrant or probable cause. *See Carpenter*, 138 S.Ct. at 2221. Plaintiffs have a reasonable expectation of privacy in the non-public information they provided and continue to provide to and on Twitter—and that they did not agree to make available to the United States Government. Such information includes private phone numbers and email addresses connected to their accounts, as well as private messages and group chats. *See Riley v. California*, 573 U.S. 373, 403 (2014) (holding that warrants are required to search cell phones, as "[w]ith all they contain and all they may reveal, they hold for many Americans the privacies of life … . The fact that technology now allows an individual to carry such information in his hand does not make the information any less worthy of the protection for

which the Founders fought.") (internal citations and quotation marks omitted). The Government's demand therefore constitutes a warrantless search and violates the Fourth Amendment.

## III.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION

To satisfy the irreparable harm requirement, a plaintiff need only demonstrate that absent a preliminary injunction, he is "likely to suffer irreparable harm before a decision on the merits can be rendered." *Winter v. NRDC*, 555 U.S. 7, 22 (2008) (citation omitted). "A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007).

The deprivation of a constitutional right, "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) (recognizing that the loss of First Amendment rights, even for a minimal period of time, constitutes irreparable harm); *Newsom v. Norris*, 888 F.2d 371, 378 (6th Cir. 1989) ("The Supreme Court has unequivocally admonished that even minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief.").

As discussed, there is no question that Defendants violated Plaintiffs' First and Fourth Amendment rights. *See Covino v. Patrissi*, 967 F.2d 73, 77 (2d Cir. 1992) (holding that plaintiffs may establish irreparable harm based on alleged violation of Fourth Amendment rights); *McDonell v. Hunter*, 746 F.2d 785, 787 (8th Cir. 1984) (finding that a violation of privacy constitutes an irreparable harm); *Rodriguez v. Providence Cmty. Corr., Inc.*, 155 F.Supp.3d 758 (M.D. Tenn. 2015) ("When an alleged deprivation of a constitutional right is involved … most courts hold that no further showing of irreparable injury is necessary.").

Furthermore, if the RFI is not enjoined promptly, Plaintiffs' information will be given to the Government, an action that cannot be undone. Thus, there is further infringement on Plaintiffs' constitutional rights that *may not yet already have occurred,* making the preliminary injunction all the more warranted and all the more urgent. *See BST Holdings*, No. 21-60845 * 18 (5th Cir. 2021) (granting preliminary injunction because being forced to choose between vaccination and employment entailed a loss of constitutional freedoms, *even though* masking and testing was offered as an alternative to vaccination), *aff'd National Federation*, Nos. 21A244 and 21A247; (mandate "substantially burden[s] the liberty interests of reluctant individual recipients put to a choice between their job(s) and their jab(s)".).

## IV.  THE BALANCE OF EQUITIES (INCLUDING THE PUBLIC INTEREST) WEIGHS HEAVILY IN PLAINTIFFS' FAVOR

A preliminary injunction is proper when "the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. "These factors merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. "[T]here is a strong public interest in requiring that the plaintiffs' constitutional rights no longer be violated[.]" *Laube v. Haley*, 234 F. Supp. 2d 1227, 1252 (M.D. Ala. 2002); *see also Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights."); *See Coal. to Defend Affirmative Action v. Granholm*, 473 F.3d 237, 252 (6th Cir. 2006) ("[P]ublic interest lies in a correct application of the" law and "upon the will of the people … being effected in accordance with [the] law"); *Republican Party of Minn. v. White*, 416 F.3d 738, 753 (8th Cir. 2005) ("It can hardly be argued that seeking to uphold a constitutional protection ... is not per se a compelling state interest."); *Rodriquez*, 155 F. Supp.3d at 771 ("enforcing constitutional rights serves the public interest and the Court does not find such an obvious point to require much more explanation."). The Government has no legitimate interest in continuing to enforce and

promote an unconstitutional and otherwise unlawful initiative. Accordingly, the balance of equities weighs solidly in Plaintiffs' favor.

<div align="center">**CONCLUSION**</div>

For the reasons set out above, the Court should grant a preliminary injunction following briefing and a hearing, against Defendants' initiative and RFI. A form of order is attached as an exhibit to the preliminary injunction motion.

March 29, 2022

Respectfully submitted,

s/ *Angela Lavin*

Angela M. Lavin (0069604)
Jay R. Carson (0068526)
Local Counsel
WEGMANHESSLER
6055 Rockside Woods Boulevard North
Suite 200
Cleveland, Ohio 44131
Telephone: (216) 642-3342
Facsimile: (216) 642-8826
AMlavin@wegmanlaw.com

s/ *Jenin Younes*

Jenin Younes*
Litigation Counsel
Jenin.Younes@ncla.legal
*Admitted pro hac vice*
NEW CIVIL LIBERTIES ALLIANCE
1225 19th Street NW, Suite 450
Washington, DC 20036
Telephone: (202) 869-5210
Facsimile: (202) 869-5238
*Admitted only in New York. DC Practice limited to matters and proceedings before United States courts and agencies. Practicing under members of the District of Columbia bar.

*Attorneys for Plaintiffs*