# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**MARK CHANGIZI, *et al.*,**

       **Plaintiffs,**

    **v.**

**DEPARTMENT OF HEALTH
AND HUMAN SERVICES, *et al.***

       **Defendants.**

**Case No. 2:22-cv-1776**
**JUDGE EDMUND A. SARGUS, JR.**
**Magistrate Judge Chelsey M. Vascura**

## OPINION AND ORDER

This matter arises on Plaintiff Mark Changizi, Daniel Kotzin, and Michael Senger's (collectively, "Plaintiffs") Motion for Preliminary Injunction (ECF No. 9) and Motion for Limited Expedited Discovery, or, in the Alternative, to Exclude Defendants' Evidence (the "Motion to Compel") (ECF No. 27), to which Defendants Department of Health and Human Services, Surgeon General Vivek Murthy, and Secretary Xavier Becerra (collectively, "Defendants" or "HHS") have responded (ECF Nos. 31, 32). Simultaneously, HHS moves to dismiss Plaintiffs' claims pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) (the "Motion to Dismiss"). (ECF No. 30.)

For the reasons stated herein, the Court **GRANTS** HHS' Motion to Dismiss (ECF No. 30) and **DENIES AS MOOT** Plaintiffs' Motion for Preliminary Injunction (ECF No. 9) and Motion to Compel (ECF No. 27).

1

## I.  INTRODUCTION

Plaintiffs are three Twitter users who, for the better part of the past two years, have used their respective platforms to criticize conventional government responses to the COVID-19 pandemic. Until recently, Plaintiffs allege that Twitter more or less provided a free environment for users like them, "rarely suspending" individuals who—as Plaintiffs often did—questioned the "wisdom, efficacy, and morality" of public "lockdowns and mask and vaccine mandates." By March of 2021, however, the website allegedly changed its tune, doling out suspensions for violations of its policy against "demonstrably false or misleading COVID-19 information" at a faster rate.  Plaintiffs state they were ensnared in this crackdown. Now, they claim to be "heavily censored" on, or entirely banned from, the platform.

But Plaintiffs do not fault Twitter for allegedly stifling their COVID-19-related "tweets." To them, Twitter's actions were (and are) puppeteered by the federal government—or, more precisely, the executive branch of the federal government. Plaintiffs allege that, for nearly a year, members of the administration—including the Surgeon General—have waged an ostensible war against the spread of COVID-19 "misinformation" with the true intent of silencing individuals who, like them, express "opinions that diverge from the White House's messaging on COVID-19." They believe that Twitter has directly capitulated to this pressure campaign. And they contend that the public record bears this theory out.

Plaintiffs specifically rely on the days following March 3, 2022, to illustrate their point. On that date, the Surgeon General issued a Request for Information which, in relevant part, asked platforms like Twitter to voluntarily provide HHS with, *inter alia*, information concerning the breadth, channels, and "major sources" of "COVID-19 misinformation" (the "RFI"). Plaintiffs contend that the language of the RFI, along with "previous and contemporaneous statements" by

2

various Biden Administration officials, effectively put companies like Twitter "on notice" that the administration is "likely to escalate" its "involvement in social media censorship"—namely, through "adverse regulatory action." This, Plaintiffs assert, prompted Twitter to again "ramp up" enforcement of its COVID-19 policy to escape the administration's crosshairs—which, in turn, led the platform to muzzle Plaintiffs' accounts.

Plaintiffs thus accuse HHS of "instrumentalizing" or "commandeering" Twitter to both censor and "chill" online criticism of the government's pandemic response—activity which they assert infringed (and, in some respect, continues to infringe) (1) their rights under the First and Fourth Amendments of the United States Constitution, (2) the Administrative Procedure Act (the "APA"), and (3) 42 U.S.C. § 264(a). They now seek a range of declaratory and injunctive relief, including a preliminary injunction which requires HHS to both retract the RFI and abstain "from enforcing coercive policies or conditions that exert pressure upon Twitter and other technology companies to censor users."

## II. MOTION TO DISMISS

HHS contends that this Court lacks subject-matter jurisdiction to adjudicate Plaintiffs' claims because Plaintiffs do not have standing to bring them in the first place. It also contends that Plaintiffs have not sufficiently established that they are entitled to the relief they seek. Accordingly, HHS now moves to dismiss Plaintiffs' claims in their entirety pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (ECF Nos. 30, 31.)

### A. Legal Standards

#### 1. Rule 12(b)(1)

Rule 12(b)(1) motions to dismiss for lack of subject-matter jurisdiction "fall into two general categories: facial attacks and factual attacks." *United States v. Ritchie*, 15 F.3d 592, 598

(6th Cir. 1994). "A facial attack is a challenge to the sufficiency of the pleading itself," whereas "[a] factual attack challenges 'the factual existence of subject matter jurisdiction.'" *Id.* The distinction between the two is significant: for facial attacks, federal courts must take the complaint's "material allegations" as true and construe them in the "light most favorable" to the non-movant; for factual attacks, no level of presumptive truthfulness is warranted. *Id.* Rather, "the court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Id.* However a court construes the defendant's Rule 12(b)(1) motion, one thing remains true: "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice" to defeat it. *O'Bryan v. Holy See*, 556 F.3d 361, 376 (6th Cir. 2009) (citing *Mezibov v. Allen*, 411 F.3d 712, 716 (6th Cir. 2005)); *accord Rote v. Zel Custom Mfg. LLC*, 816 F.3d 383, 387 (6th Cir. 2016).

"Standing is a component of subject-matter jurisdiction." *Harris v. Lexington-Fayette Urban Cnty. Gov.*, 685 Fed. Appx. 470, 472 (6th Cir. 2017) (citation omitted). And it is a component that HHS, in bringing its Rule 12(b)(1) motion, contends Plaintiffs have entirely failed to establish. (ECF No. 31.) But neither HHS nor Plaintiffs identify whether HHS' standing argument is explicitly "facial" or "factual" in nature. This is a curious oversight, given that HHS relies on various posts by Twitter officials—portions of which Plaintiffs directly reference in their complaint—as part of a larger attack on the sufficiency of Plaintiffs' initial pleading. (*See id.* at PageID #211) (arguing that, contrary to Plaintiffs' assertion otherwise, "the chronology of events, as informed by sources cited by Plaintiffs themselves, firmly *undermines* any inference of a causal link" between HHS' alleged conduct and Twitter's disciplinary actions) (emphasis in original). In other words, HHS, in mounting what is more or less a facial 12(b)(1) attack, also challenges a core factual premise of Plaintiffs' complaint: that the Surgeon General "caused" Twitter to take more

4

severe action against COVID-19 "misinformation." (*Id.*) And it uses external documents that Plaintiffs cite in their initial pleading to do so. The question, then, is whether the Court may consider HHS' use of that evidence in its standing analysis, or whether it must solely operate on Plaintiffs' allegations.

Generally, "[i]f an attack on subject matter jurisdiction . . . implicates an element of the cause of action," courts must "confine [their] jurisdictional inquiry to the allegations in the plaintiff's complaint, no matter what evidence a defendant has submitted in attempting to disprove jurisdiction." *Harris*, 685 Fed. Appx. at 472 (quoting *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007)). Here, HHS' Rule 12(b)(1) motion attacks the notion that the harm Plaintiffs allegedly suffered—the "censorship" of their Twitter accounts—is "fairly traceable" to HHS. And, as discussed below, they raise a fair point. But that point is also one which undeniably "implicates" an element of Plaintiffs' constitutional claims—namely, whether the disciplinary measures that Twitter allegedly took amounted to "state action." *See, e.g.*, *Manhattan Community Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928, 204 L.Ed.2d 405 (2019) (noting that the "text and original meaning" of the First Amendment, "as well as this Court's longstanding precedents, establish that the Free Speech Clause prohibits only *governmental* abridgment of speech," rather than "*private* abridgment of speech") (emphasis in original) (citations omitted).

Accordingly, insofar as HHS' standing argument is concerned, the Court will cabin its "jurisdictional inquiry" to the non-conclusory allegations in Plaintiffs' complaint, which it will accept and favorably construe. *Harris*, 685 Fed. App'x at 472.

**2. Rule 12(b)(6)**

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. Furthermore, "[a]lthough for purposes of a motion to dismiss [a court] must take all the factual allegations in the complaint as true, [it is] not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 677–79 (quoting *Twombly*, 550 U.S. at 55) (internal quotations omitted).

The analysis entailed by Rule 12(b)(6) is "procedurally and substantively" distinct from its Rule 12(b)(1) analog. *Ohio Nat. Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990). Unlike with Rule 12(b)(1) motions, for example, a grant of dismissal under Rule 12(b)(6) is considered a "ruling on the merits." *Id.* at 325. To account for the preclusive effect such entails, Federal Rule of Civil Procedure 12(d) instructs courts to treat any Rule 12(b)(6) motion that presents "matters outside the pleadings" as if it were a motion for summary judgment filed pursuant to Federal Rule of Civil Procedure 56, thereby heightening the defendant's burden. *Id.*

But there is an exception to this rule. Specifically, where a defendant's 12(b)(6) motion references outside information—*e.g.*, "public records" or "items appearing in the record of the case"—that are "referred to" in the plaintiff's initial pleading and "central to the claims contained therein," a court may consider said information in the context of a traditional 12(b)(6) analysis. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (citing *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001)). That is the case here. (*See* Compl., ECF No. 1 at ¶¶ 17-18, 20, 22-54.) Thus, to the extent HHS relies on records that are cited by, and central to,

Plaintiffs' complaint, this Court may—in addition to Plaintiffs' well-pled allegations—consider those records in its 12(b)(6) analysis. *Bassett*, 528 F.3d at 430.

## B. Operative Facts

### 1. Twitter Confronts "Misleading" COVID-19 Information

For years, Twitter has functioned as one of "the world's leading social media websites, with a user base of hundreds of millions." (Compl., ECF No. 1 at ¶ 13.) Generally, the platform's users may publicly post, respond to, or republish messages (or "tweets") of limited length. (*Id.* at ¶ 11.) Tweets of any given user are conveyed on the "feeds" of other users who "follow" his or her account. (*Id.* at ¶ 12.) Thus, as a user's following grows, so too does the "reach" of his or her posts. (*Id.*)

Twitter has long maintained a policy against the spread of information that it perceives to be "harmful." Plaintiffs allege that, up until March of 2020, Twitter's enforcement of this policy generally "eschewed censorship." (*Id.* at ¶ 17.) Then came the pandemic—and, with it, a dearth of conclusively proven information related to COVID-19. Nevertheless, scientific consensus surrounding the virus quickly began to mount. Accordingly, on March 18, 2020, Twitter "broadened" its definition of "harmful information" to include "content that goes directly against guidance from authoritative sources of global and local public health information." (*Id.*) (citing Vijaya Gadde (@Vijaya) & Matt Derella (@Derella), *An Update on Our Continuity Strategy During COVID-19*, https://blog.twitter.com/en_us/topics/company/2020/An-update-on-our-continuity-strategy-during-COVID-19 (last updated April 1, 2020)). The company likewise announced "that it would censor information that fell into this category" (the "COVID-19 Policy"). (*Id.*)

In the months thereafter, "Twitter . . . ramp[ed] up [its] efforts to quell the spread of

'misleading' COVID-19 information" several times, "broadening the [term's] definition and explaining" that it would "label" or "remove" posts that it considered to be misleading. (*Id.* at ¶ 18.) Even so, Plaintiffs contend, Twitter "rarely" suspended users who violated its COVID- 19 Policy. (*Id.* at ¶ 19.) Then, on March 1, 2021, Twitter took a more hardline approach. (*Id.* at ¶ 20) (citing TWITTER, *COVID-19 Misleading Information Policy*, https://help.twitter.com/en/rules-and-policies/medical-misinformation-policy (last updated December 2021) (hereinafter the "March 2021 Update"). From then on, Twitter announced, users who violated its COVID-19 Policy between two to three times would have their accounts "locked" for twelve hours. *See* March 2021 Update. A fourth "strike" would result in a seven-day suspension. *Id.* And a fifth would lead to the offending user's permanent suspension, as well as an indefinite bar on their ability to create an account. (Compl., ECF No. 1 at ¶ 21.)

### 2. HHS Enters the Ring

From May of 2021 to January of 2022, various members of the administration—including President Biden, White House Press Secretary Jen Psaki ("Press Secretary Psaki"), and the Surgeon General—publicly expressed a range of critical views related to the spread of COVID-19 "misinformation" on social media platforms. (*Id.* at ¶¶ 20-46.) Plaintiffs specifically highlight the following chronology of events:

- **May 5, 2021**: Press Secretary Psaki publicly acknowledges President Biden's view that "major [social media] platforms have a responsibility related to the health and safety of all Americans to stop amplifying untrustworthy content, disinformation, and misinformation, especially related to COVID-19 vaccinations," that the President "supports better privacy protections and a robust anti-trust program," and that he believes "more needs to be done to ensure that this type of misinformation, disinformation[—]damaging, sometimes life-threatening

information[—]is not going out to the American public." (*Id.* at ¶ 22) (emphasis removed).

- **July 15, 2021**: The Surgeon General publishes an advisory related to COVID-19 "misinformation" (the "July Advisory"). (*Id.* at ¶ 23) (citing VIVEK H. MURTHY, CONFRONTING HEALTH MISINFORMATION: THE U.S. SURGEON GENERAL'S ADVISORY ON BUILDING A HEALTHY INFORMATION ENVIRONMENT (2021) (hereinafter "ADVISORY"). Therein, he states that "[m]isinformation" has "caused confusion and led people to decline COVID-19 vaccines, reject public health measures such as masking and physical distancing, and use unproven treatments." ADVISORY at 4. He also identifies "social media platforms" as a source of COVID-19 misinformation, *id.* at 5, and suggests various "areas of action" for them to address the issue, including:

  1. Granting "researchers access to useful data to properly analyze the spread and impact of misinformation[;]"

  2. Bolstering "the monitoring of misinformation"—for example, by "increas[ing] staffing of multilingual content moderation teams" and "improv[ing] machine learning algorithms in languages other than English since non-English-language misinformation continues to proliferate[;]"

  3. Improving their ability to detect "super spreaders" of misinformation;

  4. "Proactively" confronting "information deficits"—that is, instances where "there is high public interest in a topic but limited quality information available[;]" and

  5. Boosting "communications from trusted messenger and subject matter experts," such as "health and medical professionals" and "community organizations. *Id.* at 12.

That same day, the Surgeon General holds a joint press conference with Press Secretary Psaki. (Compl., ECF No. 1 at ¶ 28) (citation omitted). Therein, he notes that "[m]odern technology companies have enabled misinformation to poison our information environment with little accountability" and that "[t]hey've allowed people who intentionally spread misinformation—what we call 'disinformation'—to have an extraordinary reach." (*Id.* at ¶ 29.) He further states that HHS "expect[s] more" from social media platforms, and that it is "asking them to operate with

greater transparency and accountability . . . asking them to monitor misinformation more closely . . . [and] asking them to consistently take action against misinformation super spreaders on their platforms." (*Id.* at ¶ 30.) Press Secretary Psaki notes that the Biden Administration is "working to take" various actions in response to the spread of COVID-19 misinformation, including:

1. Increasing "disinformation research and tracking within the Surgeon General's office" and "flagging problematic posts for Facebook that spread disinformation[;]" and

2. Proposing various "changes . . .to social media platforms," including recommendations that they "publicly share the impact of misinformation on their platform" (such as "data on the reach of COVID-19 misinformation"), "create a robust enforcement strategy", "take faster action against harmful posts," and "promote quality information sources in their feed algorithm." (*Id.* at ¶ 31) (emphasis removed).

• **July 16, 2021**: Press Secretary Psaki is asked by a reporter to define the "role" the Biden Administration plays in "flagging Facebook 'disinformation.'" (*Id.* at ¶ 33) (citation omitted). She responds that "it shouldn't come as any surprise that we're in regular touch with social media platforms—just like we're in regular touch with all of you and your media outlets—about areas where we have concern [and] information that might be useful." (*Id.*) Press Secretary Psaki further notes, for example, that the Biden Administration "regularly mak[es] sure social media platforms are aware of the latest narratives dangerous to public health," and that the administration is actively "engaging" with the companies to "understand" their enforcement policies. (*Id.*)

That same day, President Biden is asked what his "message to platforms like Facebook" is with regard to "COVID misinformation."  (*Id.* at ¶ 42) (citation omitted).  His response: "They're killing people." (*Id.*)

• **July 20, 2021**: USA Today reports that "[t]he White House is assessing whether social media platforms are legally liable for misinformation spread on their platforms." (*Id.* at ¶ 44) (citation omitted). The report notes, in particular, that the Biden Administration is "examining how misinformation fits into the liability protections granted by Section 230 of the Communications

10

Decency Act." (*Id.* at ¶ 45.)

- **January 25, 2022**: The Surgeon General, in a media interview, remarks that "social media platforms still have not stepped up to do the right thing." (*Id.* at ¶ 46) (citation omitted). He also notes that "[t]his is about companies and individuals recognizing that the only way we get past misinformation is if we are careful about what we say and we use the power that we have to limit the spread of . . . misinformation." (*Id.*)

### 3. Twitter's Pre-RFI Disciplinary Action

Plaintiffs all created their respective Twitter accounts sometime between 2009 and 2014. (*Id.* at ¶¶ 57-59.) By March of 2020, all of them began to use those accounts to actively "question" state and federal responses to the COVID-19 pandemic, as well as to engage with like-minded individuals. (*Id.* at ¶ 56.) This activity led each of them to accrue relatively substantial followings. (*Id.* at ¶¶ 57-59.) It also earned them numerous temporary suspensions. Specifically, between April 2021 and December 2021, Twitter temporarily suspended Mr. Changizi three times, Mr. Senger twice, and Mr. Kotzin once. (*Id.* at ¶¶ 61-80.) Of these suspensions, five were explicitly predicated on violations of the platform's COVID-19 Policy, while one—levied against Mr. Changizi on December 1, 2021—was not based any particular rationale. (*Id.*); (*see also* Declarations of Michael Senger, Daniel Kotzin, & Mark Changizi, ECF Nos. 1-2, 1-3, 1-4.)

Twitter did not limit its disciplinary tactics to suspensions. It also allegedly resorted to more discrete measures, namely with respect to Mr. Changizi. By as early as May of 2021, for example, Plaintiffs contend that Twitter began to artificially lower (or "de-boost") the frequency in which Mr. Changizi's tweets appeared in other users' feeds. (*Id.* at ¶ 78-79.) It also allegedly began to hide his responses to certain posts. (*Id.*) These tactics, Plaintiffs assert, ultimately caused the number of users who "engaged" with (*i.e.*, "liked" or "retweeted") Mr. Changizi's tweets to

drop "precipitously." (*Id.* at ¶ 79.)

### 4. The RFI

On March 3, 2022, the Surgeon General issued the RFI. (*Id.* at ¶¶ 47, 53.) As noted, part of the RFI asks "technology platforms"—that is, all "general search engines, content sharing platforms, social media platforms, e-commerce platforms, crowd source platforms, and instant messaging systems"—to provide HHS with data concerning "sources of COVID-19 misinformation" by May 2, 2022. (*Id.* at ¶¶ 47-52.) The document broadly defines "misinformation" as "health information that is false[,] inaccurate, or misleading according to the best available evidence at the time." (*Id.* at ¶ 51.) And it defines the "sources" of this "misinformation" to include any "specific, public actors that are providing misinformation" or "components of specific platforms that are driving exposure to information." (*Id.* at ¶ 50.)

The RFI frames itself as part of a larger "information-gathering initiative" led by the Surgeon General. (*Id.* at ¶ 53.) By its text, it "does not carry a penalty" for noncompliance. (*Id.* at ¶ 49.) It also cautions its audience multiple times not to submit any "personally identifiable information" related to their users. *See* Dep't of Health & Hum. Servs., Docket HHS-OASH-2002-0006, Impact of Health Misinformation in the Digital Information Environment in the United States Throughout the COVID-19 Pandemic Request for Information (Mar. 10, 2022), *available at* https://www.regulations.gov/document/HHS-OASH-2022-0006-0001 (hereinafter "RFI Document").

### 5. Twitter's Post-RFI Disciplinary Action

Plaintiffs contend that the RFI—in tandem with the July Advisory and the above-mentioned statements of the Surgeon General, Press Secretary Psaki, and President Biden—compelled Twitter to further "ramp up" enforcement of its COVID-19 Policy. (*Id.* at ¶¶ 53-54, 67,

87.) They point to the following narrative of events to support this contention:

- **December 18, 2021**: Twitter permanently suspends Mr. Changizi for two tweets—one stating, *inter alia*, that "Covid is 10 to 20 times less dangerous than flu for kids," that there is "NO long term data for the shot," and that "even the short and medium data for that age group are ambiguous at best," and another asserting that "[v]accinations don't slow spread" and that unvaccinated individuals "pose no threat" to those who are vaccinated. (*Id.* at ¶ 80.) It is his third suspension overall. (*Id.* at ¶¶ 75-77.) Mr. Changizi internally appeals, and, ultimately, his account is re-activated on December 27, 2021. (*Id.* at ¶¶ 82-83.) Nevertheless, to this day, Mr. Changizi's account remains "heavily censored," to the extent that (1) his tweets are "typically labeled [as] 'age-restricted adult content'"—and, thus, "require an explicit effort to read"—and (2) his account name "does not occur in a search unless his name is fully typed." (*Id.* at ¶ 84.)

- **March 7, 2022**: Twitter temporarily suspends Mr. Kotzin—his second temporary suspension—for seven days after he tweets that "[i]t is important to never lose sight of the fact that the global pandemic is ending not because of vaccines, but because almost everyone on the planet got infected with covid." (*Id.* at ¶ 72.)

- **March 8, 2022**: Twitter permanently suspends Mr. Senger after he tweets that "the vast majority have realized that every COVID policy—from the lockdowns and masks to the tests, death coding, and vaccine passes—has been one, giant fraud." (*Id.* at ¶ 64.) It is his third overall suspension, with the previous two occurring on October 27, 2021, and October 29, 2021—each for twelve hours. (*Id.* at ¶ 61.)

## C. HHS' Rule 12(b)(1) Motion to Dismiss

Plaintiffs, as discussed, now bring claims against HHS arising under the First and Fourth Amendment, the APA, and 42 U.S.C. § 264(a) for "not simply colluding with, but

13

instrumentalizing Twitter and other technology companies" to "silenc[e] opinions that diverge from the White House's messaging on COVID-19." (*Id.* at PageID #4.) HHS argues that none of these claims are cognizable—principally because Plaintiffs lack standing to bring them, but also because their allegations do not "plausibly" state a claim for relief. (ECF No. 31 at PageID #209.) Because standing is a threshold issue, the Court directs its attention there first. *See Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990) ("[W]e are bound to consider the 12(b)(1) motion first, since the Rule 12(b)(6) challenge becomes moot if this court lacks subject matter jurisdiction.").

### 1. Standing

"Where subject matter jurisdiction is challenged pursuant to Rule 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive the motion." *Id.* Generally, this burden entails the plaintiff to allege enough "non-conclusory facts which, if true, establish . . . the district court['s] jurisdiction." *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 440 (6th Cir. 2012) (citation omitted). Because HHS' 12(b)(1) motion centers on the issue of standing, that is where Plaintiffs' burden lies.

Standing is an "essential and unchanging part of the case-or-controversy requirement of Article III" of the United States Constitution. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Three essential elements define this "irreducible constitutional minimum:"

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Id.* (internal quotation marks, brackets, and citations omitted).

Normally, when a plaintiff alleges that he or she was *directly* subjected to unlawful government action, "there is . . . little question" that standing exists. *Assoc. of Am. Physicians & Surgeons v. Schiff ("AAPS")*, 518 F. Supp. 3d 505, 513 (D.D.C. 2021) (quoting *Lujan*, 504 U.S. at 561), *aff'd* 23 F.4th 1028 (D.C. Cir. 2022). "But when a 'plaintiff's asserted injury arises from the government's allegedly unlawful regulation . . . of *someone else*, much more is needed.'" *Id.* (quoting *Lujan*, 504 U.S. at 562.) In those cases, standing is usually "substantially more difficult to establish." *Id.* (citation and internal quotation marks omitted).

HHS' 12(b)(1) challenge focuses on the second and third elements of the standing inquiry. It argues, specifically, that Plaintiffs have failed to sufficiently demonstrate (1) a "fairly traceable" causal connection between HHS and any past, present, or future disciplinary action taken by Twitter; and (2) that their injuries are sufficiently "redressable." On both counts, the Court agrees.

### a. Causation

HHS posits that all of Plaintiffs' claims rely on at least one of "two theories of injury:" First, that "Twitter has allegedly taken, and may again take, disciplinary action against them based on their Twitter posts," and second, that "Twitter allegedly may disclose, in response to the RFI, certain information concerning them." (ECF No. 31 at PageID #210.) Neither theory, in HHS' view, is sufficiently tied to any of its alleged actions. In other words, HHS contends that Plaintiffs have failed to establish that the "harm" Plaintiffs allegedly suffered (or will suffer) derives from anything other than Twitter's own "legitimate discretion." *Turaani v. Wray*, 988 F.3d 313, 316 (6th Cir. 2021).

### i. Twitter's Disciplinary Actions

HHS contends that Plaintiffs' complaint is "bereft of factual support for the conclusory allegation that any remedial actions that Twitter has taken (or may again take) against Plaintiffs

were (or will be) attributable to Defendants, rather than the 'independent' and 'legitimate discretion' of Twitter." (*Id.* at PageID #211.) Plaintiffs beg to differ. In their view, the *timing* of Twitter's actions gives away the game. Plaintiffs point to the fact that Twitter's various suspensions of Mr. Changizi, as well as its alleged "de-boosting" of his account, all "occurred right around the time the Government began its public campaign" against COVID-19 "misinformation." (ECF No. 33 at PageID #253.) They also highlight the fact Twitter's permanent suspension of Mr. Senger and (second) temporary suspension of Mr. Kotzin came "just *days* after the Surgeon General's RFI launched," as well as the fact "[n]one of them was ever suspended before the Biden Administration began its public campaign to combat 'misinformation' about COVID-19 last spring." (*Id.*) This "timeline of events," Plaintiffs assert, is more than enough to raise "an inference of causality" between HHS and Twitter's actions. (*Id.*)

The Court disagrees. Plaintiffs themselves allege that, in March of 2020—months before the current Surgeon General was even appointed—Twitter announced its intention to "censor" COVID-19 information that openly contravened "guidance from authoritative sources of global and local public health information." (Compl., ECF No. 1 at ¶ 17.) And they allege that "Twitter continued to ramp up efforts to quell the spread of 'misleading' COVID-19 information on several subsequent dates," including May 11, 2020, and December 16, 2020. (*Id.* at ¶ 18.) Why did Twitter establish—and progressively "ramp up" the enforcement of—its COVID-19 Policy nearly one year before HHS allegedly "commandeered" it? Plaintiffs do not explain. Nor, evidently, do they think it matters much. To them, the fact they were all able to post "similar, controversial tweets" *without* getting suspended "until the spring of 2021"—after the Biden Administration began to broadly ask social media companies to "do more" to combat COVID-19 "misinformation" —is enough.

But the entire administration is not a defendant here. HHS is. And Plaintiffs' own alleged timeline of events betrays the notion that HHS acted in any specific way to confront COVID-19 "misinformation" *before* Twitter began to heavily enforce its COVID-19 Policy. Plaintiffs contend that Twitter began to increasingly suspend users for posting COVID-19 "misinformation" in March of 2021. (*Id.* at ¶ 19.) It is not until four months later, on July 15, 2021, that they allege HHS (via the Surgeon General's publication of the July Advisory) first "command[ed] technology platforms" to take various steps against the spread of "misinformation." (*Id.* at ¶¶ 23-26.) They do not point to any specific attempt by HHS to confront COVID-19 "misinformation" before that point. Accordingly, Plaintiffs have failed to establish that Twitter acted on HHS' behest when it instituted, and began to enforce, the suspension policy that effectively underpins their complaint.[1]

That brings us to *AAPS*, which HHS relies upon as persuasive authority. In that case, a non-profit medical organization ("AAPS") brought a First Amendment claim against Congressman Adam Schiff after he, *inter alia*, (1) "sent letters" to Google, Facebook, and Amazon which "encourage[d] them" to prevent the spread of "inaccurate information on vaccines" and "requested information about what actions the companies currently take to address misinformation about vaccines on their platforms," and (2) publicly challenged the "immunity" those companies possess under Section 230 of the Communications Decency Act of 1996 during a congressional hearing. 518 F. Supp. 3d at 510. In so doing, AAPS alleged—akin to Plaintiffs here—that Congressman

---

[1] Plaintiffs seek to circumvent this conclusion by noting that the first threatening "public statement from someone in the Biden Administration [Press Secretary Psaki] blaming technology companies for 'misinformation' . . . occurred in May," and that "commonsense dictates that . . . technology companies were aware of the administration's position on the matter" before that point because the two would have had "discussions." (Compl., ECF No. 1 at ¶ 87 n. 17.) Setting aside the fact neither Press Secretary Psaki nor the entire Biden Administration are defendants in this case, this sort of "bald speculation" is far from enough to save Plaintiffs from the timeline they have set forth. *AAPS*, 518 F. Supp. 3d at 515. And even assuming that members of the Biden Administration did have "discussions" with "technology companies," it is entirely unclear who participated in these talks, when they occurred, or what they supposedly entailed. In other words, Plaintiffs' "commonsense" assertion says next to nothing about HHS, Twitter, or the state of their relationship after March of 2021.

Schiff "intended to put . . . technology companies on notice that they would need to comply with [his] position" or risk suffering adverse legislative action. *Id.* AAPS also alleged that "a number" of those companies—including Twitter—heightened their regulation of "vaccine-related" content "because of Congressman Schiff's statements," leading them to impede AAPS' access to, and publication of, vaccine-related information. *Id.* at 510-11.

AAPS' complaint failed every element of the district court's standing analysis. *Id.* at 513-17. And insofar as the court focused on causality, it found numerous deficiencies, including the fact that a notable portion of Congressman Schiff's allegedly unlawful actions—namely, his "comments at the [congressional hearing]"—"occurred after the technology companies" began to more heavily moderate vaccine-related information. *Id.* at 516 n. 12. To that extent, AAPS "fail[ed] to establish a chronological chain of causation between [Congressman Schiff's] comments" and their alleged injuries. *Id.* And that—in addition to AAPS' disregard of the "innumerable other potential causes for the actions taken by the technology companies"—ultimately meant it failed to show that its injuries could be "fairly traced" to Congressman Schiff. *Id.* The United States Court of Appeals for the District of Columbia Circuit affirmed this approach. *Assoc. of Am. Physicians v. Schiff ("AAPS II")*, 23 F.4th 1028, 1034 (D.C. Cir. 2022) (noting that, "[e]ven assuming" the technology companies at issue changed their vaccine-related information policies in anticipation to potential adverse legislative action, many of their decisions to do so "occurred before [Congressman] Schiff even sent" his allegedly unlawful letters or public comments).

Plaintiffs argue—in vain—that *AAPS'* logic does not hold with equal force here. Much of their position boils down to the fact that AAPS did not allege, as Plaintiffs do here, that their online speech has been, and will continue to be, "chilled" by government action. (ECF No. 33 at PageID #255-56.) Plaintiffs, in other words, assert that the fact they self-censor because of the "implicit

threat" that HHS will cause Twitter to take punitive action against them is, for present purposes, sufficient to establish standing.[2] (*Id.*)

But that again implies HHS has effectively deprived Twitter of the ability to make its own disciplinary decisions. Plaintiffs, for the reasons cited above, have not sufficiently alleged that is the case. Nowhere in their complaint do they reconcile their overarching theory—that HHS has effectively dictated Twitter's enforcement of its COVID-19 Policy since March of 2021—with the numerous efforts that Twitter took to "quell the spread of 'misleading' COVID-19 information" *before* HHS took any position on the matter (including Twitter's adoption of new COVID-19 Policy on March 1, 2021). (Compl., ECF No. 1 at ¶¶ 18-19.) Nor, as HHS notes, do they account for the "innumerable other potential causes" that may have driven, or currently drive, Twitter's behavior, including "widespread societal concerns about online misinformation." *See AAPS II*, 23 F. 4th at 1034-35.

Plaintiffs, in other words, have failed to "establish a chronological chain of causation between" HHS' actions and Twitter's disciplinary measures. *AAPS*, 518 F. Supp. 3d at 505. And that—in tandem with Plaintiffs' other oversights—lends itself to the notion that Twitter's past and current disciplinary measures were (and are) the product of its own "legitimate discretion," not HHS' "command[s]." *Turaani*, 988 F.3d at 317. At the very least, it does not permit this Court to draw the reasonable inference that HHS, specifically, "instrumentaliz[ed]" Twitter's conduct.

To that end, Plaintiffs' causation showing falls well short of the mark. *Id.*; *see also AAPS*

---

[2] Plaintiffs simultaneously point out that "standing requirements are relaxed" in the First Amendment context. (ECF No. 33 at PageID #255.) They cite *Secretary of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 956 (1984) for this proposition. But *Munson* simply stated that, in some circumstances, courts may relax "prudential limitations" on third-party standing when a plaintiff brings a facial overbreadth challenge against a statute. *Id.* This is so because the "very existence" of an overbroad statute may "chill" free speech. *Id.* (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973)). Plaintiffs here are not challenging a statute; they are challenging HHS' alleged influence over a private social media company. They fail to acknowledge this difference. Nor do they sufficiently explain why the rationale that underpins *Munson* applies here.

*II*, 23 F. 4th at 1034-35; *AAPS*, 518 F. Supp. 3d at 505.

        ii. <u>The RFI</u>

Plaintiffs' second alleged theory of injury—that Twitter will disclose Plaintiffs' private information to HHS—fails for effectively the same reasons. Plaintiffs acknowledge that the RFI, on its face, "does not carry a penalty" for noncompliance. (Compl., ECF No. 1 at ¶ 49.) Nor does its language make any specific reference to Plaintiffs, or even quantify how many "sources of misinformation" a respondent should provide.[3] (*Id.* at ¶¶ 50-52.) Plaintiffs do not even allege that Twitter definitively *will* respond to the RFI. To that end, and in light of the foregoing, Plaintiffs' anticipated RFI-related injuries—insofar as they suffer any at all—would primarily be of Twitter's own doing. That, again, suggests that Plaintiffs' "quarrel is with [Twitter], not [HHS]." *Turaani*, 988 F.3d at 316.

    **b. Redressability**

"[T]o establish redressability, a plaintiff must show that it is 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *AAPS*, 518 F. Supp. 3d at 516 (quoting *Lujan*, 504 U.S. at 561). "An injury is redressable if a court order can provide "'substantial and meaningful relief.'" *Parsons v. U.S. Dep't of Just.*, 801 F.3d 701, 715 (6th Cir. 2015) (quoting *Larson v. Valente*, 456 U.S. 228, 243 (1982)).

> [A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his every injury. The relevant standard is likelihood—whether it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. Redressability is typically more difficult to establish where the prospective benefit to the plaintiff depends on the actions of independent actors.

*Id.* (internal quotation marks and citations omitted).

---

[3] It is certainly no guarantee that a website "with a user base of hundreds of millions" will choose to provide the information of three users, even if they have a substantial amount of followers. (Compl., ECF No. 1 at ¶ 13.)

HHS argues that, even if Plaintiffs had managed to adequately establish causation, "they would still lack standing since they cannot show" that the prospective relief they seek—namely, an injunction on HHS' ability to pursue "coercive policies or conditions that exert pressure upon Twitter and other technology companies to censor users," as well as various legal declarations that such activity is unlawful—is likely to redress their stated injuries. (ECF No. 31 at PageID #214.) That, HHS contends, is because Twitter may still "*independently* conclude that it is in its interest to take remedial action against Plaintiffs, as [their alleged] sequence of events indicates the company has been doing all along." (*Id.*) Plaintiffs disagree. In their eyes, it is "'substantially' likely" that, "absent pressure from the Government," Twitter would reverse course on its alleged "censorship" spree, and "would not have suspended" Plaintiffs' Twitter accounts in the first place. (ECF No. 33 at PageID #260.) This is so, they argue, because Twitter has long recognized that its popularity subsists (or, at the very least, subsisted) on its reputation as a "free speech haven," and thus understands that "[d]riving users away *en masse* is typically not a profitable business strategy." (*Id.*)

Again, Plaintiffs' own narrative belies their stance. The facts alleged, as discussed above, demonstrate that Twitter began to increasingly suspend users—including Mr. Changizi—who violated its COVID-19 Policy well before HHS took any specific position on the matter. (*See* Compl., ECF No. 1 at ¶¶ 18, 75) (alleging that Mr. Changizi was first temporarily suspended by Twitter in April of 2021 for posting "an article finding that masks were 'ineffective [and] harmful'"). Plaintiffs have failed to articulate *how* HHS, specifically, dictated these disciplinary measures. Nor have they explained *why* these measures were any less of a discretionary matter for Twitter than its previous efforts to "quell the spread of 'misleading' COVID-19 information." (*Id.*

21

at ¶ 18.) And, as discussed, the same goes for Twitter's subsequent disciplinary measures.[4] Plaintiffs also fail to substantiate anywhere in their complaint their suggestions that Twitter's actions have "driv[en] users away *en masse*," that this supposed exodus has been unprofitable, that Twitter *believes* its enforcement of its COVID-19 Policy comes to the overall detriment of its financial health, or that Twitter would not prioritize other, non-economic aspects of its business during a global health emergency.[5]

In sum, Plaintiffs' non-conclusory allegations—even when taken as true and construed in their favor—do not establish that their requested relief is "substantially likely" to mitigate Twitter's enforcement of its COVID-19 Policy. *See Ritchie*, 15 F.3d at 598. To that extent, Plaintiffs have failed to show that the relief they seek could sufficiently "redress" their alleged injuries. *Parsons*, 801 F.3d at 715.

### D. HHS' Rule 12(b)(6) Motion to Dismiss

Even if Plaintiffs have established enough facts to establish standing—and this Court holds they have not—HHS contends that none of their claims pass muster under Rule 12(b)(6). The Court agrees. And in the interest of thoroughness, it will explain why.

#### 1. First Amendment Claim

Plaintiffs allege that HHS' "instrumentaliz[ation]" of Twitter to censor viewpoints that do

---

[4] Plaintiffs point to the fact that the Surgeon General has, in various instances, asked social media companies to "do more" to address COVID-19 "misinformation" as the animating factor behind Twitter's increase in suspensions. But broad requests such as these, absent more, are plainly not enough to strip Twitter of its ability to govern itself. Plaintiffs' assertion that these requests carried the clear subtext of potential "adverse regulatory action" does not change the equation. For one, Plaintiffs do not elaborate what "adverse action," if any, HHS could take against noncompliant social media companies. And to the extent Plaintiffs believe that some other executive agency not before this Court would step in to regulate noncompliant platforms, they do not identify (1) what agency that is; (2) what action they would take; or (3) why that action would be enough to compel "one of the largest social media platforms in the world" to unilaterally cede its authority to moderate its own content.

[5] It is entirely possible, for instance, that Twitter believes its actions were (and are) necessary to save itself from losing other sources of revenue, such as advertisers (or other users) who do not want to be associated with a company that passively allows "misinformation" to spread. Or it is possible that Twitter simply chose to prioritize tackling the spread of perceived COVID-19 mistruths over its profitability.

not comport with White House messaging constitutes clear "viewpoint discrimination," and that it has manifested a "profound chilling effect" on the manner in which Twitter users like Plaintiffs speak their ideals and engage with one another online. (Compl., ECF No. 1 ¶¶ 136-37.) To that end, Plaintiffs claim that HHS has violated their First Amendment "rights to free speech and free expression, and to receive information." (*Id.* at ¶ 146.)

### a. State Action

The First Amendment "safeguard[s] the rights of free speech and assembly" by placing certain "limitations on state action," rather than the acts of private entities. *Lloyd Corp., Ltd. v. Tanner,* 407 U.S. 551, 567 (1972). "To draw the line between governmental and private," federal courts apply "what is known as the state-action doctrine." *Halleck*, 139 S. Ct. at 1926. That doctrine allows private entities to qualify as "state actors" for First Amendment purposes "in a few limited circumstances—including, for example, (i) when the private entity performs a traditional, exclusive public function; (ii) when the government compels the private entity to take a particular action; or (iii) when the government acts jointly with the private entity." *Id.* at 1928 (citations omitted). Here, Plaintiffs' First Amendment claim falls within the second category.

"[A] State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982); *see also Snodgrass-King Pediatric Dental Assoc., P.C. v. DentaQuest USA Ins. Co., Inc.*, 780 Fed. App'x 197, 204-05 (6th Cir. 2019) (citing *S.H.A.R.K. v. Metro Parks Serving Summit Cty.*, 499 F.3d 553, 564 (6th Cir. 2007) (citation omitted)). The analysis this "state compulsion" test entails is "necessarily 'a normative and fact-bound endeavor.'" *Snodgrass-King*, 780 Fed. App'x at 205. Nevertheless, it is well-settled that the "[m]ere approval of or acquiescence in the

initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives" on a First Amendment claim. *Id.* (citing *Blum*, 457 U.S. at 1004-05). "More is needed." *Id.* Private action that is predicated on "some rule of decision for which the State is responsible," for example, is generally enough to satisfy the "state compulsion" test. *West v. Atkins*, 487 U.S. 42, 52 n. 10 (1988). But private action that is "based on independent professional judgment," by contrast, usually fails the same inquiry. *Id.*

### b. Arguments

HHS contends that Plaintiffs have not plausibly established that it coerced Twitter (or subjected it to a "similar degree of encouragement") to violate Plaintiffs' First Amendment rights. In the main, it points to the fact the Surgeon General—whether through his public comments or issuance of the July Advisory and RFI—never once purported to "mandate" Twitter (or any other social media company) to take any specific disciplinary action, let alone against Plaintiffs. Rather, it asserts, he "simply did what government officials do routinely: express their views on important issues of public policy" by "propos[ing] certain strategies and request[ing] certain information." (ECF No. 35 at PageID #359) (quoting *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 598 (1998) for the proposition that "[i]t is the very business of government to favor and disfavor points of view on . . . innumerable subjects") (Scalia, J., concurring)). HHS argues further that, because Twitter must invariably decide whether a given tweet contains "misinformation," and because Plaintiffs have not specifically tied HHS to any of the discipline they have faced (or may face), the company's actions cannot be attributed to HHS. (*Id.* at PageID #360.)

Plaintiffs disagree—not only with HHS' assessment of the facts, but also with its entire characterization of their First Amendment claim. They assert, rather, that their constitutional and statutory claims "are based upon an atmosphere of Government censorship created by the

24

statements of" Press Secretary Psaki, the Surgeon General, and "other members of the Biden Administration." (ECF No. 33 at PageID #268.) And "[w]hile the [July] Advisory and RFI contribute to that environment," Plaintiffs contend "they are not the sole bases" for their lawsuit. (*Id.*)

Again, HHS is the named defendant and stated target of Plaintiffs' First Amendment claim. Whether or not HHS is liable on that claim invariably centers on a "fact-based" analysis of its *own* conduct—not that of other, non-party government officials. *Snodgrass-King*, 780 Fed. Appx. at 205; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (noting, in the context of a *Bivens* or 42 U.S.C. § 1983 claim, that "a plaintiff must plead that each Government-official defendant, through the official's *own individual actions*, has violated the Constitution") (emphasis added). Plaintiffs do not readily point to any specific caselaw which suggests otherwise. Thus, the Court will only consider Press Secretary Psaki and President Biden's alleged conduct solely to the extent it has any direct bearing on the alleged "coerciveness" of HHS. And it will construe Plaintiffs' counterarguments accordingly.

### c. Analysis

Plaintiffs contend that the various statements and actions of the Surgeon General, when examined in their totality, leave "no question that the message conveyed to tech companies is that if they do not 'do more'. . . they will suffer consequences." (ECF No. 33 at PageID #270.) They cite *Nat'l Rifle Assoc. of America v. Cuomo ("National Rifle")*, 350 F. Supp. 3d 94 (N.D.N.Y. 2018) to support this belief.

In *National Rifle*, the National Rifle Association ("NRA") brought, *inter alia*, a First Amendment freedom of speech claim against then-Governor of New York, Andrew Cuomo ("Governor Cuomo"), the New York State Department of Financial Services ("DFS"), and the

25

Superintendent of DFS, Maria Vullo ("Superintendent Vullo"). *Id.* at 111. It predicated this claim on an array of conduct, including (1) DFS' communication of "'backchannel threats' to banks and insurers with ties to the NRA that they would face regulatory action if they failed to terminate their relationships with the NRA[;]" (2) Governor Cuomo's issuance of a press release which, *inter alia*, explicitly urged "insurer and bankers . . . doing business in New York to join the companies that have already discontinued their arrangements with the NRA[;]" and (3) various "guidance letters" issued by Superintendent Vullo which effectively conveyed the same message. *Id.* at 111-115. The NRA—akin to Plaintiffs here—alleged that the defendants' messaging, in its totality, implicitly threatened banking and insurance companies "critical to the survival of the NRA" with adverse regulatory action if they did not cut ties as instructed. *Id.* And that, it asserted, was enough to plausibly establish that the defendants had "coerced" those entities in an effort to "obstruct, chill, deter, and retaliate against the NRA's core political speech." *Id.*

The *National Rifle* court, after an extensive analysis, agreed. *Id.* at 115-19. As Plaintiffs note, it did so on the recognition that the defendants' comments could be "reasonably interpreted" to "intimat[e] that some form of punishment or adverse regulatory action" would follow if its intended targets—the banking and insurance companies that transacted with the NRA—did not "accede" to their "request[s]." *Id.* at 114 (citation omitted). Plaintiffs contend that same principle applies here. And they assert that it warrants in favor of denying HHS' Rule 12(b)(6) challenge. (ECF No. 33 at PageID #270.)

But the circumstances underlying *National Rifle* differ substantially from the instant case. Here, Plaintiffs do not allege that the Surgeon General (or HHS as a whole) has the power to take adverse regulatory action against social media companies like Twitter—or, for that matter, that he

26

has "actually exercised" such regulatory power.[6] *See National Rifle*, 350 F. Supp. 3d at 114-15. Indeed, Plaintiffs explicitly allege that the agency *lacks* congressional authority to even "urge" social media companies to moderate certain content. (Compl., ECF No. 1 at ¶ 110.)

HHS' alleged conduct is also largely distinguishable from that of the defendants in *National Rifle*. The *National Rifle* defendants specifically targeted the NRA. Not so here. Nowhere, for instance, do Plaintiffs allege "that any Defendant either told Twitter that Plaintiffs' posts in particular contain misinformation, or defined 'misinformation' in a manner that would necessarily include Plaintiffs' posts."[7] (ECF No. 35 at PageID #344.) Nor, in light of the HHS' lack of alleged regulatory authority,[8] do the Surgeon General's public comments—even when read favorably—plausibly lend themselves as "threats" against Twitter. (*See* Compl., ECF No. 1 at ¶ 30) ("We're *asking* them to operate with greater transparency and accountability. We're *asking* them to monitor misinformation more closely.") (emphasis added); ADVISORY at 6 (citing Twitter, specifically, for the proposition that "[s]ome technology platforms have *improved* efforts to monitor and address misinformation by reducing the distribution of false or misleading posts and directing users to health information from credible sources") (emphasis added);

---

[6] Nor do Plaintiffs plausibly allege that HHS "ha[s] the power to direct or encourage others" to take adverse regulatory action against Twitter. *See National Rifle*, 350 F. Supp. 3d at 115 (citing *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 66 (1963)).

[7] As HHS points out:

> Plaintiffs admit that the Surgeon General did not provide a specific definition of misinformation [in the July Advisory and RFI], and they instead argue that the lack of a concrete definition has chilled their speech because they cannot anticipate what speech will be permitted on Twitter. But Plaintiffs' concern is that they do not know how *Twitter* will define misinformation when *Twitter* decides which posts warrant remedial actions. [HHS], however, [is] not dictating those decisions, and are thus not responsible for them.

(ECF No. 35 at PageID #344.)

[8] *Cf. National Rifle*, 350 F. Supp. 3d at 116 ("Viewed in the light most favorable to the NRA, *and given DFS' mandate—'effective state regulation of the insurance industry' and the 'elimination of fraud, criminal abuse and unethical conduct by, and with respect to, banking, insurance and other financial services institutions,'*—the Cuomo Press Release and the Guidance Letters, *in the context of DFS' regulatory enforcement actions . . .* could reasonably be interpreted as threats of retaliatory enforcement . . . .") (emphasis added).

RFI Document at 1 ("The Office of the Surgeon General *requests* input from interested parties on the impact and prevalence of health misinformation in the digital information environment during the COVID-19 Pandemic . . . *Please feel free to respond to as many topics as you choose*.") (emphasis added).

To that end, the Court agrees with HHS that its efforts to confront COVID-19 misinformation, as alleged, do not "reasonably" constitute an exercise of "coercive power" over Twitter. *Blum*, 457 U.S. at 1004. Thus, because Plaintiffs' allegations do not pass muster under the "state compulsion" framework, and because they do not make any colorable argument that any other exception to the state-action doctrine applies, Plaintiffs' First Amendment claim fails.

### 2. Fourth Amendment Claim

Plaintiffs assert that the RFI constitutes a "warrantless" search of their private online information in violation of their Fourth Amendment rights. (Compl., ECF No. 1 at ¶ 160.) This is so, they allege, because the RFI "demand[s] that Twitter (and other social media companies) provide them with 'sources of misinformation.'" (*Id.* at ¶ 156.)

The Fourth Amendment vests private citizens with the right to be free from "unreasonable searches and seizures." U.S. Const. amend. IV. But this provision, like the First Amendment, has definitive limits. For one, it only extends to "intrusive" or "invasive" government action. *United States v. Miller*, 982 F.3d 412, 421 (6th Cir. 2020). And for that action to constitute an "unreasonable search," it must encroach upon "a person's 'expectation of privacy that society is prepared to consider reasonable.'" *Id.* at 426 (citing *United States v. Warshak*, 631 F.3d 266, 284 (6th Cir. 2010)); *see also Skinner v. Ry. Lab. Execs. Ass'n,* 489 U.S. 602, 613–14 (1989).

"Not all government actions," however, "are invasive enough to implicate the Fourth Amendment." *Warshak*, 631 F.3d at 284. An unlawful "search and seizure," for example, "does

not occur just because an officer 'approaches an individual and asks a few questions'" that the individual can decline to answer. *United States v. Armando-Martinez*, 792 Fed. Appx. 610, 611 (10th Cir 2019) (quoting *Florida v. Bostick*, 501 U.S. 429, 439 (1991)); *see also Bostick*, *supra* at 437 ("The Fourth Amendment proscribes unreasonable searches and seizures; it does not proscribe voluntary cooperation."). Only when "official intimidation or harassment" strips the individual of the ability to "[c]onsent" to questioning does the activity transcend the Fourth Amendment's bounds. *Bostick*, 501 U.S. at 438.

Here, both parties spar over whether the RFI constitutes an "unlawful search." HHS argues that it cannot, given that Twitter's response to the RFI (if it gives one at all) would be (1) voluntary—and, thus, not an act of "intrusion"—and (2) predicated on *Plaintiffs'* own disclosure of their private information to Twitter. Plaintiffs, by contrast, argue that "[t]he question in this case is. . . not whether the RFI is an intrusion, but rather whether it demands information from Twitter in which Plaintiffs maintain a reasonable expectation of privacy."

Plaintiffs premise their argument on the notion that the RFI constitutes a "demand." But the express language of the document—even when construed favorably—lends itself to a much different idea. As Plaintiffs note, the RFI does not penalize "technology companies" that do not respond to it. (Compl., ECF No. 1 at ¶ 49.) It also repeatedly states that respondents may answer "as many topics as [they] choose," that they can "respond to some or all" of its content, and that they should *not* submit their users' "personally identifiable information." RFI Document at 3, 5, 8; *see also id.* at 5 ("All information should be provided at a level of granularity that preserves the privacy of users.").

The RFI's language, to be sure, is not the only basis Plaintiffs cite for their framing of the document. They also rely on the fact HHS issued it *after* the Surgeon General (and various Biden

Administration officials) "commanded" social media companies to "do more" to combat COVID-19 misinformation. (Compl., ECF No. 1 at ¶ 53.) In Plaintiffs' view, this clearly shows that the RFI is a "demand masquerading as an innocent 'request.'" (*Id.*)

But, again, none of the Surgeon General's statements (or those of Press Secretary Psaki or President Biden, for that matter) makes the RFI appear any less flexible. At no point in the Surgeon General's string of alleged public comments did he even mention the RFI. Nor, as discussed, did he ever plausibly suggest that Twitter *must* turn over Plaintiffs' private information if it wishes to avoid HHS' regulatory oversight. He simply conveyed his position that the country's social media landscape—which includes much more than Twitter—can "do more" to combat the spread of COVID-19 "misinformation" and suggested various recommendations as to what "more" might entail. "A government entity has the right to 'speak for itself' . . . 'say what it wishes,' and to select the views that it wants to express." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467-68 (2009) (citations omitted). Broad stances like those embraced by the Surgeon General embody that right. And they are no more coercive than any of the other one-sided views that government officials routinely embrace.[9]

Plaintiffs, in other words, have not plausibly established that the RFI is anything other than what it purports to be: a request. And a mere non-compulsory request for information from the government does not constitute "intrusive" or "invasive" action. *See United States v. Jones*, 565 U.S. 400, 408 (2012) ("A trespass on 'houses' or 'effects,' or a *Katz* invasion of privacy, is not alone a search unless it is done to obtain information; *and the obtaining of information is not alone*

---

[9] Twitter, in other words, may very well share the Surgeon General's view on the exigency of combatting COVID-19 misinformation, or even adopt his recommendations on how to do so. But those facts alone do not logically suggest that the Surgeon General's public comments *forced* Twitter to align with his office's views. Any number of reasons, as discussed, could have led Twitter to take this "tack" on its own. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 225 (2013) (Scalia, J., dissenting); *see also AAPS*, 518 F. Supp. 3d at 516. This is especially apparent given the actions Twitter took to combat COVID-19 misinformation before HHS even weighed in on the matter. (*See* Compl., ECF No. 1 at ¶¶ 17-20.)

*a search unless it is achieved by such a trespass or invasion of privacy*."); *Hotop v. City of San Jose*, 982 F.3d 710, 720 (9th Cir. 2020) ("[T]he Supreme Court's Fourth Amendment jurisprudence has consistently found that government collection of information effects a search only when it involves some physical intrusion or its functional equivalent.") (Bennett, J., concurring) (citations omitted); *Armando-Martinez*, 792 Fed. Appx. at 611 (holding that an individual's "voluntary" response to "an agent's non-coercive questions" brought those questions "outside the scope of the Fourth Amendment"). That means the RFI is not a "search." And to that extent, Plaintiffs have not made out a plausible Fourth Amendment claim.[10]

### 3. APA Claim

Plaintiffs allege that the Surgeon General's "initiative" against COVID-19 misinformation—which they define as "the July Advisory, the . . . RFI, and [his] continuous pressure on social media companies at least throughout that time but likely before"—embodies "final agency action" under the APA. (Compl., ECF No. 1 at ¶ 166.) That, they contend, means the July Advisory and RFI needed to proceed through the statute's notice-and-comment

---

[10] Nor have Plaintiffs plausibly alleged that HHS "invaded" (or will "invade") any reasonable expectation of privacy. (Compl., ECF No. 1 at ¶¶ 15-16.) "[A] person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." *Carpenter v. United States*, 138 S. Ct. 2206, 2216, 201 L.Ed.2d 507 (2018). "That remains true 'even if the information is revealed on the assumption that it will be used only for a limited purpose.'" *Id.* (quoting *United States v. Miller*, 425 U.S. 435, 443 (1976)). Plaintiffs seek to circumvent this general rule by pointing to the Supreme Court's decision in *Carpenter* and the Sixth Circuit's decision in *Warshak*. (ECF No. 33 at PageID #273-74.) But neither case is controlling here. Both, for starters, involved clear acts of government compulsion. *Carpenter*, 138 S. Ct. at 2212 ("Federal Magistrate Judges issued two orders directing Carpenter's wireless carriers—MetroPCS and Sprint—to disclose "cell/site sector [information] for [Carpenter's] telephone[ ] at call origination and at call termination for incoming and outgoing calls" during the four-month period when the string of robberies occurred."); *Warshak*, 631 F.3d at 283 ("In January 2005, the government obtained a subpoena under § 2703(b) and compelled NuVox to turn over the emails that it had begun preserving the previous year."). *Carpenter* also involved information (cell phone location data) which, unlike here, was gathered "by dint of operation, *without any affirmative act* on the part of the user." 138 S. Ct. at 2220. (*Cf.* Compl., ECF No. 1 at ¶ 15) (noting that all Twitter users must affirmatively provide their names, phone numbers, and addresses when they choose to create an account). And while Plaintiffs may invoke *Warshak* to substantiate an expectation that their Twitter messages would remain private, they have not given this Court any plausible basis to infer that Twitter intends to share those messages with HHS—or that HHS has even asked for them in the first place. (*See* RFI Document at 3, 5) (stating that "[n]o . . . personally identifiable information should be submitted in response" to the RFI, and that "[a]ll information should be provided at a level of granularity that preserves the privacy of users").

framework. (*Id* at ¶ 171.) Because they did not, Plaintiffs argue they are legally invalid.

"The APA, by its terms, provides a right to judicial review of . . . final agency action." *Bennett v. Spear*, 520 U.S. 154, 175 (1997). "An agency action must generally meet two conditions to be considered 'final' under the APA." *Parsons v. U.S. Dep't of Just.*, 878 F.3d 162, 167 (6th Cir. 2017) (quoting *Berry v. U.S. Dep't of Lab.*, 832 F.3d 627, 633 (6th Cir. 2016)). "First, the action must mark the consummation of the agency's decision-making process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* (citations omitted). Notably, "harms caused by agency decisions are not legal consequences if they 'stem from independent actions taken by third parties.'" *Id.* at 168 (citation omitted). Thus, "[a]n agency action is not final if it 'does not of itself adversely affect complainant but only affects his rights adversely on the contingency of future administrative action.'" *Id.* (quoting *Jama v. Dep't of Homeland Sec.*, 760 F.3d 490, 494 (6th Cir. 2014)).

HHS argues that neither the RFI nor the July Advisory constitute "final agency" action because (1) neither document "imposes any requirement on any party"—and, thus, does not "determine" any "rights or obligations"—and (2) no "legal consequences flow from those documents." (ECF No. 30 at PageID #219) (citing *Parson*s, 878 F.3d at 167). Plaintiffs, in response, point to the July Advisory and RFI's alleged implication of their constitutional rights to refute the notion that they do not bear "legal consequences." They also cite to *Air Brake Systems, Inc. v. Mineta*, 357 F.3d 632, 646 (6th Cir. 2004) to substantiate the documents' "finality." (ECF No. 33 at PageID #268.)

Plaintiffs' initial argument misses the mark. As discussed above, Plaintiffs' constitutional claims fail for lack of standing, and, alternatively, do not pass muster under Rule 12(b)(6). And to

the extent Plaintiffs predicate their APA claim on any other "harm," that injury would not flow from HHS. The responses the RFI solicits, as noted, are voluntary. Nor does the July Advisory, even when construed in Plaintiffs' favor, purport to *obligate* any party—including Twitter—to take any specific action. *See, e.g.*, ADVISORY at 3 ("A Surgeon General's Advisory is a public statement that calls the American people's attention to a public health issue and provides *recommendations* for how that issue should be addressed.") (emphasis added). And the Surgeon General's public comments on the matter—contrary to Plaintiffs' assertion otherwise—do not change the equation. *See supra*, Part II.D.1-2. Accordingly, to the extent the RFI and July Advisory affect Plaintiffs at all, those effects stem from Twitter's "independent actions." *Parsons*, 878 F.3d at 168; *see also id.* ("[R]epercussions from the dissemination of information designed to provide [an] industry with up-to-date safety recommendations do not convert [a report] into a reviewable rule or sanction.") (quoting *Indus. Safety Equip. Ass'n v. Env't Prot. Agency*, 837 F.2d 1115, 1121 (D.C. Cir. 1988)).

Plaintiffs' second argument likewise falls short. Plaintiffs cite to *Air Brake Systems* to substantiate the notion that the Surgeon General's issuance of the RFI and July Advisory implicitly represent HHS' "final" view that he has the authority to issue non-binding advisories and requests related to COVID-19 "misinformation." *Air Brake Systems* revolved around various opinion letters issued by the National Highway Traffic Safety Administration's Chief Counsel. 357 F.3d at 645-46. There, the Sixth Circuit determined that, by virtue of their informality, the opinion letters did not "constitute final agency action with respect to the opinions expressed in them." *Id.* at 646. But it *did* find that the letters represented "final agency action" insofar as they concerned the Chief Counsel's general authority to issue them in the first place. *Id.* Plaintiffs argue that the same principle applies here.

Yet Plaintiffs' APA claim, as HHS points out, is specifically tailored to the "essential contents" of the RFI and July Advisory—not the general authority of the Surgeon General to issue non-binding advisories and requests for information. *See Air Brake Systems*, 357 F.3d at 638-39. And the Court has already determined that any "harms" alleged to emanate from the RFI and July Advisory stem from Twitter's "independent actions." *Parsons*, 878 F.3d at 168. Accordingly, Plaintiffs have not plausibly established entitlement to relief under the APA.

### 4. *Ultra Vires* Claim

#### a. 42 U.S.C. § 264(a)

Plaintiffs assert that, "to the extent the Surgeon General [has interpreted]" 42 U.S.C. § 264(a) to empower his "initiative" against COVID-19 misinformation, (Compl., ECF No. 1 at PageID #4), he has exceeded his congressionally delegated authority. (*Id.* at ¶ 122.) HHS, in response, essentially contends this claim is moot—not only because "the Surgeon General did not invoke section 264(a) as authority to adopt the [July] Advisory or RFI," but also because "neither document purports to regulate any member of the public in any way." (ECF No. 31 at PageID #217.) It notes further that "the Surgeon General has been issuing public health reports and advisories on a range of issues for more than five decades—since at least 1964," when HHS first confronted the health risks of smoking. (ECF No. 31 at PageID #217.)

Neither party disputes that agencies may issue "non-binding [policy] statements" on various topics even if they lack "legislative rulemaking authority" in relation thereto. *Batterton v. Marshall*, 648 F.2d 694, 702 (D.C. Cir. 1980) (emphasis added); *see also Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988); *Dyer v. Sec'y of Health & Hum. Servs.*, 889 F.2d 682, 685 (6th Cir. 1989). And, as discussed at length, all signs here paint the July Advisory and RFI as non-binding policy statements—not substantive rules. Plaintiffs have not plausibly alleged otherwise.

34

The relevant inquiry here thus does not turn on the scope of the Surgeon General's rulemaking authority under § 264(a).

### b. "Reasonableness"

Plaintiffs challenge the validity of the RFI on other grounds. They assert, specifically, that the RFI is not a "reasonable request" due to its "chilling effects, and the concomitant violations of private citizens' First and Fourth Amendment rights." (ECF No. 33 at PageID #265.)

As Plaintiffs note, "the validity of an administrative request for information generally turns on the reasonableness of the request." *United States v. Gurley*, 384 F.3d 316, 321 (6th Cir. 2002) (citing *United States v. Morton Salt Co.*, 338 U.S. 632, 652–53 (1950)). But the standard for "reasonableness" is broad. Even if, for instance, "a governmental investigation" is "of such a sweeping nature and so unrelated to the matter properly under inquiry as to exceed the investigatory power, it is sufficient if the inquiry is within the authority of the agency, the demand is not too indefinite[,] and [the] information sought is reasonably relevant." *Id.* (citation omitted).

Plaintiffs' stated bases for the "unreasonableness" of the RFI, as discussed, do not survive Rule 12(b)(6) scrutiny. And they have not otherwise persuaded this Court that the RFI was "unreasonable." As discussed, the RFI, by virtue of its non-binding status, is not a "demand," and thus does not constitute a "legislative" or "substantive" rule that requires congressional authorization. (ECF No. 30 at PageID #216.) And while the language of the RFI is broad, the Court is not persuaded that it is "too indefinite," insofar as it (1) specifies "sources of misinformation" to a sufficient degree; (2) states its general purpose; and (3) elaborates the specific topics upon which it wishes respondents to offer comment. *See* RFI Document 5-8. Likewise, the spread of misinformation related to COVID-19 is at least "reasonably relevant" to the Surgeon General's

efforts to combat the disease. This is so *even if*, as Plaintiffs argue, the Surgeon General lacks the authority to regulate that information.

**E. Conclusion**

Plaintiffs lack standing. And even if that were not the case, the content of their claims—and the sources those claims cite and depend upon—does not plausibly suggest they are entitled to the relief they seek. Accordingly, the Court **GRANTS** HHS' Motion to Dismiss. (ECF No. 30.)

### III. MOTION TO COMPEL AND MOTION FOR PRELIMINARY INJUNCTION

On March 30, 2022, Plaintiffs moved for a preliminary injunction that (1) sets aside the RFI and (2) mandates HHS to abstain "from continuing to demand that technology companies censor and ban users who articulate views that depart from the Government's messaging on COVID-19." (ECF No. 9.) Thereafter, on April 1, 2022, the Court set a date to hear evidence on Plaintiffs' motion (the "Preliminary Injunction Hearing"). Two weeks later, on April 12, 2022, Plaintiffs moved to compel HHS to produce five general categories of discovery in anticipation of this evidentiary hearing.[11] On April 28, 2022, the Court heard evidence on Plaintiffs' motion, which consisted of testimony from Mr. Kotzin and Mr. Changizi. (ECF No. 36.)

Four factors bear on the preliminary injunction inquiry—namely, (1) whether the movant is likely to succeed on the merits; (2) whether the movant's requested relief is necessary to prevent irreparable injury; (3) whether the balance of equities tips in the movant's favor; and (4) whether a preliminary injunction would not be averse to the public interest. *See, e.g., Enchant Christmas Light Maze & Market Ltd. v. Glowco*, *LLC*, 958 F.3d 532, 535-36 (6th Cir. 2020). The Court,

---

[11] The day before, Plaintiffs subpoenaed the Surgeon General to appear for a pre-hearing deposition in Washington D.C. (ECF No. 27.) HHS—in addition to all of Plaintiffs discovery requests—rejected the demand. On April 22, 2022, Plaintiffs noted during a teleconference with the Court that the parties' subpoena dispute would, pursuant to Federal Rule of Civil Procedure 45(d)(3), be adjudicated by a court in the District of Columbia. They also informed the Court they were prepared to proceed with the testimony of Mr. Kotzin and Mr. Changizi.

however, need not engage in this inquiry, given HHS' successful motion to dismiss. Nor, for that matter, must it decide Plaintiffs' Motion to Compel. Accordingly, both motions are **DENIED AS MOOT**. (ECF Nos. 9, 27.)

## IV. CONCLUSION

In the light of the foregoing, the Court **GRANTS** HHS' Motion to Dismiss (ECF No.  30) and **DENIES AS MOOT** Plaintiffs' Motion for Preliminary Injunction (ECF No. 9) and Motion to Compel (ECF No. 27).

This case is to be closed on the docket of this Court.

**IT IS SO ORDERED.**

<u>5/5/2022</u>                                              <u>s/Edmund A. Sargus, Jr.</u>
**DATE**                                                    **EDMUND A. SARGUS, JR.**
                                                            **UNITED STATES DISTRICT JUDGE**