UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


MARK CHANGIZI, ET AL,  )
         )
 PLAINTIFFS,    )  CASE NO. 2:22-CV-1776
         )
   vs.     )
         )
DEPARTMENT OF HEALTH AND )
HUMAN SERVICES, ET AL, )
         )
 DEFENDANTS.   )
_____)


TRANSCRIPT OF PRELIMINARY INJUNCTION PROCEEDINGS
BEFORE THE HONORABLE EDMUND A. SARGUS, JR.
THURSDAY, APRIL 28, 2022; 9:00 A.M.
COLUMBUS, OHIO

FOR THE PLAINTIFFS:
  New Civil Liberties Alliance
  By:  Jenin Younes, Esq.
    John J. Vecchione, Esq.
  1225 19th Street Northwest, Suite 450
  Washington, District of Columbia 20036

  Frantz Ward LLP
  By:  Jay R. Carson, Esq.
  2500 Key Center
  Cleveland, Ohio 44114


FOR THE DEFENDANTS:
  Department of Justice
  By:  Kuntal Cholera, Esq.
  1100 L Street Northwest, Suite 12306
  Washington, District of Columbia 20001

- - -

 Proceedings recorded by mechanical stenography, transcript produced by computer.

LAHANA DUFOUR, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER
85 MARCONI BOULEVARD
COLUMBUS, OHIO 43215
614-719-3286

2

1          Thursday Morning Session

2               April 28, 2022

3                  - - -

4          THE DEPUTY CLERK:  Case number 2:22-cv-1776, Mark

5     Changizi versus Department of Health and Human Services, et al.

6          THE COURT:  Counsel, good morning to all of you.  This

7     matter is scheduled for a hearing with regard to the

8     plaintiffs' motion for preliminary injunction.  We've had

9     several phone discussions about what facts were disputed and

10    which ones could be stipulated.  It looks as though not much.

11    I see the exhibits are essentially what's been attached to the

12    affidavits which I take that to mean you haven't reached

13    stipulations.  Would that be correct?

14         MR. VECCHIONE:  Your Honor, we haven't reached any

15    stipulations but they're not the same exhibits, all of them.

16    There's overlap but it's not the same.

17         THE COURT:  There's overlap.  All right.  Very good.

18        You may call your first witness.

19         MR. VECCHIONE:  Your Honor, Plaintiffs call Dan Kotzin

20    to the stand.

21         THE COURT:  He will come forward.

22       (Witness sworn.)

23         THE COURT:  Counsel, you may proceed.

24         MR. VECCHIONE:  Thank you, Your Honor.  Before we

25    begin, if there's no objection, I would like to enter

1   Plaintiffs' Exhibit 9, 10, 10-2, 11, 11-2, 12 and 12-2.

2          THE COURT:  Any objection?

3          MR. CHOLERA:  Your Honor, just for form.  We obviously

4   object on the grounds of relevance.  We're not going to object

5   to him showing it to the witness.

6          THE COURT:  I will decide what weight to put on these

7   but I take that to mean you're not objecting.

8          MR. CHOLERA:  Exactly, Your Honor.  I just wanted to

9   make sure we're not waiving any relevance.

10          THE COURT:  They're admitted.

11          MR. VECCHIONE:  Thank you, Your Honor.

12                        - - -

13                    DANIEL KOTZIN

14    Called as a witness on behalf of the Plaintiffs, being first

15   duly sworn, testified as follows:

16                  DIRECT EXAMINATION

17   BY MR. VECCHIONE:

18   Q.   Mr. Kotzin, thank you for being here today.  Can you

19   tell the Court your educational background from high school?

20   A.    Sure.  I graduated from Macalester College in St. Paul,

21   Minnesota with a bachelor's degree in English and I was an Iowa

22   law fellow and I graduated from the University of Iowa College

23   of Law.  I have a Juris Doctor.  I practiced law for over ten

24   years in California.

25   Q.   Got it.  What do you do now?

4

 1    A.    Now for quite a few years I'm a stay-at-home dad.  My

 2   wife is the primary earner of our family.  She's the only

 3   earner for our family.

 4    Q.    And where do you live?

 5    A.    I live in Denver.

 6    Q.    This is your first trip to Columbus?

 7    A.    No.  Funny you should ask.  I was just having a trip

 8   down memory lane.  From 1981 to 1983, I lived in Bexley, Ohio

 9   and I attended Bexley Junior High and then I was not in

10   Columbus for many years.  And then my last time here was in

11   2008.  I was a volunteer in Barack Obama's presidential

12   campaign and I flew here as a young lawyer and knocked on doors

13   and then spent election day at the polling booths protecting

14   the vote.

15    Q.    Did there come a time when you began using the social

16   media platform Twitter?

17    A.    Yes.  I had opened an account many years ago but it was

18   dormant and in about April of 2020, so about a month into the

19   pandemic, I wanted to find an audience for my views on what was

20   happening in response to COVID, and Twitter seemed like the

21   place to go if you wanted people, the general public, to be

22   exposed to your views.

23          So I went on Twitter and my goal was to have an outlet.

24   I wasn't journaling.  I wanted people to read what I was

25   writing.

1    Q.    What's journaling?

2    A.    Journaling is if you write for yourself.  You want to

3    get your thoughts organized and you want to write them down and

4    have a record of your own thoughts and ideas.  That wasn't what

5    I wanted to do.  I wanted to persuade other people to have my

6    ideas.

7    Q.    All right.  So on the platform Twitter, are there

8    individuals called followers?

9    A.    Yes.  And most Twitter users are actively trying to

10   accrue followers.

11   Q.    Would you say that applied to you as well?

12   A.    Yes.  That was a primary goal.  Because, as I said, I

13   wanted to broadcast my views and the more followers you have,

14   the more people are exposed to your views.

15   Q.    Can you tell the Court approximately how many followers

16   you have as we sit here today?

17   A.    Today I have about 31,000 followers which, for me, is

18   very significant.  In April of 2020, this time period that

19   we're talking about, I would have had less than 100.

20   Q.    And I guess what you're saying, can you tell the Court

21   whether or not in March, or thereabout, 2020, the major subject

22   that you discussed on your Twitter account changed?

23   A.    Yes.  The exclusive content became COVID-related and our

24   response to COVID.  I began doing extensive research.  I also

25   have a medical background.  I was trained as a paramedic.  So I

6

1    do have some medical background.  As a lawyer, I have a lot of

2    research skills.  And I wanted to understand what was happening

3    and it quickly became apparent to me that my view of what was

4    happening was quite different from the mainstream view.

5        Q.   And in general terms, what was your view?

6        A.   I was living in San Francisco at the time and I had four

7    children and I lived in an apartment without a yard.  San

8    Francisco was the first city in North America to have a

9    lockdown and they closed outdoor playgrounds for eight months.

10   So during that eight-month period, I was home with a

11   three-year-old and a five-year-old while my wife was trying to

12   work and I was unwilling to have them sit on an iPad for 16

13   hours a day which is what the city of San Francisco wanted us

14   to do.  The preschools were closed, the playgrounds were closed

15   and we had no yard.

16        So it started in some civil disobedience.  I was urging

17   other people to go to the outdoor playgrounds and that urban

18   children deserved a place to play.  So that was sort of the

19   beginning of my involvement.  As I looked into it, it seemed to

20   me that many of the other restrictions were unnecessary.  And I

21   wanted to communicate that.

22        Q.   And did you communicate that?

23        A.   I did.  I was very aggressively communicating that point

24   of view.  I was very frustrated.  I thought if I just shouted

25   louder, more people would hear me.

7

1    Q.    I'm going to just take you through a few points.  The

2    views you've just described in general, did you put those views

3    like that on Twitter in March 2020?

4    A.    I would say in April 2020, I started, yes.  I was

5    specifically telling people to resist.  That was one of the

6    words I was using during that time.  I was considering myself a

7    left-wing resister and this was a continuation of a lifetime of

8    civil disobedience.  And I wanted people -- my act of

9    resistance was taking small children to outdoor playgrounds.  I

10   was telling people disobey the rules, do not follow CDC

11   guidelines.  Do not do what the city of San Francisco tells you

12   to do.  Take your children to the outdoor playgrounds.

13   Q.    All right.  And so you did this in April of 2020, May of

14   2020?

15   A.    Uh-huh.

16   Q.    Fair to say June of 2020?

17   A.    Yes.  To be clear, I would, as time went on, by the

18   summer of 2020, I was tweeting every day.  By then I would

19   probably say I had a few hundred followers in the summer.  So

20   still not very many but I had -- it was people I don't know

21   were reading what I wrote.  I was getting messages, please keep

22   doing what you're doing.  Please explain to us.  We want to

23   understand.  We don't trust a lot of news sources.  People were

24   reaching out to me through the platform that I didn't know

25   requesting that I keep doing what I was doing.

8

1    Q.    All right.

2          MR. VECCHIONE:  Your Honor, may I either approach or

3    hand up the exhibits to the witness?

4          THE COURT:  If you give them to the courtroom deputy

5    and she'll do that.  Thank you.

6    BY MR. VECCHIONE:

7    Q.    Do you have the exhibits in front of you?

8    A.    I do.

9    Q.    You put in a declaration in connection with this

10   preliminary injunction, correct?

11   A.    (Nods head.)

12   Q.    And you attached certain tweets, I guess you call them?

13   A.    Yes.  Exactly.

14   Q.    And all of those tweets you produced yourself and you're

15   aware of them from your personal knowledge?

16   A.    Yes.

17   Q.    And these as well.  I want to direct your attention to

18   P9.  Can you tell the Court when this was?

19   A.    This tweet is dated September 27th, 2020.

20   Q.    And what do you say here?

21   A.    Come on, San Francisco.  It's a beautiful day out there.

22   Let's take our masks off and get outside.  Look for me and my

23   kids at the playgrounds.  Resist.

24   Q.    And then there's photos of your kids.  You can put

25   photos on Twitter?

9

1    A.    Yes.  And so if you notice, this is actually a very

2   famous playground.  This is Dolores Park in San Francisco.  Any

3   San Franciscan that saw this picture, and there was a lot of

4   dispute about it, the fact that -- it was eight months into the

5   pandemic.  Everywhere else in the world, outdoor playgrounds

6   were open already.  In Columbus, they'd been open for six

7   months at that time.

8         So it was quite striking.  There was basically nowhere

9   in America that still had the outdoor playgrounds closed, so I

10  was hoping to attract attention with the photos.

11   Q.    All right.  And then, that's September of 2020.  In your

12  affidavit, I won't repeat it, but in October of 2020, did you

13  also tweet about how resilient kids are or not?

14   A.    I definitely did.

15   Q.    It's not in there.

16   A.    It's not in there.  Tell me again.

17   Q.    Do you recall?

18   A.    One more time, please.

19   Q.    Did you tweet about the resiliency of children or not?

20   A.    Yes.

21   Q.    And what was the point of that?

22   A.    If I know what you're referring to, I did not like the

23  fact that children were being told that they were resilient

24  because I thought that was code for just letting children --

25  not pay attention to children's needs.

10

1    Q.    And then I'll go through.  Is it fair to say in every

2    month you're tweeting multiple times?

3    A.    Yes.  By this time, if we're in fall of 2020, I was

4    tweeting multiple times every day.  I would have had, again, I

5    don't know, probably less than 1,000 but upper hundreds.  My

6    follower count was steadily increasing and I began expanding

7    the scope of what I was tweeting about to a lot of

8    COVID-related issues, objecting to a lot of the regulations.

9    Q.    And I'd like you to --

10   A.    I see the one you're talking about in October now.

11   Q.    But you can go forward.  I think the next one -- what is

12   that one?  If you see it in front of you.

13   A.    Now I see it right in front of me.  This tweet that I

14   recollect very well from October of 2020, I wrote, we are

15   treating --

16   Q.    What's the exhibit number down at the bottom?

17   A.    I'm reading it from my attachment 2 from my declaration.

18         THE COURT:  I don't see an October, is there --

19         MR. VECCHIONE:  Neither do I.

20         THE WITNESS:  It's in my declaration.

21   BY MR. VECCHIONE:

22   Q.    Does that refresh your recollection?

23   A.    Yes.  It totally refreshes my recollection.

24   Q.    So then I'll just go through November.  In December --

25   would you please look at Plaintiffs' Exhibit 10-2?

11

1    A.    I see that one.

2    Q.    All right.  Can you read into the record what you were

3    writing in December of 2020?

4    A.    Yes.  Some public health officials are claiming that

5    asymptomatic, vaccinated people, many of whom have previously

6    been infected with COVID, could still be spreaders and should

7    be required to remain six feet apart from other humans in

8    masks.  America, we have been warned.  Resist.

9    Q.    All right.  The date on that is?

10   A.    December 15th, 2020.

11   Q.    And then on Christmas Eve, 2020, I'd like to take a look

12   at P12.

13   A.    I have that one, too.  This one I remember very well.

14   Q.    This one has to do -- it's in evidence.  You don't have

15   to read it.  This one has to do with Dr. Fauci's statements

16   about -- some of his previous statements.

17   A.    Correct.

18   Q.    You asked a question at the end, what else is he lying

19   about?

20   A.    Uh-huh.

21   Q.    All of 2020, December of 2020, you've been writing

22   messages like this.

23   A.    Uh-huh.

24   Q.    Were you ever told by Twitter during this period that

25   you couldn't tweet this type of material?

12

1    A.    No.  I felt very free.  And in fact, during that time,

2    Twitter was considered to be more free than the other major

3    platforms.  People went to Twitter for free expression of

4    various kinds because it was believed that there was less

5    censorship on Twitter.  Personally, it never occurred to me.  I

6    thought I could say whatever I wanted.  It did not occur to me

7    that anything that I might write on Twitter would ever be

8    removed by Twitter for any reason.  It was unimaginable to me.

9    I was just a guy with a few hundred followers, normal person

10   writing normal things.

11   Q.    All right.  Let's go to -- we'll keep moving on.  Did

12   there come a time from what you just described as Twitter's

13   attitude changed towards you?

14   A.    Yes.  In the -- let me make sure I'm getting the

15   timelines correct in my head.  In the summer of 2021, there

16   began to be a lot of discussion on Twitter, on people I was

17   communicating with about people being suspended and about

18   Twitter beginning to censor speech on the platform.  And there

19   was talk that this could be directed by the government because

20   there had been statements by the government.  But personally, I

21   didn't really pay any attention to it.  I didn't --

22        At this time I maybe had a few thousand followers.  So I

23   considered myself a nobody.  I thought I was living in America.

24   Yes, there were people on Twitter being suspended and knocked

25   off and there was a lot of excitement, but I didn't think it

13

1   would reach me. But then that all changed in September of '21,

2   when I woke up one morning to see that I had been locked out of

3   my account.

4          THE COURT: Let me back you up for just a moment. If

5   we go back to Plaintiff Exhibit 12.

6          THE WITNESS: I have that one.

7          THE COURT: If you go to the last line. Your view

8   regarding retweets, quote tweets and likes.

9          THE WITNESS: Yes. That is an astute observation by

10  you, Your Honor. This was my first --

11         MR. VECCHIONE: Let him ask.

12         THE COURT: My question at this point is when you have

13  that many likes, people have to see what you've tweeted. So

14  you've got a significant number of followers by, the date on

15  this is December 24th, 2020.

16         THE WITNESS: First, my apologies for interrupting.

17         THE COURT: You didn't interrupt me. That's all

18  right.

19         THE WITNESS: Secondly, I sort of -- this was my first

20  successful tweet. I never had -- that's why I said you had an

21  astute observation. I never had anything like this of the

22  kind. If you look at the others, there are things like 24.

23  This is still one of my top 10 most successful tweets. This is

24  the first time that I had a taste of success on Twitter and

25  it's quite intoxicating.

14

1        THE COURT:  All right.

2    BY MR. VECCHIONE:

3    Q.   Why don't we put that on the record.  Can you just say

4    for the record what retweets are, what quote tweets are and

5    what likes are?

6    A.   Sure.  When you tweet something, a retweet means that

7    another person likes what you wrote so much that they want to

8    rebroadcast it and have more people look at it.  So a like

9    means they liked it and a retweet means they like it so much,

10   they want more people to read it.  And quote tweets are just a

11   form of it.  So when you have thousands, there's people Elon

12   Musk gets millions.  But for me, this was like a whole

13   different level.

14   Q.   Can you tell the Court what, if anything, happened in

15   September of 2021?

16   A.   Yes.  I woke up and I tried to access my Twitter account

17   and I found that, although I could look at it, I was unable to

18   write any tweets, I was unable to like or retweet.  I wasn't

19   able to do anything but look at it.  And I didn't really

20   understand what had happened.  And then I saw that I must have

21   here somewhere, that they had sent me an e-mail explaining what

22   had happened.

23   Q.   And you describe that in your declaration?

24   A.   Yes, and that's why I want to be precise.

25   Q.   Hang on.  I can refresh recollection, if you'd like.

15

1    A.    Yes.  I was just trying to refresh myself on the date.

2  I probably had the tweet on September 23rd and I woke up on

3  September 24th.  So I guess that's fall.  And I see the tweet

4  here if you'd like me to read the tweet.

5    Q.    Go ahead.

6    A.    There is not now, nor has there ever been, evidence that

7  the COVID shots reduce infection or transmission.  Vaccine

8  passports; vaccine mandates; vaccine requirements -- they are

9  all an abomination.  That's the end of the tweet.  And if I

10 could comment now, that's two sentences.  The first one is a

11 fact and the second one is an opinion.  So I do not understand

12 then nor now how any universe that can be misinformation.

13   Q.    Were you told by Twitter why you were suspended?

14   A.    Yes.  For, quote, violating the policy on spreading

15 misleading and potentially harmful information related to

16 COVID-19.

17   Q.    All right.  So we've looked at some of your tweets and

18 you've testified.  I think it's pretty clear by now.  You were

19 saying similar things from early spring 2020, all the way up to

20 mid-fall 2021.  And during that time you didn't get any of

21 these types of notices from Twitter; is that fair?

22   A.    No.  And I would say that I made statements that were

23 much more controversial than this statement here for which I

24 was suspended.

25   Q.    And did you stay suspended?  What happened?

16

1    A.    So for this first one, it was 24 hours.  Well, first,

2    you have to delete the tweet.  You have to delete the offending

3    tweet and then they start a countdown clock, 24 hours before I

4    would regain access.  And so initially, I was sort of excited.

5    I was like, whoa, I made it to the big time.  The government

6    thinks they have to keep me quiet because I am a danger.  But

7    that quickly changed to, first of all, being frightened that I

8    would lose my voice and it would be taken away permanently.

9    And secondly, I found it really disturbing.

10   Q.    Sorry to interrupt you there.  What do you mean by a

11   fear of losing your voice?

12   A.    I haven't explained properly.  It's my fault.

13         As part of the suspension, they warned me that further

14   misinformation would result in me being permanently shut out of

15   Twitter, which I'd already -- it had happened, as I was saying,

16   over the summer, to people that I thought of as famous and

17   famous provocateurs.  So there had been people that summer who

18   had been permanently kicked off of Twitter.

19   Q.    And so in addition to writing your tweets, you read

20   other people's tweets?

21   A.    Yes.

22   Q.    On this subject?

23   A.    Yes.  My interest in Twitter was 90 percent

24   COVID-related matters.

25   Q.    Was this your last suspension?

17

1    A.    No.

2    Q.    What happened next in regards to suspensions?

3    A.    Well, if I may, the next suspension was six months

4  later.  So if I may, I'd like to discuss a little bit how I was

5  on Twitter during those few months.

6    Q.    What was happening in between then, if you'd like?

7    A.    I changed my behavior.  As I said earlier, I felt free

8  and expressed myself without concern that anyone might censor

9  me.  But now that all changed.

10        I was so concerned, I did not want to risk permanent

11  suspension from Twitter.  So I wanted to be careful not to give

12  anyone an excuse to suspend me again.

13        The first thing I did was I started -- I'm a former

14  lawyer so I was using hypotheticals, phrasing things in the

15  form of a question, trying to think of clever ways to say the

16  things I wanted to say without giving them anything they could

17  call misinformation.  But the other thing I did was I just

18  about at that time I was going to start researching early

19  treatment options for COVID which is a topic I didn't know

20  anything about which is very widely discussed.  There were

21  various antivirals, people talked about vitamin D.  Didn't

22  know, there were a lot of different things.

23        That was something that the government said early

24  treatments were bad.  We shouldn't have early treatments, only

25  the vaccines.  So I knew I would be censored if I wrote

18

1    anything.  So I didn't even research the subject.  I still, to

2    this day, I have no opinion.  I don't know.  I never wrote

3    about it.  I never researched it because, what would be the

4    point?  I wouldn't be able to share my research with others.  I

5    wasn't -- as I said, everything I did was to try --

6    Q.   Is that something Twitter told you?

7    A.   No.  That was from statements the government made.

8    Q.   Thank you.  And then I'll ask again, did there come a

9    time when you were suspended?

10   A.   Yes.  Then I want to get the exact, correct date so I

11   will look here again.  On March 7th, similarly to what happened

12   to me in September, I woke up to see that I had been locked out

13   of my Twitter account except for this time instead of one day,

14   it was for seven days.  And I got -- it was exact same e-mail

15   saying COVID-related misinformation and if I kept doing it,

16   then I would be permanently banned from Twitter.

17   Q.   And were you let back on?

18   A.   Yes.  Then seven days later I was let back on.  Can I

19   read the one that I got suspended for?  I'm quite proud of it.

20   Q.   Go right ahead.

21   A.   Because it's astonishing to me that in America someone

22   could get censored for this.  I stated a fact.  It is important

23   to never lose sight of the fact that the global pandemic is

24   ending not because of vaccines but because almost everyone on

25   the planet got infected with COVID, end quote.  Since that

1    tweet came out, that has been said almost word for word by CDC

2    Director Rochelle Walensky; Director of NIAID, Anthony Fauci.

3    Before I posted that tweet, the Icelandic health director said

4    what I said basically word for word.

5        Q.    Do you know if they have Twitter accounts?

6        A.    That's a good question.  Probably the Icelandic tourist

7    board has one.

8              THE COURT:  Only if you know.

9              THE WITNESS:  But I don't know.

10   BY MR. VECCHIONE:

11       Q.    Did there come a time when you were suspended again or

12   not?

13       A.    Yes.  So after -- I should say that this suspension I

14   just mentioned on March 7th, occurred just a few days after the

15   Surgeon General very publicly called for Twitter to crack down

16   on misinformation.  So to me, it seemed like a direct response.

17   As I said, I'd been continuing in my fashion since September.

18   I avoided certain topics, early treatment, on the topics I

19   wrote about.  I asked in the form of a question.  I used

20   hypotheticals.  I wasn't really worried about getting

21   suspended.  I had figured out a way to comport myself with the

22   government censorship and I was pretty confident.  Surgeon

23   General made his remarks, three days later I was suspended.

24              So then I went back on Twitter.  Now I should remember

25   it better because we're already in last month.  Theoretically,

20

1    I should remember that quite well. There we are, a few weeks

2    ago I just went about my business just like I had been before.

3    Because at that point now I feel it's beyond my control. If

4    the government doesn't want me on Twitter, I won't be on

5    Twitter. There's nothing I can do. They can clearly suspend

6    me for anything. So my tricks of trying to use hypotheticals

7    are irrelevant because they'll suspend me anyways.

8    Q.   What does the prospect of permanent Twitter ban mean to

9    you?

10   A.   It's so upsetting that I'm sort of even embarrassed to

11   admit it in open court. I really have devoted a tremendous

12   amount of my time and intellectual and emotional energy to

13   Twitter and I have a relationship with these followers. I

14   get -- so there's something called direct messages, DMs on

15   Twitter.

16   Q.   What are direct messages?

17   A.   They're ways to communicate with your followers.

18   Typically followers will write to someone that they follow to

19   ask them questions.

20   Q.   Can anyone see these?

21   A.   No. These are private messages or we hope that they're

22   private. And so I've been getting all this time messages,

23   almost daily, from people saying what you do really means a

24   lot. Your work means so much to us. Please keep going.

25   Please. I feel alone. I really -- I wake up every morning

21

1  looking forward to your tweets.  A person, an ego, it's a big

2  ego boost along with everything else.  As I said, I don't have

3  a job.  This is what I devoted my intellectual energy to.

4  Q.   What happens when you're banned?  Can you tell the Court

5  what happens to your past tweets and what happens to your DMs

6  and your ability to even look at what you've done before?

7  A.   So a permanent ban is different from the temporary bans

8  that I've been subjected to already.  When you're on a

9  temporary ban, you can still look at the things you've written.

10  When there's a permanent ban, Twitter not only removes your

11  access from what you've written but they remove everything

12  you've written from the platform.  No one can see it.

13      So I've spent two years, I don't know how many tens of

14  thousands of tweets I have.  There's intricate webs of

15  connection.  There's conversations.  And when someone is

16  removed, it's as if they didn't exist.  They're removed from

17  conversations.  Their comments aren't there.

18      So for people like me, it's my intellectual work.  It's

19  hard to say without sounding silly.  I'm a writer.  That's my

20  writing.  That's my work.

21  Q.   I think you testified earlier that you look at other

22  people's Twitter accounts on this subject.  Have you seen any

23  permanent bans of people you follow?

24  A.   Yes.  One of the most devastating ones is from my fellow

25  Plaintiff, Michael Senger.  I've never met him personally even

22

1  though he lived in San Francisco and I did.  But we were from

2  very early on, probably from summer of 2020, we were on Twitter

3  and he grew his following even more than me.  He had over

4  100,000 followers and he was attracting international

5  attention.  International news organizations were contacting

6  him because of his Twitter.  He leveraged his Twitter into a

7  book that he published.  None of it was possible.

8       He has been chronicling daily events around the world

9  that are happening related to COVID.  So when his account was

10  removed, the things that he documented are not there.  So

11  things that he had, I've been trying to look back.  I remember

12  communicating with him a year and a half ago about things that

13  were happening in San Francisco.  And in his Twitter account he

14  had photographs, he had writings, he had record of things that

15  had happened and that's no longer there.

16  Q.   Have you had occasion to observe Twitter accounts that

17  support the government position on lockdowns and on

18  vaccinations and on masks?

19  A.   Yes.

20  Q.   Do you have any knowledge of whether those type of

21  accounts are being shut down the same way for misinformation?

22  A.   None of those accounts have been shut down.  Those of us

23  that have been advocating on Twitter for, let's say, looser

24  restrictions from the beginning, have our counterparts on

25  Twitter that have been advocating for more strict restrictions

23

1   from the beginning.  Those people often put factually incorrect

2   statements and not only are they not suspended from Twitter

3   but, in fact, Twitter often promotes them.

4   Q.   How do you know that?

5   A.   Because they have accounts that are promoted.  They're

6   passed on.  Twitter will say, reliable source.  And they pass

7   them on.  There is one person who is often cited.  He's Eric

8   Feigl-Ding who presents himself as an epidemiologist.  He

9   regularly posts things that are factually incorrect.  Like

10  literally wrong.  The opposite of reality.  And there's never

11  any consequence.

12  Q.   The request for information from the Surgeon General,

13  did that affect you seeing it, knowing about it, did that

14  affect you in any way?

15  A.   Yes.  Well, that's what, as I said, I feel like I'm

16  caught between a rock and a hard place.  I don't want to lose

17  my account but my strategies that I used in the past are no

18  longer effective.  I feel helpless before the government and

19  I'm also concerned I never felt this way really before in my

20  life, but now I feel like the government is my antagonist and I

21  don't want them to have information about me.  They're saying

22  they want an enemies list.  That's very frightening.

23  Q.   What type of information did you give to Twitter?

24  A.   Twitter has extensive information.  One, for example, is

25  those DMs that we were talking about which I considered

24

1   private.  I communicate with real-life friends, my followers.

2   There's a lot of intimate, personal information.  Most of the

3   things you post on Twitter are for public but I always felt

4   like the DMs were completely private and that it was just

5   between me and whoever it's written to.

6   Q.   And can you say whether or not you have a concern about

7   those DMs being taken by the government?

8   A.   I'm very concerned because the Surgeon General says he

9   wants to know.  He wants -- there's an enemies list.  They want

10  to know who's making trouble for the government.

11  Q.   In this case that you've brought, you've brought it

12  against the government.  Why do you believe that it's the

13  government and not Twitter that is responsible for this?

14  A.   Because I observed it.  Before the government -- before

15  Jen Psaki called for the government to crack down on it in the

16  summer of 2021, as I said, I felt totally free.

17          THE COURT:  Let me ask, we're becoming kind of

18  evidence -- Rules of Evidence free here.

19          MR. VECCHIONE:  My last question, Your Honor.

20          THE COURT:  Anything that he knows, he can testify to.

21  But I don't want his -- in other words, as I understand, he's

22  linking things that would connect but he doesn't know they

23  connect.  He wants me to draw an inference, which I may or may

24  not do.  He's entitled to do that.  But he can't draw the

25  inference.  So we'll leave it at that.

25

 1          MR. VECCHIONE:  I understand, Your Honor.  I just

 2   wanted to ask his understanding, which I've done.  That was my

 3   final question.

 4          THE COURT:  Very good.  Thank you.

 5      Let me get the names correctly.  My name is always

 6   mispronounced.  I don't like to do that to other lawyers.  Your

 7   name is pronounced?

 8          MR. VECCHIONE:  Vecchione.

 9          THE COURT:  Vecchione.  Very good.

10      And your name is pronounced?

11          MR. CHOLERA:  Kuntal Cholera.

12          THE COURT:  And your name is produced?

13          MS. YOUNES:  Jenin Younes.

14          MR. VECCHIONE:  And this is Jay Carson.

15          MR. CARSON:  Jay Carson.

16          THE COURT:  You're easy.

17      And you may have cross-examination.

18                          - - -

19                    CROSS-EXAMINATION

20   BY MR. CHOLERA:

21   Q.   Mr. Kotzin, have you ever worked at Twitter?

22   A.   No.

23   Q.   Have you ever interviewed any executive of Twitter?

24   Have you interviewed any employee of Twitter?

25   A.   Not to my knowledge.

26

1    Q.    So you haven't spoken to anyone at Twitter that's

2    responsible for administering their misinformation policy?

3    A.    No.

4    Q.    So no one at Twitter has ever told you, we blocked your

5    account because of something the government did or were afraid

6    of government coming down on us?  Nobody ever told you that

7    from Twitter?

8    A.    No.

9    Q.    No one at Twitter then told you that we're about to

10   respond to this request for information by turning over your

11   information, Mr. Kotzin?

12   A.    No.

13   Q.    Nobody at Twitter ever told you, we're about to turn

14   over private direct messages?

15   A.    No.

16   Q.    Did anybody at Twitter ever tell you then or is it

17   correct, I think it's better to say, is it correct that nobody

18   at Twitter has ever told you, we define misinformation the way

19   we do because of anything the government said?

20   A.    I would say that's not accurate.  Given the messaging

21   that Twitter has --

22   Q.    That wasn't my question.  My question was, has anyone at

23   Twitter ever told you, we define misinformation because of the

24   way the government told us to define misinformation?

25   A.    I'm going to answer that a yes.  On their e-mails and

1    communications on their platform, they say that COVID

2    misinformation is defined by the CDC and other government

3    agencies.  So that is government.

4        Q.    And what was that definition?

5        A.    Misinformation are things that the CDC considers to be

6    misinformation.

7        Q.    And where is that definition?  But what is the

8    definition the CDC gave, I guess is my question?

9        A.    It's Twitter's.  Ask them.  It's always changing.

10       Q.    The CDC's is always changing?

11       A.    Wear a mask; don't wear a mask.  Six feet apart; not six

12   feet apart.  It's always changing.  What Rochelle Walensky says

13   today is not what she said two months ago.  Anthony Fauci said

14   the pandemic was over two days ago.  Yesterday, he said it's

15   not over.

16       Q.    Would it surprise you that the CDC's definition of

17   misinformation, I'm just quoting here, is things that go

18   against the weight of the evidence or something as broad as

19   that?

20       A.    The CDC doesn't get to decide what the weight of the

21   evidence is.

22       Q.    That wasn't my question to you, Mr. Kotzin.  My question

23   to you is would it surprise you that the CDC's definition is

24   actually a quite open-ended definition of misinformation about

25   what goes against the weight of the evidence?

28

1    A.    Nothing about the CDC would surprise me.

2    Q.    So suppose it is a very broad definition of

3    misinformation about going against the weight of evidence.  Has

4    anybody at Twitter ever told you what we consider to go against

5    the weight of evidence is whatever the CDC has told us goes

6    against the weight of evidence?

7    A.    Yes.

8    Q.    Where did Twitter ever say that to you?

9    A.    On their statements, on their platform.  When they

10   explain what misinformation is.  If you give me a minute, I

11   probably have it somewhere in my documents.

12   Q.    Go for it.

13   A.    You reference government agencies.

14        THE COURT:  Go ahead.  Why don't you look for it.

15   BY MR. CHOLERA:

16   Q.    Look for it, please.

17        THE COURT:  Take your time.

18        THE WITNESS:  Let's see what they wrote to me in their

19   e-mail about misinformation.  So under this policy, we require

20   the removal of content that may pose a risk to people's health

21   including content that goes directly against guidance from

22   authoritative sources of global and local public health

23   information.  I interpret those as government agencies.

24        THE COURT:  Let me back you up.  You read that from a

25   document.  What's the document?

29

1     THE WITNESS:  I'm reading this from each of my three

2   suspensions.  This is in the e-mail that I received from

3   Twitter explaining the reason for my suspension.  They're

4   entered into evidence.

5     THE COURT:  What document number so we can have this

6   in the record.  Is it attached to your affidavit?

7     THE WITNESS:  It's in my declaration.  That's where

8   I'm looking at it.

9     THE COURT:  If you can give me the page number, that

10   would be great.

11     THE WITNESS:  Sure.  It is going to be one of the

12   attachments in my declaration.  I believe it's attachment 5.

13   BY MR. CHOLERA:

14   Q.   I believe you also misunderstood my question.

15   A.   Also attachment 6.  Also attachment 7.

16     THE COURT:  Just so the record is clear, so it's the

17   first page behind attachment 5 and it's the second paragraph.

18     Okay.  Go ahead.

19   BY MR. CHOLERA:

20   Q.   I think you misunderstood my question.  My question to

21   you wasn't do they adopt a definition of misinformation that

22   the government adopts.  My question to you is did Twitter ever

23   tell you that they adopted that definition, the one the

24   government has proposed, because the government told them to do

25   it?

30

1    A.    Let me think that through.  There's a few elements

2  there.  Did Twitter tell me that their policy on misinformation

3  was directly given to them by the government?  I'm not really

4  privy --

5    Q.    That wasn't my --

6          THE COURT:  Hang on.  Can't take you both at the same

7  time.  Go ahead, finish your answer.

8          THE WITNESS:  As best I understand your question, I'm

9  not totally sure.  I'm going to say I don't understand your

10  question.

11  BY MR. CHOLERA:

12    Q.    Let me repeat it for you.  Did anybody at Twitter ever

13  tell you that whatever definition of misinformation they use,

14  whether it's their own formulated definition or a definition

15  provided by the government, did anybody at Twitter ever tell

16  you that the reason they picked that definition of

17  misinformation is because somebody at the government told them

18  they had to adopt that definition of misinformation?

19    A.    No.

20    Q.    Okay.

21    A.    Thank you for clarifying.

22    Q.    No problem.  And I apologize if it was unclear at the

23  beginning.

24          Are you privy to any internal e-mails within Twitter

25  about their misinformation policy and how it's administered?

31

1    A.   No, but I would like to be.

2    Q.   Are you on conference calls internally at Twitter about

3    how they administer misinformation, their misinformation

4    policy?

5    A.   No.

6    Q.   So you have no insight whatsoever on the internal

7    machinations of the Twitter discussions, e-mails and the like,

8    you have no insight on that stuff?

9    A.   I wouldn't say that.

10    Q.   You would say that?

11    A.   I have plenty of insight.  I'm on the platform.  I pay

12    attention.  Things, they talk.  There's discussions.  I have

13    insights.  Why can't I have insights?

14    Q.   Let me rephrase.  When I use the word insight, you have

15    no knowledge about the discussions within Twitter?

16    A.   I have no insider knowledge.

17    Q.   Got it.  Do you have data on the number of people who

18    are subject to disciplinary actions by Twitter every month

19    since the start of the pandemic?

20    A.   I have attempted to acquire some of that data.  It is

21    protected.  I have a lot of anecdotal data.

22    Q.   You don't have comprehensive data on the number of

23    enforcement actions Twitter has taken against people under

24    their misinformation policy month by month from the start of

25    the pandemic?

32

1    A.   I do not.

2    Q.   So you would have no reason for knowing that it was X

3   when the pandemic began, Y the month after that, Z the month

4   after that.  You wouldn't have that knowledge?

5    A.   No.  I have a lot of knowledge because I'm on Twitter

6   and I see people being suspended.

7    Q.   Let me rephrase, Mr. Kotzin.  You don't have any

8   knowledge about the precise number of people who are subject to

9   disciplinary actions by Twitter every month, month by month

10   from the start of the pandemic under their misinformation

11   policy?

12    A.   I only have general knowledge.  I do not have precise

13   knowledge.  That is correct.

14    Q.   Are you aware that Twitter has had a misinformation

15   policy since early 2020?

16    A.   No, but I believe you.

17    Q.   You mentioned that your first successful tweet was in

18   December 2020.  I know that that term is a little bit hard to

19   define.  When you say successful, is it fair to say you mean a

20   lot of people saw it?

21    A.   I believe it was in order of magnitude more successful

22   than any other tweet.

23    Q.   To the extent you can provide any more precise of a

24   definition, just for the purposes of my next line of

25   questioning.  What would constitute successful?  Is there a

33

1  threshold?  I understand if it's not.

2  A.  We can easily say if it had 1,000 retweets at that time,

3  it was very successful.

4  Q.  When was your next successful tweet after December 2020?

5  A.  Probably a month or two after that.

6  Q.  Okay.  So it would be early 2021?

7  A.  Yeah.

8  Q.  What about -- how many successful tweets do you think

9  you'd say you have, let's say, from September 2020 to the

10 present?

11 A.  Let's say 10 to 20.

12 Q.  Ten to twenty.  How many followers did you have in

13 September 2020, do you recall?

14 A.  I'm not totally sure.  But I believe it would be about

15 500 then.

16 Q.  Five hundred in September 2020?

17 A.  That's a guess, yeah.

18 Q.  How many in January 2021?

19 A.  If it was 500 then, it would have been 1,000 more.  It's

20 pretty steadily gone up.

21 Q.  So you'd say every month your number of followers got

22 higher and higher?

23 A.  Yes.

24 Q.  So is it fair to say that it was higher in March of 2022

25 than it was in September of 2020?

34

1    A.    Definitely.  Much higher.

2    Q.    So you're saying that in, let's say, December of 2021,

3    was the number higher or lower than March of 2022, probably

4    lower than, right?

5    A.    December 2021 was lower than March of 2022.

6    Q.    But higher than September 2020?

7    A.    Definitely.

8          THE COURT:  Basically it's been going up.

9          THE WITNESS:  It's been steadily going up.  I might be

10   confused about each month how many, but every month it was more

11   than the prior month.

12   BY MR. CHOLERA:

13   Q.    So is it fair to say that when you made these earlier

14   posts you were just -- I asked about in your direct examination

15   back from the start of the pandemic to let's just say

16   September 2020, and maybe even after December, but for the

17   purposes of this question, start of the pandemic

18   September 2020, you didn't have a whole lot of followers?

19   A.    Correct.

20   Q.    And then you started to get more followers?

21   A.    I was always getting more.  It was from the beginning,

22   each month was more than the last from the beginning.

23   Q.    Okay.  And when would you say you broke the 5,000

24   follower mark?

25   A.    I'm going to say probably spring of '21.

35

1   Q.   Spring.  Can you give us a month?

2   A.   No.  If you want a more precise data, it would take me

3   five minutes to find.  It's hard.  A two-year span, it's years.

4   I'm doing the best I can.  What I can guarantee you is each

5   month was more than the last.  That I can guarantee.

6   Q.   And you mentioned that you moderated your speech after

7   September 2020, right?

8   A.   September 2021, I think we're talking about.

9   Q.   I'm sorry, September '21.

10  A.   2021.  Correct.  After September 2021, moderated is your

11  word, not mine, there was certain content which I didn't post

12  about or researched and the content I did, I tried to present

13  some of it in a more oblique fashion.

14  Q.   So to go back, so we say spring of 2021, you say, is

15  when you really kind of hit your stride in terms of your number

16  of followers?

17  A.   Sure.  That's a fair enough characterization.

18  Q.   And then September 2021, is when you suffered that

19  enforcement action that we discussed?

20  A.   Correct.

21  Q.   And then March of 2022, you even had more followers?

22  A.   Correct.

23  Q.   And you said you suffered another enforcement action?

24  A.   Correct.

25  Q.   So it's fair to say as your followers went up, you

36

1   started to suffer enforcement actions?

2     A.   Do you have data to support that?

3     Q.   The answers you've given me, Mr. Kotzin.  Whatever

4   you've told me.  Is it not true that you told me that in 2020,

5   when you were posting about these things you weren't getting

6   enforcement actions, you just didn't have that many followers.

7   You got a bunch of followers in spring of 2021, all of a sudden

8   you're suffering suspensions.  I'm just asking you based on the

9   timeline you've given me, is it not fair to say that you

10  started to suffer more and more suspensions as your number of

11  followers went up?

12    A.   No.  We said number of followers went up in spring and

13  the suspension was September.  That's six months later.  It's

14  not fair to say, no.

15    Q.   So you don't think --

16    A.   Based on --

17    Q.   If I drew the two lines, you don't think they would be

18  roughly pale?

19    A.   No.  One line like this, suspension, suspension,

20  suspension.  No correlation.  Do you want me to draw it for

21  you?

22    Q.   I'm well aware, Mr. Kotzin.  You were let back on

23  Twitter, correct?

24    A.   Yes.

25    Q.   It's interesting, did anybody at Twitter tell you

37

1    despite the government forcing us to do this, we're letting you

2    back on?

3        A.   Not word for word, no.

4        Q.   But you just testified to the Judge that you think the

5    government is forcing Twitter to do this.  If they're forcing

6    Twitter to do this, why would they let you back on?

7        A.   They're going to kick me off soon.  They want me to

8    moderate.  They want to control my content.  Twitter does not

9    have an interest in kicking people off.  They're a business.

10   Each person they kick off is one less consumer.  Their whole

11   brand is by letting people go on and express themselves.  Each

12   time they kick someone off, they hurt their brand.  Competitors

13   are being open and people are going to them.  Twitter is a

14   company who has no interest in ever suspending an account that

15   is generating viewers and followers.  Why would they do that?

16       Q.   Mr. Kotzin, have you interviewed a significant number of

17   people on Twitter?  By significant, I should give you a little

18   more meat.  That's my fault.  Have you interviewed, let's say,

19   100,000 people?

20       A.   I don't understand your question.

21       Q.   Have you interviewed 100,000 Twitter users to speak

22   about experiences they've had with respect to disciplinary

23   actions taken by Twitter?

24       A.   I have not interviewed 100,000 Twitter users.

25       Q.   Do you want to know roughly how many users there are on

38

1    Twitter?

2    A.    Sure.

3    Q.    I'm not even on Twitter, Mr. Kotzin.  I'm just asking

4    you, do you know how many users roughly there are on Twitter?

5         THE COURT:  Thanks to Elon Musk, we've all seen that

6    number recently, right?

7    BY MR. CHOLERA:

8    Q.    Exactly.  Now with the *New York Times* reporting.  It's

9    in the multiple tens of millions, correct, Mr. Kotzin?

10   A.    I would assume even more.

11   Q.    That's what I would assume.

12        THE COURT:  It's under a billion is what I think is

13   correct.

14        THE WITNESS:  They like to make the number as big as

15   possible.

16   BY MR. CHOLERA:

17   Q.    I think all the social media sites would like to do

18   that.  So you don't know whether -- let me take that back.  You

19   are not prepared to testify here today before the Court that

20   there were no users on Twitter who are posting things similar

21   to you who were not subject to disciplinary actions from the

22   start of the pandemic to, say, the end of 2020?

23   A.    On my personal information and belief, I never heard of

24   anyone getting suspended by Twitter for COVID-related matters

25   before summer of 2021.  It only started happening after Jen

39

1   Psaki said to do it.  We all saw it happen.  They started

2   suspending and kicking people off.  We saw it.  It happened in

3   front of our eyes.

4       Q.    That wasn't my question to you, Mr. Kotzin.  My question

5   to you is -- wasn't what have you heard.  My question to you is

6   you are not prepared here to testify to the Court that you know

7   that there is nobody else on Twitter, nobody, from start of the

8   pandemic to the end of 2020, you cannot say that there's nobody

9   else who posted things like you but who were not subject to

10  disciplinary actions?  In other words, it's possible there were

11  other users who were posting things like you who were subject

12  to disciplinary actions from the start of the pandemic to the

13  end of 2020?

14      A.    No.

15      Q.    It's not possible?

16      A.    Highly unlikely.  I knew most of the people that were

17  posting this content.  We are a very small group in the

18  beginning.  I knew we were the antiCOVID Twitter.  I knew them.

19      Q.    So your testimony here is that you know of every single

20  person who was criticizing COVID-related vaccines, treatments,

21  social distancing, you know all of them on Twitter?  What's

22  your basis for that statement, Mr. Kotzin?

23      A.    I said it was highly unlikely but possible.  It's a

24  community.  You communicate with each other.  So I didn't need

25  to know them directly.  When someone is suspended, first of

1   all, they disappear.  The only way you know about it -- we have

2   a little network.  We say like last week, Eli Cline was

3   suspended.  People pass around, hey, Eli Cline was suspended.

4   That's how we know.  Because the person has disappeared when

5   they're suspended.  They're not there.

6   Q.   Mr. Kotzin, I'm going to repeat the question one more

7   time.  I'm not asking for speculation.  I'm asking you for what

8   you know.  And my question to you is do you know, can you tell

9   the Judge, do you know of every single person on Twitter from

10  the start of the pandemic who has posted something that is

11  critical of COVID-related protections, vaccines, treatments, do

12  you know all those people?

13  A.   I do not know every single person on Twitter.

14  Q.   You do not.  So it's fair to say, once again, you cannot

15  conclusively tell the Court that nobody was suspended from the

16  start of the pandemic to the end of 2020 because they posted

17  things similar to the things you posted in 2020.  You can't

18  conclusively tell the Judge that?

19  A.   I can't conclusively.  All I can say is the community of

20  Twitter users, of which I am a member, is unaware of anyone it

21  happened to before summer of 2021, and we are aware of many

22  people it happened to starting in summer of 2021.  So it's a

23  conclusion reached by a community of people.  Maybe there's

24  others that didn't join our community.  But if you're not in

25  the community, there's no point in being on Twitter.  What

41

1   you're saying is possible but extremely highly unlikely.

2           MR. CHOLERA:  This will probably go away but I move to

3   strike to the extent it invokes hearsay regarding what other

4   people in a hypothetical community.

5           THE COURT:  I've not been clamping down tightly on

6   this but when it comes to weighing the evidence, trust me, I'm

7   only going to depend on admissible evidence.

8           MR. CHOLERA:  I have no further questions, Your Honor.

9           THE COURT:  Thank you.

10       Redirect?

11          MR. VECCHIONE:  No redirect, Your Honor.

12          THE COURT:  Mr. Kotzin, thank you very much.  You may

13  step down.  If you like, it's up to you, you can stay in the

14  courtroom.  You're not going to be recalled by the government.

15  Thank you.

16       And the plaintiff may call the next witness.

17          MS. YOUNES:  We call Mark Changizi.

18          THE COURT:  He will come forward.

19     (Witness sworn.)

20          THE COURT:  Ms. Younes, whenever you're ready, you may

21  proceed.

22          MS. YOUNES:  Thank you, Your Honor.

23

24

25

42

1              - - -

2              MARK CHANGIZI

3      Called as a witness on behalf of the Plaintiff, being first

4  duly sworn, testified as follows:

5              DIRECT EXAMINATION

6  BY MS. YOUNES:

7      Q.   Good morning, Dr. Changizi.  Can you tell us about your

8  educational background starting with college?

9      A.   Yeah.  I was a physics math undergrad and the point of

10 doing that was so that some day I could answer the questions to

11 the universe more concerning neuroscience, cognitive science,

12 big kind of questions.  I needed those under my belt.  Ph.D.

13 was in applied math.  But then I went on to cognitive science,

14 neuroscience kinds of things that university college core

15 professor in computer science, Duke University in neuroscience,

16 psychology, Caltech as a theoretical neuroscientist.  And a

17 professor of cognitive science at Rensselaer Polytechnic up in

18 Troy.  Then I started my own research institute in 2010 called

19 2AI labs and have been sort of a publicly-facing intellectual

20 since early 2000s.  I'm on my sixth book is coming out this

21 year.

22          I research in a varieties of areas.  All over the place.

23 From why your fingers get pruny when they're wet, their rain

24 treads to why we see in color.  They're actually optimized to

25 see blood and health and motions on their skin to more emergent

43

1    phenomena like how we came to have language and music to the

2    next book which is on the origins of emotional expressions and

3    the importance of free expression.  All kind of

4    theoretical/empirical kinds of studies.

5    Q.    Where did you get your degrees from?

6    A.    Undergrad physics math at University of Virginia.  Math

7    Ph.D. at University of Maryland College Park.

8    Q.    And what's your latest book on?

9    A.    *Expressly Human:  Decoding the Language of Emotion* is on

10   why we have the sweet emotional expressions that we do, how

11   they function.  And how they also function as the atoms or the

12   grammar underlying how social networks, social media networks,

13   how society itself slowly changes people's reputations rise and

14   fall through these complex expressive processes, arguments,

15   debates, interactions so that we have those around us for a

16   high reputation by virtue of being right many times, through

17   expressive arguments and somewhere low.  It's through that

18   process that both science as a special case and society

19   generally slowly moves towards the truth.

20   Q.    So going back to March of 2020, can you tell us what

21   your views were about COVID and the government response to it?

22   A.    Yeah.  So in March 10th, I had pinned -- as of

23   March 17th I've had pinned -- pinned means at the very top of

24   your Twitter so it's always at the top of your stream.  So new

25   stuff always comes below it.  It's always there.

44

1    As of March 17th, I remarked that to the effect of

2    this -- the most dangerous thing for society is sort of a

3    collective hysteria or sort of a pandemic of memes or ideas

4    that can flow through the populous and the hysteria, not a

5    biological pandemic.  I could tell that this was becoming kind

6    of collective hysteria and people were acting very

7    irrationally.  I said, I've got to come out.  All of the

8    scientists that I look up to are completely being irrational

9    about this and have completely, any attachment they had to

10   civil rights, civil liberties was being thrown under the bus

11   within the first -- by March 11th.

12   Q.   Did your educational and research background influence

13   your views on COVID?

14   A.   Yeah.  I think in, at least, three ways.  I think as a

15   psychologist, cognitive scientist, I have a lot of experience

16   with cognitive biases and understanding the kind of mistakes

17   that people make, that we're all prone to make unless you're

18   very, very self-aware of it.  I also -- good at understanding

19   sort of emergent level phenomena.

20       A lot of times you might see there's someone that's

21   doing this to us.  Who's doing this?  It's the great research.

22   Who did this?  No, it doesn't need to be anybody that does it.

23   These are emergent effects that happen by virtue of large

24   numbers of people and they just happen on their own like a

25   ouija board but with a million fingers and you can explain a

45

1   lot of the effects that are seen like there's somebody out

2   there to get you or somebody pushing this is just the results

3   of large numbers of people acting the ways that networks do.

4          And as a third thing, as I've always tried to be aloof,

5   both scientifically and politically, I'm moving from field to

6   field and I know that my own biases would trap me and I think

7   by virtue of being aloof in the ways that I tried to be, it let

8   me stay -- not get swept up because I would have been equally

9   swept up as anybody else if I had been attached to the same

10  kind of high reputation people that suddenly thought this was

11  the most dangerous thing ever and we've got to overturn

12  society.  I would have been right there with them if I hadn't

13  kept that kind of aloofness as a scientist I needed to keep.

14  Q.   So you referred to your Twitter account.  You have a

15  Twitter account, obviously.  When did you start it?

16  A.   I think it's from 2009 or so.

17  Q.   And as of March 2020, approximately how many followers

18  did you have?

19  A.   Several thousand.  Most, I would say half were probably

20  bots.  I was using it here and there over the years.  As a

21  writer, popular books that are all about my research,

22  publishers now tell you, get an account, your job is to be the

23  PR person as well as the publisher.  I would be there just

24  talking about science, research, interacting with science

25  journalists.  It was fairly inactive and semi-dormant,

46

1    semi-used but no real impact.

2        Q.   And how many followers do you have today, approximately?

3        A.   About 37,000.

4        Q.   And how would you define or determine what's an

5    influential Twitter account?  Is it just by the number of

6    followers or are there other indicators?

7        A.   Certainly the first order.  But any of us can open an

8    account today and suddenly follow 100,000 people by tomorrow

9    and 80 percent of them sometimes might just follow you back.

10   You can suddenly have 80,000 followers tomorrow.  But you have

11   no sway, you can't really get any impact from your tweets

12   because those followers are not paying any attention to you.

13   You're not a big person in terms of their account.  Key is --

14        So the first order, that would be a good predictor the

15   number of followers that you have.  In reality, it's more

16   complicated.  In reality, even when I only had 5,000, even when

17   I had grown just a little bit, I had 5,000 followers, which

18   again I think it was 3,000 nonbot followers, I was having

19   tremendous impact.  I was already part of this early community

20   back in March of 2020, of these wide-ranging data scientists,

21   epidemiologists, medical folks and scientists like me who were

22   saying something is going off and so we -- and there's all

23   these people that glommed onto us.  We were having tremendous

24   virality despite our relatively small size due to where we sat

25   within the network.

47

1          THE COURT REPORTER:  If you could please speak a

2    little slower.

3          THE COURT:  When someone has to take down every word,

4    we all have to learn to talk a little slower.

5          You may continue.

6    BY MS. YOUNES:

7    Q.    So there's something called impressions on Twitter.  If

8    so, what are those?

9    A.    The number of impressions for a tweet is just the number

10   of times it was seen by people.  And I think it came up

11   earlier.  To be clear, the number of impressions just isn't

12   from your own followers because your followers might be

13   retweeting it and others who are not following you can retweet

14   it and so on and so on.  It can be mostly not your followers

15   who are actually seeing it.

16   Q.    And what was the focus of your account beginning in

17   March of 2020?

18   A.    COVID.  Both the biological side, the collective

19   hysteria side, the psychology and emergent phenomena and civil

20   rights all connected to COVID.  But, to me, it was just a

21   specific example of the kinds of dangers that society always

22   has had to deal with.  It happened to be worldwide this time.

23   So, for me, this was sort of an excuse in some sense to say,

24   look, we need to have ways of understanding these kinds of

25   events because this is just one really dangerous, special case.

48

1    Q.    Would you call your Twitter account as of today

2    influential?

3    A.    Yes and no.  I'm sure you'll get there, but as of May of

4    2021, it's been severely throttled.  So I'm down by a factor of

5    ten or more in terms of my --

6    Q.    What do you mean by throttled?

7    A.    What do I mean by?

8    Q.    Throttled.

9    A.    Throttled.  So I mean that I have been so deboosted or

10   censored in more than one capacity.  So there was more than one

11   way to censor and I don't know the full range of mechanisms

12   that Twitter has.  But they -- it might be helpful if I go

13   back.

14        If you actually look back at my impressions starting

15   from January of 2020, and you plot the number of impressions

16   each month up until today or up until the end of March, you'll

17   see me rising from a very small number of impressions per month

18   and by the end of May of 2021, a year and a half later, I was

19   nearly at 20 million impressions per month or more.  And it

20   turns out that it starts to fall, but I didn't even notice.  It

21   wasn't until November or December of 2021, that I started to

22   feel like something is not right.  I'm just not getting any

23   impacts anymore.  I'm not getting the kind of feedback, the

24   kind of reactions, virality from my tweets that I had been.  It

25   wasn't until February or March that I then said, let's go ahead

49

1  and do this month by month number of impressions and then when

2  I did, I see that May was, in fact, the peak and then since --

3  Q.    You're talking about May 2021?

4  A.    May 2021 was the highest number of impressions, after

5  which it starts to fall kind of a very nice bell curve.  It's

6  not a bell curve driven thing but it happened to look like a

7  bell curve, and it just starts to fall in June, July and just

8  falls and falls all the way down to March where it's at levels

9  of what it was in March or February of 2020.  It's not just

10  sudden.  They didn't just come in and say okay, let's do this

11  one -- one of their dozens of mechanisms for deboosting

12  someone.  I don't know what they are.

13       They clearly decided we're going to slowly do this and

14  turn up the knob and start activating more and more of these

15  mechanisms to greater and greater levels of -- each one of

16  their mechanisms has more than one level you can set it at, I'm

17  sure.

18       These include, for example, on all -- for significant

19  numbers of my followers, when they see my stream, if they see

20  it at all -- first, they're not likely to find me.  They say,

21  Mark, I haven't seen you in months.  I didn't even know you

22  were still here.  I don't come up on their stream.  When I do,

23  it just has Mark Changizi, my little logo and a little

24  horizontal band that says, the content in here is sensitive and

25  you're not able to see it.  And if you click here or you go and

50

1  change your settings and something like this, you can then go

2  see it.  But a lot of people never figured out how to do that

3  so that's all that they see.  This is a page of this is

4  sensitive, this is sensitive.

5       It later changed to and this is adult content.  Suddenly

6  I'm a porn service or something like this.  They put -- somehow

7  changed the settings to even put me in that category.

8       And people who search on me say, where is Mark?  They

9  start typing in Mark.  If you type in Mark and I'm one of the

10  people that they follow, it often will just suggest like they

11  might follow four or five Marks.  All the Marks will come up.

12  Mark C-H-A, now I'm certainly the only one.  And then Chang,

13  I'm definitely the only person that they follow that's Mark

14  Chang.  Still don't come up on Twitter.  You've got to type in

15  Mark Changizi with a final I and finally there will be other

16  accounts like a temporary account that I once had that has my

17  name.  And then it says see more on the bottom and then if you

18  click see more, then my name will pop up.  For which it says,

19  are you sure you want to enter because this is a sensitive,

20  dangerous account.

21       So all the stops are being pulled out to make sure that

22  I'm not visible.

23  Q.    So have you ever been suspended by Twitter?

24  A.    Yeah.  I think my first suspension was a twelve-hour

25  suspension in April-ish of 2021.  And it was for posting a link

51

1   to an article that was pointing out in effect efficacies and

2   harms of masks.  A paper that was linked on the NIH -- NIMH

3   website.

4   Q.  And how long was that suspension?

5   A.  That was a twelve-hour.

6   Q.  And when was your next suspension?

7   A.  It think it was July.  I don't know the reasons.  The

8   place in the e-mail where they would say here are the tweets

9   that -- it was just blank.  I don't know what went on there.

10  Q.  And when was your next suspension?

11  A.  By the way, the second was a seven-day suspension in

12  July.  And the third was a permanent suspension December 21st

13  of 2021.  And there it referred to two tweets.  One of them

14  talking about natural immunity and asymptomatic transmission.

15  Saying, look, natural immunity is stronger than vaccine

16  immunity, which it is.  Asymptomatic transmission is not a

17  major driver, which is true.  Things along these lines.  They

18  said I violated their terms and I'm permanently suspended.

19  Q.  Was there another tweet that was also --

20  A.  There was another tweet.  There was two tweets.  The

21  other one was -- if you can remind me what it was.

22          MS. YOUNES:  May I?

23          THE COURT:  You may.

24  BY MS. YOUNES:

25  Q.  This is from Exhibit B.

52

1    A.    COVID.  It said COVID is 10 to 20 times less dangerous

2    than flu for kids.

3          THE COURT:  What page are you on?  It should be the

4    bottom right.

5          THE WITNESS:  Five of 36.  COVID is 10 to 20 times

6    less dangerous than flu for kids, which is true.  It's five

7    times more dangerous for adults.  For older adults 70 and up at

8    the limits.  So I said, get a grip.  There's no long-term data

9    for the shot.  Which is true because it's only been a certain

10   period of time.  And even the short and medium-term data for

11   that age group are ambiguous at best.  That's the first of the

12   two that got me permanently suspended.

13        And the second was asymptomatics rarely spread it.

14   Vaccinations don't slow spread.  They don't.  They may provide

15   some protection.  It depends on whether there are any or

16   adenovirus.  Unvaxxed posed no threats to the vaxxed.  The

17   risks are broadly flu-like and safer for flu for those under 40

18   and a huge percentage of the unvaxxed have superior natural

19   immunity via recovery.  That is, they've recovered.  They've

20   gotten the disease, they've already recovered.

21        Both of these things are, I would argue, just clearly

22   true.  At best, you could argue that -- they're best arguable.

23   I would say these things are clearly true.

24   BY MS. YOUNES:

25   Q.    You said you were permanently suspended for that?

53

1    A.    Yes.

2    Q.    How is it you still have a Twitter account?

3    A.    I didn't plan on going back.  A couple weeks later some

4    folks said, why don't you go ahead and appeal.  It's good to

5    get an appeal in just so that you've lodged your case.  So I

6    went ahead and did it after Christmas or on Christmas Day it

7    actually turns out, and appeal's in here, and without

8    explanation, they gave me back the account.

9         MS. YOUNES:  Your Honor, if I may give Exhibits 1

10   through 8 to the witness.

11        THE COURT:  You may.

12   BY MS. YOUNES:

13   Q.    Can you tell me what -- do you recognize Exhibit 1?

14   A.    Yes.

15   Q.    And what is it?

16   A.    This is -- the first plot that's shown on the left and

17   the right is showing what was published in --

18   Q.    I was getting at, in a very general sense, what is it?

19   A.    Okay.  This is a tweet.

20   Q.    Who tweeted it?

21   A.    From me.  This my tweet.

22   Q.    And what's the date?

23   A.    On May 13th, 2020.

24   Q.    And if you can just read, you don't need to explain

25   detail, but the general.

54

1    A.   One example of the apocalyptic narrative communicated by

2    the media in March which caused the hysteria and lockdowns,

3    where media inappropriately compared flu infection fatality

4    rate, (IFR), and COVID case fatality rate, (CFR).  So the short

5    story is that if you look at the top plot, on the left you have

6    flu, on the right you have COVID.  On the left they're looking

7    at something called infection fatality rate.  On the right

8    they're showing COVID but they're showing it for case fatality

9    rate which are always, in order of magnitude, are more higher.

10       This is what insider business review and all these other

11    places were publishing this.  And this was actually what was

12    presented in Congress, the same kind of mistaken comparison,

13    apples and oranges comparisons.  Which if you look at this,

14    it's going to freak you out.  You ought to be freaked out if

15    you see this.  It's looking like it's radically more dangerous,

16    COVID than flu.

17       When you look below, you've actually normalized it so

18    they're both about infection fatality rate.  Then you see that

19    there's broad similarities.

20    Q.   How about Exhibit 2?

21    A.   So these are three tweets that are part of a longer

22    viral thread.

23    Q.   What's the date on that?

24    A.   Exhibit 2, this is April 27th, 2020.

25    Q.   And what do they say?  You can be general.

55

1    A.    So this was part of a 15 reasons why the arguments --

2    why lockdowns were never common sense.  And so this became kind

3    of a viral thread.  A thread is where you start and then you

4    link to the next one which links to the next one and they're

5    kind of -- it turns into a thread which then automatically

6    suggests the next one.  So you can then do long pieces in some

7    sense like a blog or an article but it breaks it down to sort

8    of tweet-size, bite-size pieces.  These were just the first

9    two, three of the 15 reasons.

10        The second reason was the literature reviews prior to

11   COVID-19 had little good to say about shutdowns.  That was just

12   a link to one of these massive things.  Here's what -- if a

13   pandemic were to ever happen, here's all that we know and they

14   basically said don't do shutdowns.

15        Three was almost no awareness of the impact on civil

16   rights as if emergency declaration suspension of rights, house

17   arrest, mass unemployment and business shutdowns is just

18   something democratic governments sometimes do.  Which of course

19   prior to March of 2020, people would never even have thought

20   that.  But suddenly it was obvious everybody should do it.

21        And four, just since it's here, there was no historical

22   precedent for putting the entire healthy population in

23   quarantine.  Never before.  Yet this was suddenly common sense

24   as of mid-March 2020.

25   Q.    And Exhibit 3?

56

1  A.  This is the first sort of bullet or item in that 15

2  list.

3  Q.  The date is?

4  A.  The date is April 27th of 2020, part of that same

5  thread.  Describing kind of what I had already mentioned before

6  going through the same plot that I pointed out that the

7  evidence was poor that COVID-19 was doomsday in the first

8  place.  It has low IFR, and I linked to the Centre for

9  Evidence-Based Medicine at Oxford.  The are not is around 2.3.

10  That means how transmissible it is and link to a paper which is

11  not so transmissible, it's not very different than others.  Age

12  distribution is very similar to that of flu.  I mean, it's

13  different but it's the first order it's roughly the same.  It

14  hits those primarily with significant comorbidities.  It should

15  say comorbidities there but I may have run out of space.  And

16  it's safer for the young than is the flu.  And I subtweet James

17  Todaro, MD, a tweet of his.

18  Q.  And Exhibit 4, can you tell us the date and the content

19  of that one?

20  A.  That's a tweet by me on November 30th, 2020.  And I'm

21  just quoting here from a paper.  The first randomized

22  cross-over study assessing the effects of surgical masks and

23  N95 masks on cardiopulmonary exercise capacity yields clear

24  results.  Both masks have a marked negative impact on exercise

25  parameters.  And a link to the NIH page where it is.  Basically

57

1  masks shouldn't be worn.  Even if they work, they would cause

2  problems if you're doing exercise.

3      Q.    And Exhibit 5?

4      A.    This is a tweet of mine in May 18th.  May 18th, 2020.

5  The hysteria quickly creates a religion, in quotes, accompanied

6  by moral outrage at rule breakers and the development of a

7  battery of arbitrary codes to follow.  It's akin to Iran's

8  Islamic revolution.  It can take a life of its own and can be

9  practically impossible to stop.

10     Q.    And can you do the same with Exhibit 6, please?

11     A.    A tweet of mine from October 14th, 2020.  I refer to

12 Ioannidis.  He's a famous -- probably one of the most famous

13 scientists of all actually on earth today and he's certainly

14 one of the most famous epidemiologists.

15           Ioannidis estimated IFR, infection fatality rate, to be

16 about .25 percent.  This is similar to the mid-March estimates

17 from the Centre for Evidence-Based Medicine of .1 percent to

18 .3 percent.  It's a nasty flu for those 50 and up, especially

19 with comorbidities.  Safer than flu for young people.  I link

20 to the study which was at the WHO site.

21     Q.    And Exhibit 7, please?

22     A.    This is a tweet of mine from November 22nd, 2020 and

23 it's titled asymptomatic farce.  And this is a quote, there

24 were no positive tests amongst 1,174 close contacts of

25 asymptomatic cases.  In other words, of the 1,174 people that

58

1  were asymptomatic that they tested, none of them came back

2  positive as having it.  So none of the asymptomatics actually

3  had the disease.  Lockdowns, masks, social distancing are moot

4  even if they worked, which they don't.  Symptomatic?  Stay

5  home.  As in 2019 and all years before.  And then I'm referring

6  to this nature paper that I quoted from.

7  Q.   And the last one, Exhibit 8?

8  A.   A tweet of mine from November 18th, 2020, titled

9  breaking (and obvious).  Random controlled trials show no

10  benefit to masks.  And for COVID-19, the difference observed

11  was not statistically significant, in quotes, referring to the

12  study.  And then influenza, quote, 14 RCTs, randomized control

13  trials, did not support a substantial effect on transmission.

14  And I have screenshots of these studies below.

15  Q.   So is it fair to say that you were tweeting very similar

16  content the entire time and you were not suspended until April

17  of 2021?

18  A.   That's right.

19  Q.   Thank you.  Do you have other social media accounts?

20  A.   I do.  I have YouTube, Instagram, Facebook and also now

21  competitors with Twitter, Parlor, Gab, Gitter and Truth Social,

22  and YouTube.

23  Q.   Did you notice -- you talked about a drop in impressions

24  and engagement with your account.  Did you notice any similar

25  patterns across your other social media accounts?

1    A.    The only other ones that I both have any following at

2    all and could check, I didn't figure out how to check Facebook

3    which I barely have been on.  YouTube, I have a very similar

4    curve to my number of new subscribers.  I have a YouTube

5    channel where I have videos that talk about science-related

6    things from my research and now COVID-related hysterias,

7    psychology, cognitive science related kind of things.  And I

8    grew -- the number of new subscribers was growing and growing

9    and growing.  Somewhere around summer, June, July of 2021, the

10   number of new subscribers that you see a similar kind of curve

11   falling then and following.  A little bit more jagged because

12   the number of followers is a smaller number than the number of

13   impressions which are in the millions here.  We're talking

14   about hundreds.  So it's more sarcastic.

15   Q.    Did you ever attribute censorship of your social media

16   to the government publicly?

17   A.    Yeah.  I certainly did.  I was somewhere around --

18   Q.    Do you need Exhibit B to refresh your recollection?

19   A.    Exhibit B?

20   Q.    Yeah.  Paragraph -- beginning at paragraph 31.

21   A.    Did you say a page number?

22   Q.    I guess it's page 7 at the top and then it's paragraph

23   31.

24   A.    On January 5th of 2021, I tweeted, it's actually

25   government censorship.  Much of the reason why big tech is

60

1    engaged -- that's part of the tweet.  Much the reason why big

2    tech is engaged in censorship is pressure from government

3    itself.  And so the premise at the start of this thread is

4    false.  They're not acting as a private company but are a de

5    facto arm of the state.

6    Q.   Do you recall what prompted you to tweet that?

7    A.   Well, at the time I felt that it was surely the case and

8    I wasn't -- at the time I still thought it was a small

9    pressure.  I presume these kinds of pressures potentially --

10    they're always worried about what the state might do.  The

11    state might start to do any number of regulations.  And so it's

12    always on their mind.

13    But really even then I said I think I presume that some

14    of this was going on but hadn't really been real, taken reality

15    to me until a few months later.  I was more worried at the time

16    of just the attitudes that people had toward free expression

17    and not appreciating it.  Just a general attitude of tolerance

18    which was missing in the debate and in the culture.

19    Q.   So did you ever discuss this again, for instance --

20    A.   Yes.  Then it became real when Jen Psaki started just

21    saying unabashedly that we're working -- this was an article

22    that I wrote --

23    Q.   I would actually back you up to your May 5th tweet.

24    A.   Oh, yeah.

25    Q.   Paragraph 32.

61

1    A.    Yeah.  So I had tweeted a video of Press Secretary Jen

2    Psaki's May 5, 2021 speech and remarked, free expression alert.

3    Amazing.  She specifically threatens big tech here to censor or

4    risk greater regulation.

5    Q.    And did you ever write an article on the subject?

6    A.    Yeah.  I have a newsletter that comes out of my free

7    expression, my free speech research institute.  It's big tech

8    censorship.  This came out July 5th, 2021.  Big tech censorship

9    is actually government censorship.  And I cited her May 5th

10   talk and -- I don't know if you need me to recite the verbiage

11   that she did.

12   Q.    I think that's sufficient.

13         Did you ever tweet anything again, for instance, on

14   September 20th?

15   A.    I tweeted that Psaki's statement that, quote, you

16   shouldn't be banned from one platform and not others for

17   providing misinformation.  And then she said, your federal

18   government -- this is me joking, your federal government who is

19   totally not directing big tech censorship and thereby violating

20   the First Amendment.

21   Q.    Are you aware of any, for instance, very recent

22   statements that Jennifer Psaki made on the subject?

23   A.    Yeah.  Just earlier this week she reiterated the same

24   threats, actually even more before she had threatened antitrust

25   regulation is on the table, right in the very sentence or the

1    very next sentence after saying that --

2         THE COURT:  There's an objection.

3         MR. CHOLERA:  Yes.  Move to strike on grounds of

4    hearsay.  To the extent there is some statement regarding Jen

5    Psaki that the plaintiffs want to refer to, they can just go

6    ahead and submit that itself directly.

7         THE COURT:  This is what I was hoping we could achieve

8    through stipulation.  It is hearsay.  But I don't think the

9    government's denying that it occurred, right?

10        MR. CHOLERA:  I just don't know the precise comment

11   that he's referring to.  So we certainly -- we're not denying

12   she might have made some comments.  I don't know if this

13   comment they're referring to --

14        THE COURT:  Maybe when this hearing is over, you can

15   look at some statements and see if you can agree that they are

16   accurate and you both agree they're part of the record.  When

17   we get it second hand, there's not going to be any

18   cross-examination, for example.  And this way it will be

19   admissible which will help you but at the same time we won't

20   have a hanging chad, so to speak, in the middle of the record

21   here.

22   BY MS. YOUNES:

23   Q.   Did your belief about the government's involvement in

24   Twitter and other social media censorship and knowing the views

25   that you're expressing, did that cause you to do anything

63

1    differently?

2    A.    Yeah.  So my first -- somewhere around May of that year

3    before I realized I was actually being censored, starting then.

4    I chose not to talk about certain kinds of things because it

5    was clear to me that I couldn't talk about early treatments

6    and, again, I didn't even bother looking it up.  What's the

7    point of looking these things up?  I didn't talk about

8    vaccinations.  I talked only about mandates concerning

9    vaccinations and about, let's say, the transmissibility, but I

10   didn't talk about whether or not how effective they were or

11   damages that they had or if I ever -- I would just flirt and

12   point in that direction.

13        And I started to, if I wanted to refer to a paper, I

14   would either start putting broken links so that they didn't

15   know I was referring to the real thing so you don't have to go

16   fix the spaces or I would do a screenshot.  I was avoiding

17   certain topics and coming up with very circuitous ways of

18   getting people to the place that they needed to go to find

19   information themselves out of fear of losing my voice in the

20   public square.

21   Q.    And is there information that you have given to Twitter

22   or that you've exchanged on Twitter which you don't consider

23   public and you would not want the government to have access?

24   A.    Yeah, there's the obvious, the direct message side which

25   I've always presumed.  A little bit more subtle than that is if

64

1    the government, sure, all of my tweets are public.  But it's a

2    very different thing if your name is passed on to the

3    government, you've got -- I've got 30,000, 40,000 tweets, maybe

4    more than 50,000 tweets.  Effectively, it's impenetrable and if

5    they suddenly acquire an interest in me, suddenly they can make

6    the time to really make that transparent.

7       Q.   Do you use any messaging apps like Signal or Telegram?

8       A.   I do.

9       Q.   And when you send messages over Signal, Telegram,

10   Twitter, do you expect the government to have access to those

11   messages?

12      A.   I do not.

13      Q.   Do you have, on those sorts of platforms, do you have

14   different expectations of privacy than you would over e-mail?

15      A.   I mean, I kind of -- I expect them to be at least as

16   good, as safe as e-mail.

17      Q.   So if the government were to somehow magically bow out

18   of this whole thing, would that change your behavior on

19   Twitter?

20      A.   Yeah.  I think it would.  I would be very much relieved.

21   I'm fairly confident that it would probably go back to 2020

22   standards where suddenly we're free to say huge -- there's

23   maybe some new wall, some other wall that was out there but it

24   was very far from anything I was ever posting.  I felt free as

25   a bird through all of 2020.

65

1          MS. YOUNES:  Thank you very much, Mr. Changizi.

2          THE COURT:  Thank you.  And cross-examination.

3          MR. CHOLERA:  Your Honor, may I please have a

4   five-minute break?

5          THE COURT:  Well, what we're going to do, I have

6   a 10:30 criminal matter that's going to take about ten minutes.

7   That will be just about right.  You don't have to clear the

8   well.  But I will see you back here at 10:40.

9       (Recess taken at 10:25 a.m. to 10:50 a.m.)

10          THE COURT:  The defendants may have cross-examination.

11                         - - -

12                   CROSS-EXAMINATION

13   BY MR. CHOLERA:

14   Q.   Mr. Changizi, did I pronounce that right?

15   A.   Yes.

16   Q.   If you sat through the last cross-examination, I think

17   you already have a feel for what my first few questions will be

18   so hopefully we can walk through this fairly quickly.  Did you

19   ever work at Twitter?

20   A.   No.

21   Q.   Have you ever interviewed an executive at Twitter or

22   anybody at Twitter whose responsibility it is to administer

23   their misinformation policies?

24   A.   No.

25   Q.   So nobody at Twitter ever told you that we're targeting

66

1    your posts, Mr. Changizi, because the government told us to?

2    A.   No.

3    Q.   Did anybody at Twitter then tell you, we define

4    misinformation the way we do because we were instructed to by

5    the government?

6    A.   No.

7    Q.   Are you privy to internal e-mails circulated within

8    Twitter about how they administer their misinformation policy?

9    A.   No.

10    Q.   Are you on conference calls with people at Twitter who

11    are responsible for administering their misinformation policy?

12    A.   No.

13    Q.   Do you have data on all the people who are users on

14    Twitter who are subject to enforcement actions pursuant to

15    Twitter's misinformation policy from the beginning of the

16    pandemic to the present?

17    A.   No.

18    Q.   So you don't know how many people Twitter has suspended

19    under their misinformation policy from the beginning of the

20    pandemic to, say, December 2020?

21    A.   No.  I wouldn't agree with that.  I certainly don't have

22    the knowledge that comes with having 100 percent of the data.

23    Q.   That's what I'm asking you.  Do you know for sure the

24    number of people they suspended from the beginning of the

25    pandemic?

67

1 A. Your last question was if you -- I don't recall the

2 exact way you phrased it was such that just because one doesn't

3 have complete knowledge doesn't mean one doesn't have

4 knowledge. Nearly all of us wouldn't have knowledge about

5 anything if that was the case.

6 Q. I'm not trying to make a vague epistemic point. My

7 question is do you have knowledge, do you know the number of

8 people that have been subject to disciplinary action under

9 Twitter's misinformation policy from the beginning of the

10 pandemic to the end of 2020?

11 A. I do not.

12 Q. So you don't know how many people they suspended in

13 March of 2020 under their misinformation policy?

14 A. No, I do not.

15 Q. Or April of 2020?

16 A. No, I do not.

17 Q. May of 2020?

18 A. No.

19 Q. So you actually don't have any firsthand, conclusive

20 knowledge over the rate of suspensions that Twitter has engaged

21 in from the beginning of the pandemic to the present?

22 A. Again, that doesn't follow from what I said. One can

23 have sarcastic, indirect information about each of those months

24 on the basis of observations that are probabilistic and can be

25 a good probabilistic strong sense that don't come from absolute

1  knowledge, complete knowledge month by month.

2     Q.    I'm asking for absolute knowledge.

3     A.    Well --

4     Q.    Is the answer no, Mr. Changizi?

5     A.    Then none of us know absolutely anything.  So I say no

6  to your final question.  I reject your final question and yes,

7  I do have knowledge but I don't have God-like knowledge.

8     Q.    Why don't we put it this way, Mr. Changizi.  How many

9  users on Twitter did you interview from the beginning of the

10  pandemic to the present to see what their experiences have been

11  under the misinformation policy?  Did you interview 100,000

12  Twitter users every month from the beginning of the pandemic?

13  I agree I'm not asking for your God-like knowledge.  Certainly

14  if you're professing this much knowledge, did you conduct a

15  statistical analysis, Mr. Changizi?

16     A.    No.  I didn't --

17           THE COURT:  Let me intervene.  So you have, by using

18  Twitter, you have some familiarity with some people, maybe a

19  large number of people who have been suspended or not suspended

20  but you don't have any data behind that other than your

21  personal use of Twitter.  Would that be accurate?

22           THE WITNESS:  My personal use of Twitter and the

23  consequences of that as being both part of a community of tens

24  of thousands of folks which themselves are part of a greater

25  community.  So the information flows within Twitter provide a

1    lot more knowledge than the number of interviews and personal

2    conversations that I've had with other direct Twitter users.

3    That's the whole point of large networks is you end up with

4    information that goes beyond your first layer of network that

5    you're attached to.  You're getting information by virtue of

6    the whole network.  Through that, there's been a lot of

7    knowledge of another kind, a much more subtle and complex kind

8    than, in fact, all of us in real life deal with that has

9    provided all of us with clear data that nobody on the other

10   side has been censored throughout and there's been a clear

11   uptick in censorship at all levels somewhere around late April,

12   early summer of last year.

13   BY MR. CHOLERA:

14   Q.   None of that answers my question to you, Mr. Changizi.

15   Let me try again.  Except maybe the first part where you

16   answered no, you have not conducted interviews.

17        So you mentioned tens of thousands of people.  Your

18   testimony is here, under oath, that you know conclusively the

19   personal experiences of tens of thousands of Twitter users and

20   whether they have been suspended and the rates at which they

21   have been suspended from the beginning of the pandemic to now?

22   A.   No.  I am saying I definitely do not have the kind of

23   rigorous data that you were suggesting.  And I would love to

24   have, yes.

25   Q.   I'm not asking about rigorous data regarding the whole

70

1   Twitter platform and every user.  I'm just asking what number

2   of people can you say conclusively I know their experiences on

3   Twitter, I know that they've been on Twitter since the

4   beginning of the pandemic, I know that they've been posting

5   this stuff and I know what disciplinary actions they've been

6   subject to from the beginning of the pandemic to the present.

7   Can you give me a number?

8       A.   The number for whom I would say I'm familiar with, it

9   could be -- there could be probably extending to thousands of

10  folks for whom I have a very good sense --

11      Q.   I'm not asking good sense.  I'm asking --

12           THE COURT:  He's not done.  Finish your answer.

13           THE WITNESS:  I have a very good sense of the degree

14  to which they have or have not been censored throughout the two

15  years.

16      BY MR. CHOLERA:

17      Q.   I wasn't asking for a good sense, Mr. Changizi.  I take

18  your point.  You don't know about everyone on the platform.

19  I'm asking for the number of people that you know, you know

20  what their experiences have been with respect to disciplinary

21  actions under the misinformation policy.  That is my question.

22  Can you give me a number on that?

23      A.   The number of people for whom I know, it probably -- I'm

24  more directly familiar and are probably with at least 100 folks

25  I'm directly familiar with, we communicate all the time.

71

1    Q.    So 100 people among tens of millions of people?

2    A.    One hundred people that are among the top leaders in

3    this movement, yeah.  They're not just your everyday person.

4    Q.    Are you aware that Twitter has had a misinformation

5    policy since early 2020?

6    A.    I would be surprised if they haven't had one for ten

7    years.

8    Q.    You mention that you were let back on Twitter after you

9    appealed; is that correct?

10   A.    Yes.

11   Q.    And what did they tell you when they let you back on?

12   A.    Nothing.

13   Q.    They just let you back on?

14   A.    Just said your account has been reactivated.

15   Q.    What did you tell Twitter in order to get back on?

16   A.    I have a statement that I provided to them saying it was

17   more of a philosophical free expression kind of point about how

18   they're making a mistake in engaging this kind of behavior.

19   Q.    Can you provide a little more information to the Court

20   on what you said and the specific argument you made to Twitter?

21   A.    It's probably not in this batch.

22        MS. YOUNES:  May I give the witness --

23        THE COURT:  You may.  To the courtroom deputy.

24        THE WITNESS:  Yeah.  I appealed the suspension on

25   Christmas Day.  And on that day I wrote, you have permanently

1   suspended me for speaking out as a scientist concerning the

2   evidence-based dangers of COVID and the efficacy and ethics of

3   the interventions.  Ironically, I'm one of the few scientists

4   studying the importance of free expression and how it is an

5   absolutely crucial part of the mechanism society and science

6   uses to stumble toward the truth.

7           I'm an academic with a number of well-known discoveries.

8   My sixth book appearing in a few months and also perhaps the

9   only person arguing against the interventions that understands

10  there was no plandemic and has tried to educate people against

11  their bias towards conspiracy theory thinking.

12          You've made a huge mistake in suspending so many voices

13  including mine.  And that is true whether or not what we're

14  saying is true.  Of course, I believe my statements are true

15  and always provide argument and evidence.  Remember, nearly

16  every journal article in the academic literature is false but

17  that doesn't mean it gets canceled.  It is part of the truth

18  discovery process itself.  Don't become part of the problem by

19  encouraging censorship and groupthink.

20  BY MR. CHOLERA:

21  Q.   So is it fair to say that in your note to Twitter you

22  defended your statements, you indicated that it was not

23  misinformation, you pleaded with Twitter about the way in which

24  they're administering their misinformation policy and they went

25  ahead and let you back on the platform?

1    A.    Yes.

2    Q.    Would it be fair to say Twitter had discretion to let

3    you back on their platform?

4    A.    Yes.

5    Q.    You mentioned YouTube before.  Have you ever worked at

6    YouTube?

7    A.    No.

8    Q.    Any knowledge of their misinformation policies, how they

9    go about policing misinformation?

10    A.    Not directly.

11    Q.    Have you spoken to anyone at YouTube about their

12    policies of policing against misinformation?

13    A.    No.

14    Q.    Same question, have you been privy to internal

15    discussions, copied on internal e-mails about it?

16    A.    No.

17    Q.    You mention that you would change your personal behavior

18    with a favorable ruling in this case.  Do you know who the

19    defendants are in this action?

20    A.    The Department of Health and Human Services, yes.

21    Q.    Who else?

22    A.    Surgeon General.

23    Q.    And the Secretary of the Department of Health and Human

24    Services?

25    A.    Okay.

74

1    Q.    Those are the three defendants?

2    A.    Yeah.

3    Q.    You mentioned before certain comments made by other

4    government officials.  Your testimony is that if there was an

5    injunction against the three defendants in this action, you'd

6    feel comfortable posting again on Twitter?

7    A.    Well, I'm not a legal expert to know whether even if we

8    were 100 percent successful here, exactly fully what that

9    entails in terms of the degree to which the government can

10   continue to do what they've been doing.  Actually, I'm not

11   entirely sure.  But once I get clear, if it's clear to me that

12   the federal government can no longer intimidate and threaten

13   us, as I believe they have, then yeah, I would feel much freer.

14   Q.    So I think it's fair to say when you were asked could a

15   favorable ruling help you, you just don't know yet?

16   A.    Well, I'm always -- of course, I'm hoping -- certainly

17   it's going to help me.  It's one step toward helping me.  I

18   don't fully know the degree to which the government can still

19   side step.  There's so many legal things that I'm worried about

20   they can still do.

21   Q.    My question to you doesn't go to the objective factors

22   of what the government is doing.  It's just your own subjective

23   view of it all.  It's fair to say that you have subjective fear

24   that goes beyond the defendants in this action?

25   A.    They concern primarily those actors, yeah, that have

1  been the ones that I believe have been making these threats and

2  intimidations.

3     Q.   Have you spoken to Twitter or any social media platform

4  about how they plan or if they plan to respond to the request

5  for information from the Surgeon General and if they do, what

6  information they're going to provide?

7     A.   No.

8     Q.   So nobody from Twitter has told you, Mr. Changizi, we're

9  about to turn over your name to the Surgeon General?

10     A.   Correct.  No.

11     Q.   And nobody's told you, Mr. Changizi, we're about to turn

12  over your direct messages?

13     A.   Correct.  No.

14     Q.   Has anyone told you that your information is about to be

15  produced to the Surgeon General?

16     A.   Nobody has specifically told me that.  But given that

17  I'm a leader in this movement and they're asking for basically

18  the leaders of misinformation, I exactly expect my information

19  to be handed over.

20     Q.   Am I correct that you stated that your first suspension,

21  and correct me if I'm wrong here, happened in April 2021?

22     A.   Yes.

23     Q.   I was looking at the bottom of some of these exhibits,

24  and you certainly don't have to go through all of them.  I

25  wanted to touch on a question that the Judge had actually asked

76

1    before.  We see these little icons at the bottom.  One is kind

2    of like a little chat bubble.  The other one are two different

3    arrows which I've been told means -- is that a retweet?

4      A.    The first one is a comment, number of comments.  Second

5    one is just there's two kinds of retweets you talk about and it

6    just sums up both of those and ignores the differences.  Third

7    is just likes.  The fourth little arrow up is if you want to

8    save the -- copy that link so you can link to it elsewhere.

9      Q.    Understood.  And then the heart is just someone saying

10   they like your post.  Am I right?

11     A.    Correct.

12     Q.    So, for example, if we were to look at what's labeled as

13   Exhibit 6, you have ten hearts, five retweets, one comment

14   bubble, correct?  And that's a tweet from October 14th, 2020?

15     A.    Uh-huh.

16     Q.    Then we look at this which is labeled as Exhibit 1 and

17   it's a post on the back of Exhibit 1, a tweet from

18   December 2nd, 2020.  Do you see that one?

19     A.    Uh-huh.

20     Q.    And now we look in, you have the little heart symbol and

21   it's about 1600?

22     A.    Uh-huh.

23     Q.    Would you say that your following grew over time?

24     A.    Yeah.  From March 2020 up until about May of 2021.

25           MR. CHOLERA:  I have no further questions, Your Honor.

77

1          THE COURT:  Thank you.

2      Any redirect?

3          MS. YOUNES:  Yes, Your Honor.  Just a couple.

4          THE COURT:  You may.

5                          - - -

6                    REDIRECT EXAMINATION

7  BY MS. YOUNES:

8  Q.    Are there degrees of knowledge, in your opinion?  Does

9  one either know something certainly or doesn't know it at all?

10 A.    There's degrees.  In fact, one of my seminal or early

11 parts of my dissertation is exactly about understanding exactly

12 how to justify and mathematically understand with what are

13 called prior probabilities, posterior probabilities.  Exactly

14 that kind of issue.

15 Q.    So what degree of knowledge would you assign your belief

16 that more people were suspended subsequent to the government's

17 public campaign?

18 A.    I'd say something like we're 100 percent is the --

19 there's an arbitrariness to the answer to this question which

20 is 100 percent being amongst nonmathematical things that

21 gravity works.  I might say let's say 80 percent in terms of

22 kind of sociological knowledge.

23          THE COURT:  There's an objection.  Let's go back to

24 the Rules of Evidence.  This is an interesting discussion, by

25 the way.  Part of a job of a fact finder, in this case this is

78

1    me, is to only rely on evidence that's admissible.  So it has

2    to be firsthand knowledge under the evidence rules and I think

3    the witness -- that's why I asked the question.  He has

4    firsthand knowledge of people he's seen on Facebook get

5    suspended and he can testify to that and the broader question

6    of how many people that would include.  But as far as

7    statistics, he's already told us he doesn't know.

8           So we'll leave the theoretical question aside.  But I

9    think -- I don't think there's a dispute about what I just

10   summarized to be what his knowledge base is.

11          You may continue.

12   BY MS. YOUNES:

13   Q.   As far as the question about whether or not a favorable

14   ruling would change your behavior, that was sort of discussed

15   more in the speech context.  But what about a favorable ruling

16   in terms of the Surgeon General no longer being able to get

17   your information from Twitter or other social media platforms,

18   would that change your behavior?

19   A.   Well, certainly.  I might be inclined to destroy out of

20   fear of what they might do, once they start hyperanalyzing,

21   they can use this for whatever means they want.  And you can

22   never know what the government will use information about you

23   for.  So it could motivate me.  Maybe I should go through and

24   scan through and search through anything that they might

25   consider bad, unclean speech or something of this kind that

79

1    could be used against me.  I don't want to -- I'm not the kind

2    of person that scrubs old speech.  I want it out there as part

3    of a record of which I also use as part of my external memory

4    in some sense.  I use it.  Its being there is important to me.

5          MS. YOUNES:  Thank you.  No more questions, Your

6    Honor.

7          THE COURT:  Thank you.

8       Any recross?

9          MR. CHOLERA:  No.

10          THE COURT:  Doctor, thank you very much.  You may step

11   down.

12      Any additional witnesses?

13          MS. YOUNES:  No, Your Honor.

14          THE COURT:  Any witnesses from the government?

15          MR. CHOLERA:  No, Your Honor.

16          THE COURT:  The last thing let's just talk about.

17   There was some testimony regarding I believe it's the White

18   House Press Secretary.  Do you think you can reach a

19   stipulation with regard to that?

20          MR. VECCHIONE:  May I, Your Honor?

21          THE COURT:  Yes.

22          MR. VECCHIONE:  So the easily spelled and

23   pronounceable Mr. Carson has run out to get a copy of that and

24   we hope to meet with the government momentarily and see.

25          THE COURT:  We just don't want to be chasing down

80

1    things that are not in dispute and may or may not have anything

2    to do with how the case is decided.

3          MR. CHOLERA:  I just haven't seen the document, Your

4    Honor.  So I mean, I guess we're treating it as almost a notice

5    of supplemental authority.  Obviously they want to submit it,

6    they can submit it and we would just ask if we have a chance to

7    review it and we believe there has to be some context or

8    clarification that we be permitted to submit something on that.

9    I don't know what this document is.

10         THE COURT:  We can spin a lot of wheels here.  We can

11   brief whether this is under 803(8) a public record.  You don't

12   want to do that.  So if it's something that's not in dispute, I

13   would suggest you try to agree to it.

14        Then my question becomes, does that close the record for

15   our purposes on the preliminary injunction?

16         MR. VECCHIONE:  Yes, Your Honor.

17         THE COURT:  All right.  I'll do this as a compliment.

18   You heavily briefed this already.  The facts you've educed

19   today helped me understand what's at stake here.  But I don't

20   see any real point for any additional briefing or argument, do

21   you?

22         MR. VECCHIONE:  Your Honor, if the Court has no

23   further questions of the attorneys, we are fine to waive

24   argument.  You have a lot on your plate.

25         THE COURT:  I never make a good Court of Appeals Judge

81

1    because I think you've made all the points you're going to make

2    in your briefing.  And I've read them all thoroughly.  They're

3    well briefed on both sides.  So we'll close out the record

4    factually.  And then we'll get to work on an opinion and you

5    can expect that hopefully forthwith.

6           Anything else we need to address?

7           MR. CHOLERA:  Nothing from us, Your Honor.  And thank

8    you for your time.  I did want to say thank you for the

9    accommodation when I sent the e-mail or when I notified you

10   that my spouse has COVID.  I took a test yesterday.  It was

11   negative.  Obviously I know that a lot of things can vary but I

12   just wanted to be very candid with the Court.

13          THE COURT:  Appreciate that, and hope your wife is

14   well.

15          Thank you.  All right.  If there's --

16          MR. VECCHIONE:  We're fine, Your Honor.

17          THE COURT:  Very good.  With that, we'll be in recess.

18   Thank you.

19       (Proceedings concluded at 11:15 a.m.)

20                             - - -

21

22

23

24

25

82

C E R T I F I C A T E

        I, Lahana DuFour, do hereby certify that the foregoing
is a true and correct transcript of the proceedings before the
Honorable Edmund A. Sargus, Jr., Judge, in the United States
District Court, Southern District of Ohio, Eastern Division, on
the date indicated, reported by me in shorthand and transcribed
by me or under my supervision.


                        s/Lahana DuFour
                        Lahana DuFour, RMR, CRR
                        Official Federal Court Reporter
                        June 8, 2022