

**United States Senate**

WASHINGTON, DC 20510

June 7, 2022

<u>**VIA ELECTRONIC TRANSMISSION**</u>

The Honorable Alejandro N. Mayorkas
Secretary
U.S. Department of Homeland Security


Dear Secretary Mayorkas:

Department of Homeland Security (DHS) information obtained by our offices through protected whistleblower disclosures raises serious concerns about DHS's recently-paused Disinformation Governance Board (DGB) and the role the DGB was designed to play in DHS counter disinformation efforts. Documents show that, contrary to your May 4, 2022, testimony before the Senate Committee on Homeland Security and Governmental Affairs, the DGB was established to serve as much more than a simple "working group" to "develop guidelines, standards, [and] guardrails" for protecting civil rights and civil liberties.[1] In fact, DHS documents show that the DGB was designed to be the Department's central hub, clearinghouse and gatekeeper for Administration policy and response to whatever it happened to decide was "disinformation."

Specifically, documents describe a prominent DGB designed to "serve as the departmental forum for governance of DHS policies, plans, procedures, standards, and activities" pertaining to what the government refers to as "mis-, dis-, and mal- information," or "MDM," "that threatens homeland security" as well as the Department's internal and external point of contact for coordination with state and local partners, non-governmental actors, and the private sector.[2] Internal DHS memoranda also show that in practice, the DGB was expected to function as a "coordination and deconfliction mechanism… conven[ing] to discuss threats, assessments, response actions, and engagements as often as warranted."[3] According to the DGB's charter,

---

[1] Resources and Authorities Needed to Protect and Secure the Homeland: Hearing before the Senate Committee on Homeland Security and Governmental Affairs, 117th Congress (May 4, 2022).

[2] DHS Disinformation Governance Board Charter (February 24, 2022); The Cybersecurity & Infrastructure Security Agency (CISA), one of nine DHS components with representation on the DGB, defines misinformation as "false, but not created or shared with the intention of causing harm." CISA defines disinformation as "deliberately created to mislead, harm, or manipulate a person, social group, organization, or country," and it defines malinformation as "based on fact, but used out of context to mislead, harm, or manipulate." Cybersecurity & Infrastructure Agency, "MIS, DIS, MALINFORMATION", available at https://www.cisa.gov/mdm.

[3] "Ukraine MDM Playbook Version 12, as of 2/14/2022" at 2. *See also* DHS Disinformation Governance Board Charter (February 24, 2022).

"DHS-wide or Component specific proposals for funding related to efforts to counter MDM" were also required to be "appropriately coordinated with the Board, including in advance of submitting any final funding proposals."[4]

While DHS components apparently have established methods for defining and analyzing disinformation, and would continue to carry out all of their normal operational functions under a DGB, it appears that the DGB was equipped to review evidence presented by representatives of the various components and guide DHS counter disinformation efforts.[5] A September 13, 2021, memo prepared in part by Robert Silvers, Under Secretary for Strategy, Policy, and Plans and, according to whistleblower allegations, one of two intended co-chairs of the DGB, outlined specific policy recommendations that should guide DHS efforts to counter disinformation.[6] The memo states that DHS's "role in responding to disinformation should be limited to areas where there are clear, objective facts."[7] It is unclear how DHS defines "clear, objective facts," and it is unclear what safeguards, if any, DHS has put in place to ensure that individuals charged with determining which issue areas have "clear" and "objective facts" are not influenced by their own ideological and political beliefs. While the memo boldly asserts that the Department's "counter-disinformation mission, including the choices as to what issue areas to focus on, must not be politicized and must be protected from perceptions of politicization," some of the examples of disinformation given in the memo relate not only to foreign disinformation but issues that have been at the heart of domestic political discourse for the past several years.[8] For instance, the memo refers to "[c]onspiracy theories about the validity and security of elections" and "[d]isinformation related to the origins and effects of COVID-19 vaccines or the efficacy of masks."[9]

Given the significant coordinating role the Department envisioned for the DGB, the consequences of installing Nina Jankowicz, a known trafficker of foreign disinformation and liberal conspiracy theories, as the DGB's first Executive Director, would have been a disaster. Jankowicz once asserted that the Hunter Biden laptop should be viewed as a "Trump campaign product."[10] Content on the Hunter Biden laptop has since been verified by multiple major news outlets.[11] In 2016, Jankowicz also sent out multiple tweets spreading the now-debunked claim

---

[4] "DHS Disinformation Governance Board Charter" (February 24, 2022) at 4.

[5] "DHS Disinformation Governance Board Charter" (February 24, 2022); *See also* "Ukraine MDM Playbook Version 12, as of 2/14/2022" at 2, 18.

[6] "DHS Disinformation Governance Board Charter" (February 24, 2022); Memorandum from Robert Silvers, Under Secretary, Office of Strategy, Policy, and Plans, and Samantha Vinograd, Senior Counselor for National Security, Office of the Secretary, for the Secretary (September 13, 2021).

[7] Memorandum from Robert Silvers, Under Secretary, Office of Strategy, Policy, and Plans, and Samantha Vinograd, Senior Counselor for National Security, Office of the Secretary, for the Secretary (September 13, 2021).

[8] *Id.*

[9] *Id.*

[10] Callie Patteson, "Ex-Disinformation Board chief Nina Jankowicz breaks silence, cites death threats" (May 19, 2022), available at https://nypost.com/2022/05/19/ex-disinformation-board-chief-nina-jankowicz-breaks-silence/ .

[11] Craig Timberg, Matt Viser, and Tom Hamburger, "Here's how The Post analyzed Hunter Biden's laptop," *The Washington Post* (March 30, 2022), available at https://www.washingtonpost.com/technology/2022/03/30/hunter-

that President Trump had a "secret server" to communicate with Kremlin-linked Alfa Bank.[12]  In 2020, Jankowicz tweeted that a podcast by Christopher Steele, the author of the debunked Steele Dossier containing Russian disinformation, had provided "some great historical context about the evolution of disinfo."[13]  So this begs the question, if the (former) Executive Director of the DGB is incapable of determining what is and is not disinformation, how could the DGB ever have expected to function properly under her leadership?  We believe that Congress and the American people require full transparency regarding the DGB's creation as well as the role Jankowicz would have played had she remained in her position at DHS.  Toward that end, we are releasing documents we have collected during our investigation as an attachment to this letter.

Documents also suggest that the Department has been working on plans to "operationalize" its relationships with private social media companies to implement its public policy goals.[14]  For example, we obtained draft briefing notes prepared for a scheduled April 28, 2022, meeting between Robert Silvers and Twitter executives Nick Pickles, Head of Policy, and Yoel Roth, Head of Site Integrity.  The notes are marked "TBC," and it is unclear whether the scheduled meeting actually took place.  The briefing notes frame the planned meeting between Silvers and the Twitter executives as "an opportunity to discuss operationalizing public-private partnerships between DHS and Twitter, as well as [to] inform Twitter executives about DHS work on MDM, including the creation of the Disinformation Governance Board and its analytic exchange..."[15]  According to whistleblower allegations, Nina Jankowicz may have been hired because of her relationship with executives at Twitter.  Consistent with these allegations, Silvers' briefing notes state that both Pickles and Roth know Jankowicz.[16]  A recent DHS strategy document further discusses efforts to "[e]mpower partners to mitigate MDM threats."[17]  The document states that in certain cases, federal, state, local, tribal, and territorial or nongovernmental partners "may be better positioned to mitigate MDM Threats based on their capabilities and authorities."[18]  DHS theorizes that "[b]y sharing information, DHS can empower these partners to mitigate threats such as providing information to technology companies enabling them to remove content at their discretion and consistent with their terms of service."[19]

---

[12] Jankowicz, Nina [@wicsipedia].  "Trump had not one, but two secret email servers to communicate w/ influential Russian bank.  Unbelievable."  *Twitter* (November 1, 2016), available at https://twitter.com/wicsipedia/status/793329082167619584; Jankowicz, Nina [@wicsipedia].  "Husband texted me 'you have news to wake up to.' Never thought it would be this. Confirms our worst fears about Trump. I am horrified."  *Twitter* (November 1, 2016), https://twitter.com/wicsipedia/status/793322439505772544.

biden-laptop-data-examined/;  Katie Benner, Kenneth P Vogel and Michael S. Schmidt,  "Hunter Biden Paid Tax Bill, but Broad Federal Investigation Continues," *The New York Times* (March 16, 2022), available at https://www.nytimes.com/2022/03/16/us/politics/hunter-biden-tax-bill-investigation.html.

[13] Jankowicz, Nina [@wicsipedia]. "Listened to this last night- Chris Steele (yes THAT Chris Steele) provides some great historical context about the evolution of disinfo."  *Twitter* (August 7, 2020), available at https://twitter.com/wicsipedia/status/1291692143262814209.

[14] Draft Briefing Notes, Twitter (April 28, 2022).

[15] *Id.*

[16] *Id.*

[17] "Ukraine MDM Playbook Version 12, as of 2/14/2022" at 17.

[18] *Id.*

[19] *Id.*

Collectively, whistleblower allegations and the documents we've reviewed raise concerns that DHS could be seeking an active role in coordinating the censorship of viewpoints that it determines, according to an unknown standard, to be "MDM" by enlisting the help of social media companies and big tech.  The DGB's charter also specifically states that the DGB should "serv[e] as the Department's internal and external point of contact for coordination with state, local, tribal, and territorial partners, the private sector, and nongovernmental actors regarding MDM."[20]

The First Amendment of the Constitution was designed precisely so that the government could not censor opposing viewpoints – even if those viewpoints were false.  DHS should not in any way seek to enlist the private sector to curb or silence opposing viewpoints.  It is therefore imperative for DHS to provide additional clarity regarding its policies and procedures for identifying and addressing "MDM," as well as its efforts to "operationalize" public-private partnerships and the steps it is taking to ensure that it does not infringe on the constitutional rights of American citizens.

In order for us to better understand the role of the DGB and DHS's efforts to counter disinformation, we ask that you respond to the following no later than June 21, 2022.

1. Has DHS at any point in time asked or suggested to Twitter, Facebook, TikTok, or any other social media executives that they should censor, flag, add context to, or remove any social media posts that it believes to be disinformation?

2. Has DHS at any point in time asked or suggested to Twitter, Facebook, TikTok, or any other social media executives that they suspend or ban the account(s) of individuals believed to be promoting information it believes to be disinformation?

3. Please provide all documents, including all written and electronic communications, memoranda, and organizational documents, related to the DGB from the point that DHS first considered establishing a DGB until the present.

4. Please provide all documents, including all written and electronic communications and memoranda, related to Nina Jankowicz's selection as Executive Director of the DGB.

5. Please explain why, in your public statements and testimony before Congress, you have not fully explained the key role that the DGB was designed to play in coordinating among DHS components and engaging the assistance of the private sector.

---

[20] "DHS Disinformation Governance Board Charter" (February 24, 2022) at 3.

6. Please explain how DHS defines "MDM" and how DHS decides whether a given news story or other piece of information fits its definition of "MDM." Please identify who exactly is ultimately responsible for making this determination.

7. Please explain the criteria DHS uses when deciding whether to spend taxpayer resources addressing a particular news item or narrative that it has classified as "MDM."

8. Please describe all safeguards that DHS has put in place to ensure that its efforts to counter the spread of disinformation do not infringe on Americans' constitutional right to free speech.

9. Did DHS Under Secretary for the Office of Strategy, Policy, and Plans Robert Silvers meet with Twitter executives on April 28, 2022? If so, please provide a summary of topics discussed during the meeting.

10. Please define what DHS means by the phrase, "operationalizing public-private partnerships."

Thank you for your prompt attention to this important matter.

Sincerely,

Charles E. Grassley
U.S. Senator

Josh Hawley
U.S. Senator

Enclosures.

Release Authorized by Senator Grassley and Senator Hawley

PRE-DECISIONAL/DELIBERATIVE
~~UNCLASSIFIED // FOR OFFICIAL USE ONLY~~



**U.S. Department of Homeland Security**
**Washington, DC 20528**

September 13, 2021

**INFORMATION**

MEMORANDUM FOR THE SECRETARY

FROM:           Robert Silvers /s/
                Under Secretary
                Office of Strategy, Policy, and Plans

                Samantha Vinograd /s/
                Senior Counselor for National Security
                Office of the Secretary

SUBJECT:        **Organizing DHS Efforts to Counter Disinformation**

---

The spread of disinformation[1] presents serious homeland security risks:
- Conspiracy theories about the validity and security of elections may undermine trust in core democratic institutions, amplify threats against election personnel, and jeopardize the voting rights of vulnerable communities.
- Disinformation related to the origins and effects of COVID-19 vaccines or the efficacy of masks undercuts public health efforts to combat the pandemic.
- Foreign terrorists, nation-states, and domestic violent extremist (DVE) groups leverage disinformation narratives to amplify calls to violence, including racially or ethnically motivated and anti-government/anti-authority violence. These actors often amplify and exploit narratives that already exist in public discourse, such as disinformation surrounding the validity of the 2020 election underpinning calls to violence on January 6, 2021.
- Disinformation can complicate the performance of core DHS missions. Falsehoods surrounding U.S. Government immigration policy drive vulnerable populations to pay smugglers to bring them on the dangerous journey to our southern border. Disinformation can hamper emergency responders in the aftermath of natural disasters or other incident responses.

DHS efforts to combat disinformation must account for the sensitivities inherent to this mission:
- The Department must ensure its counter-disinformation efforts do not have the effect of chilling or suppressing free speech and free association or of infringing on individuals' privacy or other First Amendment protected activity.
- The protection of privacy, civil rights, and civil liberties must be incorporated into every step of this work and any overarching framework guiding its execution.

---

[1] The term disinformation will be used to reference any of mis-, dis-, or mal-information, or other terms of art that refer to false information that is intentionally or inadvertently injected into the information environment.

PRE-DECISIONAL/DELIBERATIVE
~~UNCLASSIFIED // FOR OFFICIAL USE ONLY~~

Release Authorized by Senator Grassley and Senator Hawley

Release Authorized by Senator Grassley and Senator Hawley

PRE-DECISIONAL/DELIBERATIVE
~~UNCLASSIFIED // FOR OFFICIAL USE ONLY~~

**Subject: Organizing DHS Efforts to Counter Disinformation**
**Page 2**

- The counter-disinformation mission, including the choices as to what issue areas to focus on, must not be politicized and must be protected from perceptions of politicization.
- DHS should not attempt to be an all-purpose arbiter of truth in the public arena. It should instead focus its efforts on disinformation impacting DHS core missions.
- DHS's role in responding to disinformation should be limited to areas where there are clear, objective facts (i.e., medical evidence regarding COVID; factual information about elections administration and security, DVE narratives) and where DHS has particular expertise and a strong oversight structure to ensure legal and policy review of any response efforts.
- DHS has a unique role to play in information sharing across the government, with SLTT entities, and with the public. DHS is uniquely situated to share information in an authoritative way, something that the private sector and academia cannot do. Conversely, information sharing carries risks for the Department and must be accomplished in a way that is perceived as unbiased and viewpoint neutral.
- In addition, the federal government may not always be the ideal or most trusted voice on a given topic. DHS should work closely as appropriate with state, local, tribal, and territorial (SLTT) authorities and private sector partners.

**DHS Functions and Existing Efforts to Counter Disinformation**
DHS components are already engaged in countering disinformation, with activities falling into five functions that are performed by the components themselves or through third-party resources: 1) identification of disinformation relevant to DHS's mission; 2) analysis of its source and influence; 3) information sharing regarding threats posed by disinformation, 4) response to the disinformation threat; and 5) building resilience to disinformation. There is also excellent work being done by interagency partners, the private sector, and academia—particularly concerning identifying and analyzing disinformation—and DHS should leverage this work when possible.

1) *Identification*: Information gathering on disinformation threats and trends.
   - I&A's Homeland Influence Task Force collects information on possible disinformation from publicly available sources as well as other intelligence sources where the collection furthers one of I&A's authorized intelligence missions, such as foreign intelligence and protection of critical infrastructure.
   - CISA gathered information on disinformation related to the elections with SLTT partners leading up to the 2020 election and has limited authority to collect information on disinformation related to critical infrastructure.

2) *Analysis*: Assessing the impact of specific disinformation narratives on the homeland or on DHS missions.
   - I&A, as well as other components engaging in intelligence and analytic functions, produce analysis on disinformation threats, whom they may be targeting, and what attendant risks might arise.

3) *Information Sharing*: Providing timely, quality information on disinformation threats and strategic trends to stakeholders including SLTT authorities, private sector partners, or the public directly.
   - Leading up to the 2020 election, CISA relayed reports of election disinformation from election officials to social media platform operators.

PRE-DECISIONAL/DELIBERATIVE
~~UNCLASSIFIED // FOR OFFICIAL USE ONLY~~

Release Authorized by Senator Grassley and Senator Hawley

Release Authorized by Senator Grassley and Senator Hawley

PRE-DECISIONAL/DELIBERATIVE
~~UNCLASSIFIED // FOR OFFICIAL USE ONLY~~

**Subject: Organizing DHS Efforts to Counter Disinformation**
**Page 3**

- I&A distributes intelligence products to SLTT partners related to disinformation threats. Most recently, I&A issued a Public Safety Notification concerning the possible threat of violence motivated by conspiracy theories related to the "reinstatement" of former President Trump.
- The August 13, 2021 National Terrorism Advisory System Bulletin referenced the threat of disinformation spread by foreign and domestic threat actors.

4) *Response*: Factually countering disinformation through public communications channels to mitigate related threats, increase awareness, and improve public safety.
- During the 2020 election, CISA maintained a 'Rumor Control' website to counter foreign disinformation related to the security and conduct of the vote. CISA sought to 'prebunk' incorrect claims with factual information.
- In your August 12, 2021 public remarks in Brownsville, TX concerning the southwest border, you stated your intention to "debunk false information that has been spread," sharing factual information about the situation on the ground and DHS's border enforcement and policies.

5) *Building Resilience*: Improving the public's ability to detect disinformation through digital and media literacy, where DHS has a unique role to play, programs and civic education. These programs are coordinated with federal, SLTT, and private sector partners.
- CISA launched a graphic novel series to reach potentially impacted communities in a non-traditional way. The novels educate on the dangers of disinformation and how to detect it.
- PLCY is working with the Department of Education to build resilience to disinformation and CP3 Digital Forums and Community Awareness Briefings could further address digital media literacy, empowering communities to mitigate the harmful effects of content encouraging violence.
- S&T Technology Centers are examining methods to mitigate disinformation, to include leveraging global research leaders on this topic and to provide scientific advice in support of Department initiatives.

**Models to Structure DHS Counter-Disinformation Efforts**
There are many possible ways to structure DHS counter-disinformation efforts moving forward. The models presented below for your consideration represent a spectrum of options, from fully federating counter-disinformation operations to operational components, to building in varying levels of Headquarters oversight, governance, and coordination.

**Option 1** Fully Federated Model: Operational Components Execute Independently
The DHS counter-disinformation mission would be entirely federated to components, which would report to the Secretary and Deputy Secretary in the ordinary course but would not otherwise be governed by specific headquarters policies or guidance on this topic beyond existing DHS oversight functions. This model generally resembles the status quo in which components identify and prioritize disinformation threats in their respective mission spaces (sometimes relying on I&A intelligence reports), plan and execute operations, and conduct their own oversight and governance. It also means that each component operates under its own authorities, including the limits on these authorities.

**Option 2** Governance Board Model: Independent Component Execution Under an Overarching DHS Protective Framework
Execution of DHS counter-disinformation operations would be federated to components, but subject to overarching Department-wide governance requirements to ensure that a common set of issue-agnostic safeguards and oversight tools are employed. PLCY could convene a governance board that would

PRE-DECISIONAL/DELIBERATIVE
~~UNCLASSIFIED // FOR OFFICIAL USE ONLY~~

Release Authorized by Senator Grassley and Senator Hawley

PRE-DECISIONAL/DELIBERATIVE.
~~UNCLASSIFIED // FOR OFFICIAL USE ONLY~~

**Subject: Organizing DHS Efforts to Counter Disinformation**
**Page 4**

promulgate policy and legal requirements setting forth baseline requirements that all components must meet in their counter-disinformation work, to include protections ensuring compliance with applicable civil rights and civil liberties, privacy, and legal requirements, such as First Amendment and Privacy Act requirements. Members would include all components conducting counter-disinformation operations as well as CRCL, PRIV, OGC, I&A, S&T, and MGMT.

The board's role would not be prescriptive, instead providing components with guidelines and minimum safeguards applicable across disinformation missions, regardless of the topic. The board could also develop and share with components best practices, to include:

- Risk assessment methodologies to prioritize disinformation threats with a nexus to violence or that pose a direct risk to operations;
- Guidelines for partnering with or procuring counter-disinformation services from the private sector consistent with the sensitivities addressed above; and
- Best practices for auditing or other oversight of counter-disinformation operations.

The board could also convene DHS stakeholders when new disinformation threats emerge or are identified by interagency partners that do not clearly fit within a disinformation mission already being performed by a DHS component. The board would determine who within the Department is best positioned to address the threat, make recommendations to the Secretary as to how the new threat should be addressed, and support whichever operational component is taking on the mission in standing up with appropriate governance.

The board would not play a role in coordinating or overseeing operations. Components would determine the functions they need for their counter-disinformation missions and how they will perform them. For example, a component could conduct identification and analysis itself, or leverage reporting from I&A or another federal agency, or engage private sector services.

Components would also be responsible for partner engagement in their respective mission spaces, including with the interagency, SLTT authorities, private sector entities, tech platforms, and the general public. Components would work together as needed to coordinate engagement with partners to avoid organizations receiving overlapping outreach from multiple parts of the Department.

**Option 3** Disinformation Coordinator Model: Coordinated Oversight and Operations
The most centralized approach could involve a newly-designated Coordinator for Countering Disinformation, modeled after the Department's Counterterrorism Coordinator. The Coordinator would work with components (and potentially non-DHS agencies should the administration encourage such an approach) to develop policies, procedures, and guidelines, and identify required resources to mature the Department's disinformation capabilities. Components would still be responsible for executing their respective disinformation missions, but the Coordinator would regularly convene components to facilitate the identification and analysis of disinformation threats and coordinate operational responses.

The Coordinator would also be responsible for developing homeland security counter-disinformation functions in coordination with components, other federal agencies, international partners, academia, non-profits, and the private sector, to include:

- Instituting Department-wide governance and oversight structures to ensure counter-disinformation efforts satisfy, among other considerations, civil rights and civil liberties, privacy, and legal (including First Amendment) requirements (similar to Option 2 above);

PRE-DECISIONAL/DELIBERATIVE
~~UNCLASSIFIED // FOR OFFICIAL USE ONLY~~

Release Authorized by Senator Grassley and Senator Hawley

PRE-DECISIONAL/DELIBERATIVE
~~UNCLASSIFIED // FOR OFFICIAL USE ONLY~~

**Subject: Organizing DHS Efforts to Counter Disinformation**
**Page 5**

- Growing DHS counter-disinformation capacity by ensuring components develop expertise through new hiring, training, and external partner engagement;
- Keeping apprised of the overall disinformation environment and coordinating action with relevant agencies and stakeholders on cross-cutting issues.
- Reviewing and making recommendations with respect to DHS authorities to counter disinformation;
- Developing policies for DHS public communications on disinformation as well as driving engagement with SLTT and private sector entities, including platform operators, together with components;
- Engaging SLTT authorities to respond to the disinformation threat, including through Fusion Centers and state homeland security advisors; and
- Serving as a central point of contact for interagency partners such as the White House, State's Global Engagement Center, DOJ, HHS, DOD, and the Intelligence Community.

*****

PLCY recommends Option 2, to ensure nimbleness and component ownership of their mission spaces, while also providing assurance that all programs across the Department will operate in a manner consistent with our values. All components recommend a fulsome discussion with you to chart the way forward in this challenging space, so that a detailed action and implementation plan can be developed based on your guidance.

Release Authorized by Senator Grassley and Senator Hawley

Release Authorized by Senator Grassley and Senator Hawley

~~UNCLASSIFIED//FOR OFFICIAL USE ONLY~~
PREDECISIONAL//DELIBERATIVE

**U.S. Department of Homeland Security**
**Washington, DC 20528**



Homeland
Security

January 31, 2022

**ACTION**

MEMORANDUM FOR THE SECRETARY

FROM:  Robert Silvers
Under Secretary
Office of Strategy, Policy, and Plans

ROBERT P SILVERS  Digitally signed by ROBERT P SILVERS Date: 2022.02.01 16:27:36 -05'00'

Jennifer Daskal
Acting Principal Deputy General Counsel

JENNIFER C DASKAL  Digitally signed by JENNIFER C DASKAL Date: 2022.02.01 17:56:32 -05'00'

SUBJECT:  **Disinformation Governance Board Charter**

**Purpose:** To obtain your approval of the charter for the Disinformation Governance Board.

**Background:** On September 29, 2021, you directed headquarters and Component leadership to pursue a governance board model to coordinate efforts to counter mis-, dis-, and mal-information (MDM) across the Department.[1]  You emphasized the need for clarity as to the Department's policies, standards, and best practices related to MDM work.  You also concluded that operational efforts to counter MDM should largely be carried out by Components, which would be responsible for their respective mission areas subject to the oversight of the governance board.

Based on that guidance, we developed the attached charter for a DHS Disinformation Governance Board ("the Board") to execute this critical work.  The Board will ensure Departmental efforts to counter MDM are coordinated, deconflicted, and harmonized.  The Board's primary roles are to develop and support the implementation of best practices, policies, and protocols that support the identification, assessment, response, and resilience to MDM threats, and that do so in a way that ensures respect for privacy, civil rights, and civil liberties. The Board will also support and coordinate, in conjunction with the relevant Components, MDM work with other departments and agencies, the private sector, and non-governmental actors.  In addition, the Board will support research and development efforts to understand the MDM threat to homeland security.

The Board will be co-chaired by representatives of the Office of Strategy, Policy, and Plans (PLCY) and the Office of the General Counsel.  Members will include components engaged in

---

[1] This model is presented as Option 2 in the September 13, 2021 memorandum 'Organizing DHS Efforts to Counter Disinformation.'

~~UNCLASSIFIED//FOR OFFICIAL USE ONLY~~
PREDECISIONAL//DELIBERATIVE

Release Authorized by Senator Grassley and Senator Hawley

Release Authorized by Senator Grassley and Senator Hawley

~~UNCLASSIFIED//FOR OFFICIAL USE ONLY~~
PREDECISIONAL//DELIBERATIVE

**Subject: Disinformation Governance Board Charter**
**Page 2**

counter-MDM activities or that provide oversight and support for such activities. Members will be represented by the principal or deputy for their respective Component/Offices.

The Board will meet no less than once per quarter for the first two years of its existence. It will be supported by a Steering Group, consisting of representatives designated by each Member. A senior official from within PLCY will serve as Executive Director for the Board and Chair of the Steering Group, to be supported by an Executive Secretariat comprised of staff detailed or assigned to PLCY. As we build, we may enlist your office's support in obtaining detailees or other staffing.

The Charter has been coordinated with all DHS components that will be Members of the Board.

For your awareness, we attach a copy of the MDM Playbook that PLCY, together with components, developed for countering MDM in a unified way across the Department in the context of the current situation in Ukraine. We are enthusiastic about the further work that the Disinformation Governance Board can accomplish.

**Timeliness:** We request your signature of the charter as soon as practicable.

Release Authorized by Senator Grassley and Senator Hawley

Release Authorized by Senator Grassley and Senator Hawley

UNCLASSIFIED//FOR OFFICIAL USE ONLY

**Subject: Disinformation Governance Board Charter**
**Page 3**


**Recommendation:** Approve the charter for the Disinformation Governance Board.


Approve/date _AWMay_ 2/24/22     Disapprove/date_____


Modify/date_____     Needs discussion/date_____

Attachments:
    A. Disinformation Governance Board Charter
    B. Ukraine MDM Playbook
    C. 'Organizing DHS Efforts to Counter Disinformation' (September 13, 2021)


UNCLASSIFIED//FOR OFFICIAL USE ONLY

Release Authorized by Senator Grassley and Senator Hawley

Release Authorized by Senator Grassley and Senator Hawley

~~FOR OFFICIAL USE ONLY~~ / DELIBERATIVE / DRAFT

### DHS Disinformation Governance Board
### Charter

## Section 1. Purpose

The DHS Disinformation Governance Board ("Board") will guide and support the Department's efforts to address mis-, dis-, and mal-information that threatens homeland security ("MDM"). Whereas Department Components will lead on operational responses to MDM in their relevant mission spaces, the Board will ensure DHS efforts are coordinated, deconflicted, and harmonized, both within DHS and across the interagency, to ensure efficiency, unity of effort, and promotion of applicable compliance and best practices.

The Board will focus on the following four cross-functional lines of effort to counter MDM, many of which are already underway ("lines of effort"): (1) identifying MDM ("Identification"); (2) assessing and analyzing the risk that such MDM poses to homeland security ("Risk Assessment"); (3) responding to these MDM threats ("Response"); and (4) building resilience to MDM ("Building Resilience").

With respect to each of these lines of effort, the Board will develop and support the implementation of governance policies and protocols that, among other issues, protect privacy, civil rights, and civil liberties; harmonize and support coordination with other departments and agencies, the private sector, and non-governmental organizations; and support research and development efforts to assess and combat MDM.

## Section 2. Members

The Board will be co-chaired by representatives of the Office for Strategy, Policy, and Plans (PLCY) and the Office of the General Counsel (OGC). Standing Board members will be representatives of the following DHS Components: the Management Directorate (MGMT); Office of Intelligence and Analysis (I&A); Science and Technology Directorate (S&T); Privacy Office (PRIV); Office for Civil Rights and Civil Liberties (CRCL); Office of Public Affairs (OPA); Cybersecurity and Infrastructure Security Agency (CISA); Federal Emergency Management Agency (FEMA); and U.S. Customs and Border Protection (CBP). Representatives shall be the Principal or Deputy for their respective Component. Other Components may be invited to either join the Board or participate on an ad hoc basis, as appropriate and needed.

## Section 3. Structure

The Board will be supported by a Steering Group, which will consist of a representative from each Component participating in the Board. Each representative will be selected by their respective Board member.

Release Authorized by Senator Grassley and Senator Hawley

~~FOR OFFICIAL USE ONLY~~ / DELIBERATIVE / DRAFT

The Board co-chairs will designate a DHS senior official to serve as the Executive Director for the Board and Chair of the Steering Group. The Executive Director will be detailed or assigned to PLCY, where they will be supported by an Executive Secretariat for the Board comprising staff detailed or assigned to PLCY. The Executive Director will attend and may participate in all Board meetings.

### Section 4. Board Responsibilities

Components will lead on MDM-related operational responses and other efforts to counter MDM in their relevant mission spaces. The Board will serve as the central forum in the Department to ensure consistent governance and coordination of such efforts, and adherence to applicable constitutional, statutory, and regulatory authorities and obligations.

The Board's initial responsibilities will include a review of existing MDM governance policies and practices across the Department, including:

- policies, procedures, practices, plans, and standards to ensure compliance with applicable constitutional, statutory, and regulatory obligations;
- policies, procedures, practices, plans, and standards to ensure appropriate privacy and civil rights and civil liberties protections;
- policies, procedures, practices, plans, and standards for interactions with the private, non-profit, and academic sectors; and,
- relevant procurement policies and practices.

Based, in part, on the findings from its initial review, the Board will be responsible for developing MDM-related guidance, best practices, and recommendations regarding:

- compliance with applicable constitutional, statutory, and regulatory obligations;
- standards for and implementation of appropriate privacy, civil rights, and civil liberties protections;
- procurement guidelines for contracting or funding third parties to support the Department's MDM efforts;
- grant funding and cooperative agreements;
- development and implementation of new technological and data management tools; and,
- any other applicable guidance, best practices, and recommendations to guide the aforementioned four lines of effort.

The Board also will coordinate, deconflict, and harmonize departmental efforts to address MDM, including by:

- receiving regular and routine updates from DHS Components, the Intelligence Community, and other interagency partners on MDM;
- harmonizing and deconflicting activities by DHS Components regarding the lines of effort;
- harmonizing, deconflicting, and coordinating, in conjunction with relevant Components, the Department's external engagement regarding MDM;

Release Authorized by Senator Grassley and Senator Hawley

~~FOR OFFICIAL USE ONLY~~ / DELIBERATIVE / DRAFT

- serving as the Department's internal and external point of contact for coordination with state, local, tribal, and territorial partners, the private sector, and non-governmental actors regarding MDM; and,
- serving as the Department's internal and external point of contact for receiving, coordinating, responding to, and interacting with interagency partners, including the Executive Office of the President, for policy matters generally related to mis-, dis-, and mal-information, but not related to the performance of intelligence activities.

## Section 5.  Roles and Responsibilities of Board Members

The co-chairs of the Board will:

➢ convene the Board as needed;
➢ approve the agenda for Board meetings;
➢ preside over Board meetings;
➢ approve summaries of conclusions reached during the Board meetings;
➢ communicate Board decisions and activities to the Secretary and other DHS leadership, as appropriate;
➢ represent the Board to external audiences; and,
➢ take all other actions necessary and proper for the execution of the Board's responsibilities.
➢

The Board Members will:

➢ represent the perspectives of their respective Components at Board meetings;
➢ review any proposals submitted to the Board; and,
➢ ensure that their respective Components implement, execute, and follow Board decisions.

The Executive Director will:

➢ propose agenda items and discussion topics for the Board following Steering Group review;
➢ communicate the positions taken at the Steering Group concerning proposals before the Board;
➢ propose summaries of conclusion for each Board and Steering Group meeting;
➢ implement and execute Board decisions through the Steering Group;
➢ supervise the activities of the Executive Secretariat; and,
➢ represent the Steering Group and, where appropriate and in coordination with the co-chairs, the Department to external audiences on MDM-related matters.

The Steering Group Members will:

➢ represent the perspectives of their respective Components at Steering Group meetings;
➢ review and discuss any proposals to be submitted to the Board;
➢ communicate their considerations of Board proposals to their respective Board Members, the Executive Director, and other members of the Steering Group;

Release Authorized by Senator Grassley and Senator Hawley

~~FOR OFFICIAL USE ONLY~~ / DELIBERATIVE / DRAFT

- ➢ review and approve summaries of conclusions of Steering Group meetings; and,
- ➢ subject to the direction and guidance of their respective Board Members, help ensure that their respective Components implement, execute, and follow Board decisions.

## Section 6.  Processes & Procedures

The Board will meet regularly at the discretion of the co-chairs and no less than once per quarter for the first two years of the Board's existence.  The Steering Group will meet at the discretion of the Board or Executive Director.  Issues raised and proposals submitted to the Board will be resolved by consensus to the greatest extent possible.  Where there is a disagreement amongst the Board members, the Board will resolve the matter before it by majority vote.  In the absence of consensus, any Board member may elevate, in the form of a written memorandum, an issue to the Secretary or Deputy Secretary where they believe that a decision made by the Board implicates their statutory or other assigned authorities.

The Steering Group is not a voting body.  Instead, its members will discuss all issues brought before it and make their recommendations to the Board.  Steering Group members will support the development of consensus recommendations to the Board to the greatest extent possible.

## Section 7.  Relationship to Other Departmental Governance Bodies

The Board will serve as the departmental forum for governance of DHS policies, plans, procedures, standards, and activities pertaining to MDM that threatens homeland security.  As such, all DHS-wide or Component-specific proposals for funding related to efforts to counter MDM should be appropriately coordinated with the Board, including in advance of submitting any final funding proposals.  Matters raised before the Board may implicate other departmental governance fora already in existence.  Where that occurs, the Board will coordinate its activities with those respective fora through the Executive Director.

## Section 8.  Effective Date

This charter will go into effect when signed by the Secretary of Homeland Security.

## Section 9.  Signature

Alejandro N. Mayorkas
Secretary
U.S. Department of Homeland Security

Feb. 24, 2022
Date

Release Authorized by Senator Grassley and Senator Hawley

~~FOR OFFICIAL USE ONLY~~

**Twitter**

**April 28, 2022 (TBC)**

**Overview:**
- You will meet in person with Twitter executives Nick Pickles, Head of Policy, and Yoel Roth, Head of Site Integrity, for XX minutes on public-private partnerships, MDM, and countering DVE. The meeting is off the record and closed press.
  - You have previously met with Jessica Herrera-Flanigan, Twitter's Vice President of Public Policy and Philanthropy for the Americas.
  - Please note any other main external participants who will be joining the principal (i.e. co-speakers on a panel).  `Commented [KE1]: Placeholder.`
  - You will be staffed by ▮

**Key Objectives:**
- This meeting is an opportunity to discuss operationalizing public-private partnerships between DHS and Twitter, as well as inform Twitter executives about DHS work on MDM, including the creation of the Disinformation Governance Board and its analytic exchange, and the Department's ongoing DVE work.

**Flow of Show:**  `Commented [KE2]: Placeholder`
- 1:45 pm ET: *[Example]* Tech check prior to meeting.

- 2:30 pm ET: Event concludes.

**Background:**  `Commented [KE3]: All: Please include any info on recent engagements with Twitter`
- **Note:** Nick and Yoel both know DGB Executive Director Nina Jankowicz.
- **Propose** that Twitter become involved in Disinformation Governance Board Analytic Exchanges on Domestic Violent Extremism (DVE) and Irregular Migration.
  - **Thank** Twitter for its continued participation in the CISA Analytic Exchange on Election Security.
- **Ask** what types of data or information would be useful for Twitter to receive in Analytic Exchanges or other ways the Department could be helpful to Twitter's counter-MDM efforts.

**Participants:**
U/S Silvers
▮ Managing Director for Strategy

External:
(Principal), (Role)
(Staffer), (Role)
(Staffer), (Role)

**[PAGE BREAK BEFORE DISCUSSION POINTS]**

1

~~FOR OFFICIAL USE ONLY~~

Release Authorized by Senator Grassley and Senator Hawley

~~FOR OFFICIAL USE ONLY~~

~~FOR OFFICIAL USE ONLY~~

2

Release Authorized by Senator Grassley and Senator Hawley

Release Authorized by Senator Grassley and Senator Hawley

~~FOR OFFICIAL USE ONLY~~

**Discussion Points:**

DHS Efforts on MDM
- **Introduce** the Disinformation Governance Board.
  - ➤ The Board will ensure that DHS is actively and efficiently leveraging all its available resources and capabilities to mitigate and counter disinformation with a homeland security nexus, consistent with a deep commitment to protecting privacy and free speech.
  - ➤ The Board will serve as a coordinating mechanism for the Department's outreach to industry, civil society, and international partners on MDM.
- The Board's initial work plan includes establishing analytic exchanges with industry on countering MDM related to domestic violent extremism and irregular migration.
  - ➤ **Propose** that Twitter be an active participant in these exchanges and thank the company for their continued engagement with CISA's election security exchange.

Operationalizing Public Private Partnerships ........................................................ [Commented [KE4]: CISA and CP3 please add TPs]
-

DVE
- The United States remains deeply concerned regarding the complex, cross-cutting links between MDM and all forms of violent extremism.
- The primary terrorism-related threat to the United States continues to stem from lone offenders or small cells of individuals who are motivated by a range of foreign and/or domestic grievances often cultivated through the consumption of certain online content.
- Key factors contributing to the current heightened threat environment include:
  - ➤ The proliferation of false or misleading narratives, which sow discord or undermine public trust in U.S. government institutions.
  - ➤ Continued calls for violence directed at U.S. critical infrastructure; soft targets and mass gatherings; faith-based institutions, such as churches, synagogues, and mosques; institutions of higher education; racial and religious minorities; government facilities and personnel, including law enforcement and the military; the media; and perceived ideological opponents.
  - ➤ Calls by foreign terrorist organizations for attacks on the United States based on recent events.
- In June, the White House released the first ever *National Strategy for Combatting Domestic Terrorism*. In response, DHS has realigned and dedicated resources to combat domestic violent extremists (DVEs) and would like to have a deeper discussion on our latest assessments.
  - ➤ The DHS Office of Intelligence and Analysis (or I&A) created a domestic terrorism branch within its counterterrorism mission center to ensure DHS develops the expertise necessary to produce sound and timely intelligence, at the lowest classification possible in order to inform our stakeholders.
  - ➤ The Department established a new Center for Prevention Programs and Partnerships (CP3) to improve the Department's ability to combat terrorism and targeted

3

~~FOR OFFICIAL USE ONLY~~

Release Authorized by Senator Grassley and Senator Hawley

Release Authorized by Senator Grassley and Senator Hawley

FOR OFFICIAL USE ONLY

violence, consistent with privacy protections, civil rights and civil liberties, and other applicable laws.
- We are working to improve our ability to identify narratives that are playing out online in effort to counter the threat that is increasingly manifesting through various digital forums

Ukraine
- Together with partners from across the U.S. Government, DHS components – including CISA, FEMA, TSA, the U.S. Coast Guard, and our policy and legal staffs are preparing for a range of potential scenarios.
    - Our goal is to ensure that – well in advance of any potential incident – we are connecting operators from across our government and the private and civil sectors so we can identify and work to remediate an emerging campaign as quickly as possible.
    - Twitter participated in a CISA/FBI led call with social media companies on February 25th to discuss potential of influence operations stemming from the escalating geopolitical issues as it relates to U.S. critical infrastructure.
- Following actions taken by the U.S. and allies, we have seen increased instances of MDM and malign foreign influence on publicly available websites that may be linked to the Russian government, military, and intelligence services in the Russian and Ukrainian languages. These include allegations that the United States is deploying military forces to Ukraine's eastern front and that U.S. intelligence services are staging false-flag attacks in Ukraine to instigate a conflict.

**Hard Q&A:**
- What questions do we expect and/or know will come up in this meeting?
- ➤ Please provide a concise recommended response.

**Attachments**
A. Biographies

---

**Staff Responsible for Briefing Memo:** Nina Jankowicz, Executive Director DHS Disinformation Governance Board, █████████████████████

4

FOR OFFICIAL USE ONLY

Release Authorized by Senator Grassley and Senator Hawley

Release Authorized by ICE FOIA Office (case# 2022-ICFO-27269)

~~FOR OFFICIAL USE ONLY~~/ DELIBERATIVE

### DHS Disinformation Governance Board Charter

**Section 1. Purpose.** The purpose of the Board is to support the Department's efforts to address mis-, dis-, and mal-information (MDM) that threatens homeland security. Departmental components will lead on operational responses to MDM in their relevant mission spaces. The Board will ensure these activities are conducted within a protective governance framework that respects privacy, civil rights, and civil liberties. This work will be speaker-agnostic, focusing on the narratives rather than those who originate or spread them. The board will also ensure that Departmental efforts are coordinated and deconflicted to ensure efficiency, unity of effort, and promotion of best practices across the Department's MDM work.

More specifically, the Board's primary roles are three-fold: 1) To develop and implement governance policies for departmental efforts related to MDM, 2) To deconflict departmental efforts to counter MDM narratives that threaten homeland security, including with respect to departmental engagement with third parties; and 3) To streamline and enhance coordination with other departments and agencies and promote best practices for counter-MDM work.

These efforts will focus on four lines of effort (LOEs) that cut across efforts to counter MDM across DHS's many mission spaces:(1) identifying narratives of concern ("Identification"); (2) assessing and analyzing the risk that such narratives pose to homeland security ("Risk Assessment"); (3) responding to these narratives ("Response"); and (4) developing resilience against MDM ("Building Resilience").

**Sec. 2. Members.** The Board will be co-chaired by the Office for Strategy, Policy, and Plans (PLCY) and the Office of the General Counsel (OGC). Standing Board members will be the following: the Management Directorate; the Office of Intelligence and Analysis (I&A); the Science and Technology Directorate (S&T); the Privacy Office (PRIV); the Office for Civil Rights and Civil Liberties (CRCL); the Office of Public Affairs (OPA); the Cybersecurity and Infrastructure Security Agency (CISA); the Federal Emergency Management Agency (FEMA); and U.S. Customs and Border Protection (CBP). Other components may be invited to participate on an ad hoc basis.

**Sec. 3. Structure.**

Each Board member will be represented by the Principal or Deputy for their respective component. The Board will be supported by a DHS MDM Steering Group, which will consist of representatives for each component participating in the Board selected by their respective Board member. In addition, the Secretary will designate a senior official from within the Department to serve as the Executive Agent for the Board and Chair of the Steering Group. The Executive Agent will be detailed or assigned to PLCY, where they will be supported by an Executive Secretariat for the Board and Steering Group comprising staff detailed or assigned to PLCY. The Executive Agent will attend and may participate in all Board meetings.

**Sec. 4. Roles & Responsibilities.**

Department components will lead on operational responses to MDM in their relevant mission space. The Board will serve as the central forum in the Department to ensure consistent governance and coordination of such efforts.

➢ The Board's initial responsibilities will include a review of existing MDM governance policies and practices across the Department, including—
  o Policies, procedures, practices, plans, and standards to ensure compliance with applicable constitutional, statutory, and regulatory obligations;

Release Authorized by Senator Grassley and Senator Hawley

~~FOR OFFICIAL USE ONLY~~/ DELIBERATIVE

- o Policies, procedures, practices, plans, and standards to ensure appropriate privacy and civil rights and civil liberties protections;
- o Policies, procedures, practices, plans, and standards for interactions with the private, non-profit, and academic sectors; and
- o Relevant procurement policies and practices.
- ➢ The Board will also be responsible for developing guidance, best practices, and recommendations with respect to—
  - o Compliance with applicable constitutional, statutory, and regulatory obligations;
  - o Ensuring the implementation of appropriate privacy and civil rights and civil liberties protections;
  - o Proposals for additional or amended departmental authorities or funding, consistent with the processes of the Deputies Management Action Group (DMAG);
  - o Procurement guidelines for contracting with third parties to support the Department's MDM efforts;
  - o Grant funding; and
  - o Any other applicable best practices to guide the lines of effort with respect to identification, risk assessment, response, and building resilience.

The Board also will coordinate and deconflict departmental efforts to address MDM narratives that threaten homeland security. This will include—

- ➢ Receiving regular and routine updates from Departmental components on MDM narratives of concern and the relevant MDM lines of effort;
- ➢ Deconflicting any activities by the Department and relevant components to counter MDM with respect to external outreach to the private and other nongovernmental actors;
- ➢ Serving as a departmental point of contact, in addition to component points of contact, as appropriate, for receiving and assessing concerns about MDM raised by federal, state, local, tribal, private sector, or other nongovernmental partners; and
- ➢ Serving as a departmental point of contact, in addition to component points of contact, for receiving, coordinating, responding to, and interacting with interagency partners, including the Executive Office of the President, for all MDM matters not related to the performance of intelligence activities.

The Co-Chairs of the Board will—

- ➢ Convene the Board;
- ➢ Compose the agenda for Board meetings;
- ➢ Preside over Board meetings;
- ➢ Approve and disseminate summaries of conclusions reached at the Board meetings;
- ➢ Communicate Board decisions and activities as they deem appropriate to the Secretary and Deputy Secretary;
- ➢ Represent the Board to external audiences; and
- ➢ Take all other actions necessary and proper to execution of the Board's responsibilities.

The Board members will—

- ➢ Represent the perspectives of their respective offices or components at Board meetings;
- ➢ Review and either approve or reject any proposals submitted to the Board; and
- ➢ Ensure that their respective components implement, execute, and follow Board decisions.

FOR OFFICIAL USE ONLY / DELIBERATIVE

The Executive Agent will—

- ➢ Propose agenda items and discussion topics for the Board following Steering Group review;
- ➢ Communicate the position(s) taken at the Steering Group concerning proposals before the Board;
- ➢ Propose summaries of conclusion for each Board meeting;
- ➢ Implement and execute Board decisions through the Steering Group;
- ➢ Supervise the activities of the Executive Secretariat; and
- ➢ Represent the Steering Group and, where appropriate and in coordination with the Co-Chairs, the Department to external audiences on matters concerning MDM.

The Steering Group members will—

- ➢ Represent the perspectives of their respective offices or components at Steering Group meetings;
- ➢ Review and either endorse or oppose any proposals to be submitted to the Board;
- ➢ Communicate their endorsements or oppositions to Board proposals to their respective Board members, the Executive Agent, and other members of the Steering Group; and
- ➢ Subject to the direction and guidance of their respective Board members, help to ensure that their respective components implement, execute, and follow Board decisions.

### Sec. 5. Processes & Procedures.

The Board will meet regularly and at the discretion of the Co-Chairs, but in any event no less than once per quarter for the first two years of the Board's existence. The Steering Group will meet at the discretion of the Executive Agent. Issues raised and proposals submitted to the Board will be resolved by consensus to the greatest extent possible. Where there is a disagreement amongst the Board members, the Board will resolve the matter before it by majority vote. In the absence of consensus, any Board member may elevate, in a form of a written memorandum, an issue to the Secretary or Deputy Secretary where they believe that a decision made by the Board implicates their statutory or other assigned responsibilities.

The Steering Group is not a voting body. Instead, its members will make recommendations to the Board, as communicated by the Executive Agent. The Steering Group members will endeavor to make consensus recommendations to the Board to the greatest extent possible. The Executive Agent will prepare draft summaries of conclusion after each Board meeting. The Co-Chairs will review and approve the summaries of conclusion before they are socialized with the other Board members.

### Sec. 6. Relationship to Other Departmental Governance Bodies.

The Board will serve as the senior departmental forum for governance of departmental policies, plans, procedures, standards, and activities pertaining to MDM. As such, all proposals for funding through the DMAG concerning efforts to counter MDM must be coordinated in advance with the Board. Matters raised before the board may implicate other departmental governance fora already in existence. Where that occurs, the Board will coordinate its activities with those respective fora through the Executive Agent.

### Sec. 7. Effective Date.

The charter will go into effect when signed by the Secretary of Homeland Security.

UNCLASSIFIED//FOR OFFICIAL USE ONLY
PREDECISIONAL//DELIBERATIVE

U.S. Department of Homeland Security
Washington, DC 20528



## ACTION

MEMORANDUM FOR THE SECRETARY

FROM:              Robert Silvers
                   Under Secretary
                   Office of Strategy, Policy, and Plans

                   Jonathan Meyer
                   General Counsel

SUBJECT:           **DHS Disinformation Governance Board Charter**

---

**Purpose:** To obtain your approval of the charter for the DHS Disinformation Governance Board.

**Background:** In a September 29, 2021 discussion with headquarters and Component leadership, you directed the Department to pursue a governance board model to coordinate efforts to counter mis-, dis-, and mal-information (MDM).[1] You discussed the benefits of having a mechanism that would develop and coordinate intra-Departmental governance policies, standards, and best practices related to MDM work and that could coordinate efforts to engage private sector stakeholders. Execution of DHS counter-MDM activities would be federated to Components, who would be responsible for their respective mission areas subject to the oversight of the governance board.

Based on your guidance, we have developed the attached charter for a DHS Disinformation Governance Board (Board) to execute this critical work. The Board's primary roles would be three-fold: 1) To develop and implement governance policies for departmental efforts related to MDM; 2) To deconflict, where necessary, departmental efforts to counter MDM narratives that threaten homeland security, including with respect to departmental outreach engagement with third parties; and 3) To streamline and enhance coordination with other departments and agencies and promote best practices for counter-MDM work.

The Board will be co-chaired by the Office of Strategy, Policy, and Plans (PLCY) and the Office of the General Counsel. Members will include all Components and headquarters offices engaged in counter-MDM activities or providing oversight and support for such activities. The Board's guidance will include protections that ensure compliance with applicable law and policy and

---

[1] This model is presented as Option 2 in the September 13, 2021 memorandum 'Organizing DHS Efforts to Counter Disinformation.'

Release Authorized by Senator Grassley and Senator Hawley

UNCLASSIFIED//FOR OFFICIAL USE ONLY
PREDECISIONAL//DELIBERATIVE

**Subject: DHS Disinformation Governance Board Charter**
**Page 2**

protect individuals' privacy, civil rights, and civil liberties. Members will be represented by the principal or deputy for their respective Component/Offices.

The Board will meet no less than once per quarter for the first two years of its existence. It will be supported by a Steering Group, consisting of representatives designated by each member. You will designate a senior official from within the Department to serve as Executive Agent for the Board and Chair of the Steering Group, who would be supported by an Executive Secretariat comprising staff detailed or assigned to PLCY.

Chartering the Board would provide structure and oversight to critical efforts already underway, including: 1) a review of existing policies and practices to protect privacy, civil rights, and civil liberties; 2) developing a framework for the Department to notify specific entities, or in some cases the public, of MDM relevant to homeland security; and 3) reviewing opportunities for deeper information sharing and exchange of best practices with platform operators and other private sector partners.

**Timeliness:** MDM constitutes a significant and immediate threat to homeland security. We request your signature of the charter by January 31 to allow for the first meeting of the Board to occur by the end of February.

Release Authorized by Senator Grassley and Senator Hawley

**Subject: DHS Disinformation Governance Board Charter**
**Page 3**

**Recommendation:** Approve the charter for the DHS Disinformation Governance Board.

Approve/date_____         Disapprove/date_____

Modify/date_____         Needs discussion/date_____

Attachments:
    A.  Disinformation Governance Board Charter
    B.  'Organizing DHS Efforts to Counter Disinformation' (September 13, 2021)

Release Authorized by Senator Grassley and Senator Hawley

Release Authorized by Senator Grassley and Senator Hawley

**JOSH HAWLEY**
MISSOURI

115 RUSSELL SENATE OFFICE BUILDING
TELEPHONE: (202) 224–6154
FAX: (202) 228–0526
WWW.HAWLEY.SENATE.GOV

## United States Senate

WASHINGTON, DC 20510–2509

COMMITTEES
JUDICIARY
ARMED SERVICES
HOMELAND SECURITY
AND GOVERNMENTAL AFFAIRS
SMALL BUSINESS
AND ENTREPRENEURSHIP

April 28, 2022

The Honorable Alejandro Mayorkas
Secretary of Homeland Security
U.S. Department of Homeland Security
245 Murray Lane, S.W.
Washington D.C. 20528



RECEIVED
By ESEC at 9:22 am, Apr 28, 2022

Dear Secretary Mayorkas:

I write with deep concern about the Department of Homeland Security's decision to create a new Disinformation Governance Board. I confess, I at first thought this announcement was satire. Surely no American Administration would ever use the power of Government to sit in judgment on the First Amendment speech of its own citizens. Sadly, I was mistaken. Rather than protecting our border or the American homeland, you have chosen to make policing Americans' speech your priority. This new board is almost certainly unconstitutional and should be dissolved immediately.

For well over a year, your Department has consistently treated competing policy views as disinformation to be monitored or investigated. However, political debates on issues such as immigration, pandemic lockdowns, and foreign policy clearly constitute "core political speech" protected by the First Amendment.[1] The Supreme Court has even gone so far as to say that "Under the First Amendment there is no such thing as a false idea."[2] The apparent broad mandate of this new government entity to "coordinate countering misinformation" in America undermines the argument that it can even exist consistent with the Constitution.[3]

Particularly troubling is your choice to lead the new board, Nina Jankowicz, a supposed "expert" with a long history of partisan attacks. Consider:

- In 2020, she described President Trump's use of the national guard as "a sentence I expect to hear from leaders of authoritarian countries, not the President of the United States."[4]
- In 2021, she quoted with praise an article that said "homegrown fascism predated President Donald Trump."[5]
- She has said America is systemically racist.[6]
- In response to revelations about Hunter Biden's laptop, she tweeted that "50 former natsec officials and 5 former CIA heads that believe the laptop is a Russian influence op. Trump says 'Russia, Russia, Russia.'"[7]

---

[1] *Meyer v. Grant*, 486 U.S. 414, 422 (1988).

[2] *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339 (1974).

[3] https://www.politico.com/newsletters/playbook/2022/04/27/fauci-pulls-out-of-whcd-is-biden-next-00028131

[4] https://twitter.com/wiczipedia/status/1267589264440729600

[5] https://twitter.com/wiczipedia/status/1321123630403694593

[6] https://twitter.com/wiczipedia/status/1311123042387529734

[7] https://twitter.com/wiczipedia/status/1319463138107031553?s=20&t=EZYZWppGDhzWKhE5ensHnQ

Jankowicz has said the new DHS Board will "maintain the Dept's committment [sic] to protecting free speech."[8] This is particularly ironic given Jankowicz's extensive criticism of free speech and the First Amendment. Jankowicz has claimed that "the 'free speech vs censorship' framing is a false dichotomy."[9] And when Elon Musk announced his acquisition of Twitter, she said "I shudder to think about if free speech absolutists were taking over more platforms, what that would look like for the marginalized communities … which are already shouldering … disproportionate amounts of this abuse."[10] Jankowicz has even described opponents of social media speech codes as "first amendment zealots."[11] These statements that question the value of free speech are obviously disqualifying for such a role.

While Democrats have for years controlled the public square through their Big Tech allies, Mr. Musk's acquisition of Twitter has shown just how tenuous that control is. It can only be assumed that the sole purpose of this new Disinformation Governance Board will be to marshal the power of the federal government to censor conservative and dissenting speech. This is dangerous and un-American. The board should be immediately dissolved.

So that Congress can consider remedial legislation, please provide the following responses prior to your expected testimony before the Senate Homeland Security and Governmental Affairs Committee on May 4, 2022:

1. How will this Disinformation Board function? And who exactly will it be monitoring?
2. What analysis did DHS conduct, if any, to ensure that the Disinformation Board and its activities comport with the First Amendment?
3. Why did DHS time its announcement of this governance board directly after Mr. Musk's acquisition of Twitter?
4. Who appointed Ms. Jankowicz to head the board as executive director? Were you aware of her history of partisan conduct prior to her appointment?
5. Has DHS conferred with any private social media company in the creation or operation of this board?

Sincerely,

Josh Hawley
United States Senator

---

[8] https://twitter.com/wiczipedia/status/1519282822158110721
[9] https://twitter.com/JackPosobiec/status/1519397817260904454?s=20&t=ukuMjyeX1tNIuHKa1DmtGw
[10] https://www.npr.org/2022/04/16/1093212502/women-face-disproportionate-attacks-online-one-expert-shares-some-of-the-details
[11] https://twitter.com/wiczipedia/status/1192897252328714240

Release Authorized by Senator Grassley and Senator Hawley

**Department of Homeland Security Response to**
**Senator Hawley's April 27, 2022 Letter**

## 1. How will this Disinformation Board function? And who exactly will it be monitoring?

For nearly 10 years, different agencies across DHS have worked to address disinformation that threatens our homeland security. The Department is deeply committed to doing all of its work in a way that protects Americans' freedom of speech, civil rights, civil liberties, and privacy. In fact, the Disinformation Governance Board is an internal working group that was established with the explicit goal of ensuring these protections are appropriately incorporated across DHS's disinformation-related work and that rigorous safeguards of Americans' fundamental rights are in place. The working group also seeks to coordinate the Department's engagements on this subject with other federal agencies and a diverse range of external stakeholders. The working group does not have any operational authority or capability.

The Department is focused on disinformation that threatens the security of the American people, including disinformation spread by foreign states such as Russia, China, and Iran, or other adversaries such as transnational criminal organizations and human smuggling organizations. Such malicious actors often spread disinformation to exploit vulnerable individuals and the American public, including during national emergencies.

DHS would be failing in its mission if it ignored disinformation that poses a threat to the homeland. To that end, Components seek to address disinformation related to their authorized missions. Some examples of that are as follows:

- U.S. Customs and Border Protection (CBP) counters disinformation that cartels and human smugglers spread to migrants to persuade them to cross our southwest border illegally. CBP's work includes its "Say No to the Coyote" campaign, making clear that entering the United States illegally is a crime.
- In 2012, during Hurricane Sandy, the Federal Emergency Management Agency (FEMA) corrected false information about the safety of drinking water and the location of shelters to protect and serve the hurricane's victims. FEMA has since built capacity to identify and respond to false information during major disaster responses, including Hurricanes Maria and Ida, during which FEMA provided critical information to protect disaster survivors from targeted scams. FEMA also ensures that disinformation campaigns do not prevent Americans from accessing federal aid during and after disasters.
- The Cybersecurity and Infrastructure Security Agency (CISA) works with private sector stakeholders to mitigate the risk of disinformation to U.S. critical infrastructure, work that has continued in light of Russia's invasion of Ukraine.

The working group is co-chaired by the DHS Office of Strategy, Policy, and Plans and Office of the General Counsel, and includes other DHS leaders from CISA, FEMA, CBP, the Office for Civil Rights and Civil Liberties, Office of Intelligence and Analysis, Science and Technology Directorate, and Privacy Office.

## 2. What analysis did DHS conduct, if any, to ensure that the Disinformation Board and its activities comport with the First Amendment?

The Department is deeply committed to doing all of its work in a way that protects Americans' freedom of speech, civil rights, civil liberties, and privacy. In fact, the Disinformation

Release Authorized by Senator Grassley and Senator Hawley

**Department of Homeland Security Response to**
**Senator Hawley's April 27, 2022 Letter**

Governance Board is an internal working group that was established with the explicit goal of ensuring these protections are appropriately incorporated across DHS's disinformation-related work and that rigorous safeguards of Americans' fundamental rights are in place.

It is co-chaired by the DHS Office of Strategy, Policy, and Plans and the Office of the General Counsel, and its membership includes departmental leaders from other DHS components, including those from the Office for Civil Rights and Civil Liberties and the Office of Privacy. The Office for Civil Rights and Civil Liberties and Privacy Officer were consulted prior to the establishment of the Board and through the development and publication of its charter.

Secretary Mayorkas will request that the bipartisan Homeland Security Advisory Council (HSAC) make recommendations for how the Department can most effectively and appropriately address disinformation that poses a threat to the homeland, while protecting free speech and other fundamental rights, and that HSAC Co-Chair Jamie Gorelick and HSAC Member Michael Chertoff lead this effort. Ms. Gorelick is a former U.S. Deputy Attorney General and Mr. Chertoff was Secretary of Homeland Security during President George W. Bush's Administration. At Secretary Mayorkas's request, DHS is exploring additional ways to enhance the public's trust in this important work.

**3. Why did DHS time its announcement of this governance board directly after Mr. Musk's acquisition of Twitter?**

The timing of the announcement was not related to any such external events. The Board's Charter was signed in February 2022.

**4. Who appointed Ms. Jankowicz to head the board as executive director? Were you aware of her history of partisan conduct prior to her appointment?**

Nina Jankowicz was chosen for her eminent qualifications and leadership in the field of online disinformation and malign foreign influence. She is a widely acknowledged expert on online disinformation who has testified multiple times before Congress as well as the UK and European Parliaments. From 2016-2017, under the auspices of the Fulbright program, Ms. Jankowicz served as an adviser to the Ukrainian Foreign Ministry. She worked closely with our Ukrainian allies to combat Russian disinformation meant to destabilize the Ukrainian government and jeopardize its international partnerships. Most recently, she was a Disinformation Fellow at the non-partisan Wilson Center.

**5. Has DHS conferred with any private social media company in the creation or operation of this board?**

The Board is an internal working group that does not have operational capacity. The creation of the Board was not discussed with any external entities prior to the public announcement.

..................................................
(Original Signature of Member)

117TH CONGRESS
2D SESSION

# H. R. __

To direct the Cybersecurity and Infrastructure Security Agency of the
Department of Homeland Security to identify, track, and share with
homeland security stakeholders and the public information regarding
misinformation, disinformation, and malinformation with national or
homeland security implications, and for other purposes.

───────────────────────

## IN THE HOUSE OF REPRESENTATIVES

Ms. CLARKE of New York introduced the following bill; which was referred to the Committee on
───────────────

───────────────────────

# A BILL

To direct the Cybersecurity and Infrastructure Security Agency of the
Department of Homeland Security to identify, track, and share with
homeland security stakeholders and the public information regarding
misinformation, disinformation, and malinformation with national or
homeland security implications, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States
of America in Congress assembled,*

### SECTION 1. SHORT TITLE.

This Act may be cited as the "Strengthening Resilience Against
Disinformation Act of 2022".

### SEC. 2. DEFINITIONS OF MDM IN THE HOMELAND SECURITY ACT OF 2002.

Section 2201 of the Homeland Security of 2002 (6 U.S.C. 652) is amended—

  (1) by redesignating paragraphs (4), (5), and (6) as paragraphs (7), (8), and (9), respectively; and

  (2) by inserting after paragraph (3) the following new paragraphs:

  "(4) DISINFORMATION.—The term 'disinformation' means false information that is deliberately created to mislead, harm, or manipulate a person, social group, organization, or country.

  "(5) MALINFORMATION.—The term 'malinformation' means information that is based on fact, but used out of context to mislead, harm, or manipulate.

  "(6) MISINFORMATION.—The term 'misinformation' means information that is false, but not created or shared with the intention of causing harm.".

### SEC. 3. RESPONSIBILITIES OF THE CISA DIRECTOR RELATING TO MISINFORMATION, DISINFORMATION, AND MALINFORMATION.

(a) IN GENERAL.—Subsection (c) of section 2202 of the Homeland Security Act of 2002 (6 U.S.C. 652) is amended—

  (1) in paragraph (13), by striking "and" after the semicolon;

  (2) by redesignating paragraph (14) as paragraph (15); and

  (3) by inserting after paragraph (13) the following new paragraph:

  "(14) carry out activities to identify, track, and share with homeland security stakeholders and the public information regarding misinformation, disinformation, and malinformation, including by carrying out sections 2209(c)(13) and 2220D; and".

(b) NATIONAL CYBERSECURITY AND COMMUNICATIONS INTEGRATION CENTER. Subsection (c) of section 2209 of the Homeland Security Act of 2002 (6 U.S.C. 659) is amended—

(1) in subparagraph (11), by striking "and" after the semicolon;

(2) in paragraph (12), by striking the period at the end and inserting "; and"; and

(3) by adding at the end the following new paragraph:

"(13) maintaining capabilities to identify, track, and share with homeland security stakeholders and the public information regarding misinformation, disinformation, and malinformation that, either individually or in the aggregate, is likely to result in demonstrable harm to the national security interests of the United States, including undermining public confidence in democratic institutions or election integrity, or to homeland security, economic security, civil liberties, public health, emergency response, or public safety, or any combination thereof, for the purpose of enhancing the collective response to such misinformation, disinformation, and malinformation, including strengthening national security and promoting strong media literacy and digital resilience, including by carrying out activities in section 2220D.".

### SEC. 4. RUMOR CONTROL PROGRAM OF THE DEPARTMENT OF HOMELAND SECURITY TO COUNTER MISINFORMATION, DISINFORMATION, AND MALINFORMATION.

(a) IN GENERAL.—Subtitle A of title XXII of the Homeland Security Act of 2002 (6 U.S.C. 651 et seq.) is amended by adding at the end the following new section:

### "SEC. 2220D. RUMOR CONTROL PROGRAM TO COUNTER MISINFORMATION, DISINFORMATION, AND MALINFORMATION.

"(a) ESTABLISHMENT.—There is within the center authorized pursuant to section 2209 a public-facing website, known as 'Rumor Control', to carry out sections 2202(c)(14) and 2209(c)(13).

"(b) FUNCTIONS.—In administering the Rumor Control website, the Director shall establish partnerships with relevant public and private sector stakeholders, including the following:

"(1) Technology companies that own or operate internet-enabled communications platforms commonly used to spread misinformation, disinformation, or malinformation.

"(2) Non-governmental and civil-society groups, including civil rights and civil liberties organizations, with relevant subject matter expertise or stakeholder relationships, to identify and respond to misinformation, disinformation, and malinformation, and ensure such response is designed to effectively reach and raise awareness among communities or demographics targeted by such content.

"(3) State, Local, Tribal, and territorial governmental agencies.

"(4) Relevant Federal agencies, including Sector Risk Management Agencies, as appropriate.

"(c) INFORMATION PROTECTIONS.—If in the course of carrying out this section personally identifiable information is received by the Agency, the Director shall ensure such information is protected from unauthorized use or disclosure in a manner consistent with the protection of personal information under the Cybersecurity and Information Sharing Act of 2015 (enacted as title I of division N of the Consolidated Appropriations Act, 2016 (Public Law 114–113)).".

(b) CLERICAL AMENDMENT.—The table of contents in section 1(b) of the Homeland Security Act of 2002 is amended by inserting after the item relating to section 2220C the following new item:

"Sec. 2220D. Rumor control program to counter misinformation, disinformation, and malinformation.".

### SEC. 5. REPORT.

Not later than 180 days after the date of the enactment of this Act, and not later than 60 days after each regularly-scheduled general election for Federal office, the Director of the Cybersecurity and Infrastructure Security Agency of the Department of Homeland Security shall submit to the Committee on Homeland Security of the House of Representatives and the Committee on Homeland Security and Governmental Affairs of the Senate a report describing actions taken by the Director in furtherance of sections 2202(c)(14), 2209(c)(13), and 2220D of the Homeland Security Act of 2002, as amended and added by this Act, including

Release Authorized by Senator Grassley and Senator Hawley

specific details regarding the Agency's activities pursuant to subsection (b)(2) of such section 2220D, for the four-year period preceding each such election.